# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

08 Civ. 4738 (WHP)
(Judge William H. Pauley III)

---

NESIM BAHAR, SIMON ELIAS,
JACQUELINE M. C. ELIAS, IZAK
SENBAHAR and SARAH SENBAHAR,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant

---

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR PRELIMINARY INJUNCTION

---

LEWIS S. WIENER, ESQ.
SUTHERLAND, ASBILL & BRENNAN
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2415
Tel: (202) 383-0140
Fax: (202) 637-3593
ATTORNEY FOR PLAINTIFF

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

I.     PRELIMINARY STATEMENT ............................................................................. 1

II.    STATEMENT OF FACTS ..................................................................................... 1

III.   ARGUMENT .......................................................................................................... 6

      A.     Plaintiffs are Likely to Succeed in Establishing that the Assessments are
             Invalid and Illegal. ................................................................................. 6

            1.    Plaintiffs are Not Barred by the Anti-Injunction Act ................ 6

            2.    Defendant had no Authority to Make the Assessments without
                First Issuing Notices of Deficiency ........................................... 7

            3.    Defendant has no Authority to Issue Notices of Deficiency or
                Make Assessments Until the Court of Federal Claims Proceeding
                is Resolved. ................................................................................. 8

            4.    Following the Resolution of the Court of Federal Claims
                Proceeding, Defendant must Conduct Partner Level Proceedings
                and Issue Notices of Deficiency to Plaintiffs Before Issuing
                Assessments. ............................................................................. 11

      B.     There Are Sufficiently Serious Questions Going To The Merits To Make
             Them Fair Ground For Litigation. ...................................................... 14

      C.     Balance of Hardships Favors Issuing the Injunction. ............................ 15

      D.     Plaintiffs Will Suffer Permanent and Irreparable Harm if a Preliminary
             Injunction is Not Issued. ...................................................................... 15

             Partnerships Affected by Defendant's Collection Efforts ..................... 16

IV.    CONCLUSION ..................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*AIM Int'l Trading, LLC v. Valucine SpA*, 188 F. Supp. 2d 384 (S.D.N.Y. 2002)...........................6

*Brenntag Int'l Chems., Inc. v. Norddeutsche Landesbank GZ*, 9 F. Supp. 2d 331
    (S.D.N.Y. 1998) ............................................................................................................6

*Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999).................................15

*Callaway v. Comm'r*, 231 F.3d 106 (2d Cir. 2000)....................................................................10

*Comm'r v. Sunnen*, 333 U.S. 591 (1948) ....................................................................................9

*GAF Corp. & Subs. v. Comm'r*, 114 T.C. 519 (2000) ...................................................................9

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) ..........................6, 15

*Kislev Partners, L.P. v. United States*, No. 1:07-CV-00625-MCW (Fed. Cl. filed
    Aug. 22, 2007) ...............................................................................................................4

*Maxwell v. Comm'r*, 87 T.C. 783 (1986) ..............................................................................9, 13

*Russian Recovery Fund Ltd. v. United States*, 81 Fed. Cl. 793 (2008)........................................10

## STATUTES

26 U.S.C. §§ 1 – 9833...........................................................................................................1, 6

26 U.S.C. § 6212 ....................................................................................................................14

26 U.S.C. § 6213(a) ........................................................................................................7, 8, 14

26 U.S.C. § 6221 ....................................................................................................................12

26 U.S.C. § 6225(b) ..................................................................................................................9

26 U.S.C. § 6226(f) .................................................................................................................12

26 U.S.C. § 6229(d) ...........................................................................................................7, 15

26 U.S.C. § 6229(g) ................................................................................................................11

26 U.S.C. § 6230(a)(2)(A)(i) .........................................................................................11, 12, 13

## REGULATIONS

26 C.F.R. § 301.6231(a)(3)-1(a) ................................................................................................8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NESIM BAHAR, SIMON ELIAS, JACQUELINE M. C. ELIAS, IZAK SENBAHAR and SARAH SENBAHAR, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) 08 Civ. 4738 (WHP) ) |
| UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) ) |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR PRELIMINARY INJUNCTION

Plaintiffs Nesim Bahar, Simon Elias, Jacqueline M. C. Elias, Izak Senbahar and Sarah Senbahar submit this memorandum of law in support of their complaint for a preliminary injunction.

### I.    PRELIMINARY STATEMENT

Plaintiffs seek a preliminary, and ultimately, a permanent injunction to prevent permanent and irreparable harm that would result from Defendant, acting through its agency the Internal Revenue Service (the "Service"), collecting on invalid and illegal assessments of tax liabilities for Plaintiffs' 2003 through 2005 tax years.

### II.    STATEMENT OF FACTS

Plaintiffs, through their wholly-owned limited liability companies, are partners within the meaning of Section 6231(a)(2) of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 - 9833, as amended (the "Code"), in Kislev Partners, L.P. ("Kislev"), a limited partnership organized under the laws of the State of Delaware.  (Compl. ¶¶ 10-12.) Kislev is treated as a partnership for federal income tax purposes.  (Compl. ¶ 10.)   In 2002, Kislev incurred a $140,636,109 loss on the conversion of euros into United States dollars. (Compl. ¶ 13.)

1

Code Section 704(d) provides that an individual partner's distributive share of a partnership loss shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership. Any excess loss is suspended until the partner claiming such loss has sufficient basis in its partnership interest to claim the loss. Because of this basis limitation, Plaintiffs deducted only a portion of Kislev's 2002 loss on their respective 2002 individual income tax returns. As the partnership generated income in later years, the partners' bases in their partnership interests increased, allowing them to claim portions of the suspended 2002 loss. For the taxable years 2002 through 2005, Plaintiffs claimed a portion of the 2002 Kislev loss as follows:

- In 2002, $6,551,884 of the $140,636,109 2002 loss was claimed on the partners' returns. Specifically, Plaintiff Senbahar reported $2,948,348 of the loss, Plaintiff Elias reported $2,948,348 of the loss, and Plaintiff Bahar reported $655,188 of the loss.

- In 2003, $41,654,091 of the $140,636,109 2002 loss was claimed on the partners' returns. Specifically, Plaintiff Senbahar reported $18,744,341 of the loss, Plaintiff Elias reported $18,744,341 of the loss, and Plaintiff Bahar reported $4,165,409 of the loss.

- In 2004, $8,124,889 of the $140,636,109 2002 loss was claimed on the partners' returns. Specifically, Plaintiff Senbahar reported $5,594,299 of the loss, Plaintiffs Elias reported $2,070,482 of the loss, and Plaintiff Bahar reported $460,108 of the loss.

- In 2004, $32,766,802 of the $140,636,109 2002 loss was claimed on the partners' returns. Plaintiff Senbahar reported $14,745,063 of the loss, Plaintiff Elias

2

reported $14,745,058 of the loss, and Plaintiff Bahar reported $3,276,681 of the loss.

The Service has audited both Kislev and Plaintiffs for the 2002 through 2005 taxable years. On March 28, 2007, the Service issued a notice of Final Partnership Administrative Adjustment (the "FPAA") for Kislev's 2002 taxable year. (Comp. Ex. A.) The Service has not issued notices of Final Partnership Administrative Adjustment for Kislev's 2003 through 2005 taxable years. *See* Senbahar Decl. ¶ 3 attached hereto. The 2002 FPAA disallowed losses reported on Kislev's Form 1065 filed for the taxable year ending December 31, 2002, including $6,551,884 of the $140,636,109 loss from the conversion of euros into United States dollars.[1] The Service did not issue Plaintiffs notices of deficiency disallowing any portion of the 2002 loss claimed on the Plaintiffs' 2002 through 2005 personal tax returns. *See* Senbahar Decl. ¶ 1, Elias Decl. ¶ 1, and Bahar Decl. ¶ 1 attached hereto.

Pursuant to Code Section 6213(a), the Service must issue a notice of deficiency prior to assessing a partner for any adjustments attributable to items affected by the outcome of a partnership level proceeding. While the Service issued the FPAA to Kislev for the 2002 taxable year, no notices of deficiency have been issued to Plaintiffs for any of the taxable years 2002

_____

[1] Because of the Code Section 704(d) limitation on losses, Kislev reported, on its 2002 tax return, Form 1065, a loss of $6,551,884 on Schedule K, line 7 and reported a deferred loss of $134,084,225 in Statement 5 to Schedule L, Line 13. The partnership reported a portion of the 2002 deferred loss on Lines 7 or 11 of the Schedules K attached to each year's Form 1065 as the partnership generated income, thereby increasing the partners' bases in their partnership interests. Kislev has now determined that, although there was no effect on its partners' tax reporting, the more appropriate manner for reporting the 2002 loss was to report the entire $140,636,109 loss on line 7 of the Schedule K attached to its 2002 Form 1065 and is proceeding to amend its filings to report the loss in this manner. This action will not affect the manner in which the partners reported their distributive share of the $140,636,109 loss in 2002 or the later years. For purposes of Plaintiffs' complaint, Plaintiffs are prepared to treat the FPAA as though it disallowed the entire $140,636,109 of loss.

through 2005. *See* Senbahar Decl. ¶ 1, Elias Decl. ¶ 1, and Bahar Decl. ¶ 1. Nonetheless, without following any of the procedures required by Code Section 6213, the Service assessed:

- Plaintiff Bahar
  o $2,306,305.07 for the tax year ending December 31, 2003 (Compl. Ex. B), and
  o $2,209,134.70 for the tax year ending December 31, 2005 (Compl. Ex. C);
- Plaintiffs Mr. and Mrs. Elias
  o $10,861,684.43 for the tax year ending December 31, 2003 (Compl. Ex. D), and
  o $9,709,026.74 for the tax year ending December 31, 2005 (Compl. Ex. E); and
- Plaintiffs Mr. and Mrs. Senbahar
  o $10,246,106.40 for the tax year ending December 31, 2003, (Compl. Ex. F)
  o $3,133,358.87 for the tax year ending December 31, 2004 (Compl. Ex. G), and
  o $12,319,361.25 for the tax year ending December 31, 2005 (Compl. Ex. H).

On August 22, 2007, Plaintiff Bahar, a notice partner in Kislev within the meaning of Code Section 6231(a)(8), filed a Complaint for Readjustment of Partnership Items Under Code Section 6226 in the United States Court of Federal Claims challenging the adjustments set forth in the FPAA for 2002. (Compl. ¶ 16.) In accordance with Code Section 6226(e), Mr. Bahar deposited with Defendant the conservatively determined amount by which his 2002 tax liability would be increased if the loss disallowance asserted in the FPAA for Kislev's 2002 tax year were upheld. None of the other Plaintiffs would have such an increase under those circumstances. This case, styled *Kislev Partners, L.P. v. United States*, No. 1:07-CV-00625-MCW, is pending

4

before the Court of Federal Claims.[2]  The invalid Assessments are based on the contention that

the Service need not (1) follow the procedures set forth in Code Section 6213, or (2) wait for the

outcome of the pending case, but can treat the case as though the Court had held in favor of the

Service or that the taxpayer had failed to file a petition in Court.  (Compl. ¶ 22.)

Despite Defendant's failure to comply with the express terms of Code Section 6213, and

specifically its failure to satisfy all conditions precedent required thereunder, Defendant has

begun to undertake collection activity with respect to the invalid Assessments.  Specifically, on

May 12, 2008, the Service sent a letter to Mr. Bahar stating that it intends to file a notice of

federal tax others lien and to levy on Mr. Bahar's assets.  (Compl. Ex. I.)  Similar collection

notices have been sent to Plaintiffs Senbahar and Elias, copies of which are attached hereto as

Exhibits 1 and 2.  Such collection activities will cause irreparable harm to Plaintiffs.  Plaintiffs

are real estate developers who currently have, through their partnerships, a number of large real

estate projects ongoing in the State of New York.  The completion of these projects is dependent

on significant financing currently in place with draws on such financing to be made in the future

as project milestones are met.  In the current lending market, the Service's collection efforts,

particularly the imposition of liens or the levying on Plaintiffs' assets, will permanently and

irreparably damage Plaintiffs' businesses.  The institutions that are providing the financing for

Plaintiffs' projects will have the right to terminate the financing if the Service is permitted to

proceed with collecting on the invalid Assessments.

---

[2] On May 16, 2008, Defendant filed a motion to dismiss the complaint on the grounds that Mr.
Bahar failed to satisfy the jurisdictional deposit requirement of Code Section 6226(e)(1).  The
plaintiff filed its response on June 16, 2008, and oral argument on the motion is scheduled for
July 17, 2008.  Proceedings in the Court of Federal Claims are on hold pending the outcome of
Defendant's motion to dismiss.

## III.    ARGUMENT

The Court must consider the following factors to determine whether to grant a preliminary injunction or temporary restraining order: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Brenntag Int'l Chemicals, Inc. v. Norddeutsche Landesbank GZ,* 9 F. Supp.2d 331, 341 (S.D.N.Y. 1998) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir. 1979)); *see also AIM Int'l Trading, LLC v. Valucine SpA,* 188 F. Supp.2d 384, 386 (S.D.N.Y. 2002) ("[t]he standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical"). These factors weigh heavily in Plaintiffs' favor and make it clear that the Court should grant Plaintiffs' request for a preliminary injunction.

### A.    Plaintiffs are Likely to Succeed in Establishing that the Assessments are Invalid and Illegal.

#### 1.    Plaintiffs are Not Barred by the Anti-Injunction Act.

As a fundamental issue, Plaintiffs are not precluded from seeking injunctive relief in this matter. Sections 7421(a) of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 - 9833, as amended (the "Code"), the Anti-Injunction Act, provides that "[e]xcept as provided in sections 6015(e), 6212(a) and (c), **6213(a),** 6225(b), 6246(b), 6330(e)(1), 6331(i), 6672(c), 6694(c), and 7426(a) and (b)(1), 7429(b), and 7436, no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." (Emphasis added). Code Section 7421(a) does not deny the Court jurisdiction in this case, which is grounded on Code Sections 6213(a) and 6230, which specifically allow injunctions of invalid assessments under Code Section 6213 in partnership situations.

6

2.    **Defendant had no Authority to Make the Assessments without First Issuing Notices of Deficiency.**

Plaintiffs are likely to succeed in establishing that the Assessments are invalid and illegal, as Defendant has no authority to assess and collect taxes against Plaintiffs without first issuing notices of deficiency to Plaintiffs for the 2003 through 2005 years, thereby allowing Plaintiffs to challenge in court the proposed adjustments. However, because the adjustments are the result of a disallowance of a partnership item currently in court, Defendant cannot issue a notice of deficiency until the partnership level proceeding addressing the treatment of the partnership item (the United States Court of Federal Claims proceeding) is completed. If successful, Defendant would then have a full year after the decision of the Court became final to pursue the taxes in question. 26 U.S.C. § 6229(d).

Furthermore, even if Defendant were ultimately successful in the action pending in the United States Court of Federal Claims, then under Code Section 6230 it could only assess Plaintiffs taxes after issuing notices of deficiency applying the resolution of that case to Plaintiffs based upon the effect of the decision on Plaintiffs' particular facts. Such notices would permit Plaintiffs to challenge the asserted deficiencies in court. Since none of this has transpired and Plaintiffs have not been afforded their procedural protections provided by the Code, the Assessments are invalid.

The law is clear. Code Section 6213(a) of Subchapter B of Chapter 63 provides that other than in jeopardy situations, "no assessment of a deficiency in respect to any tax imposed by subtitle A or B, chapter 41, 42, 43 or 44 and no levy proceeding in court for its collection shall be made, begun or prosecuted until such notice [of deficiency authorized in Code Section 6212] has been mailed to the taxpayer" and that "[n]otwithstanding the provisions of section 7421(a), the making of such assessment or the beginning of such proceeding or levy during the time such prohibition is in force may be enjoined by a proceeding in the proper court . . . ." Code Section

7

6230 provides that the deficiency procedures of Subchapter B, which includes Code Section 6213, are applicable to affected items requiring partner level determinations, such as in the instant situation.

Kislev recognized a loss in 2002 on the conversion of euros. The Assessments for the 2003 through 2005 taxable years are the result of the Service's disallowing this **partnership item**, the 2002 loss, and then applying prospectively that disallowance to the individual partner's 2003 through 2005 tax returns.

Code Section 6231(a)(3) defines a partnership item as, "with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent the regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level." The Treasury regulations promulgated under Code Section 6231(a)(3) provide that the partnership's aggregate, and each partner's share, of "items of income, gain, loss, deduction, or credit of the partnership are partnership items". 26 C.F.R. § 301.6231(a)(3)-1(a). The 2002 Kislev loss from the conversion of the euros is a partnership item and the Assessments result from an asserted deficiency attributable to a partnership item.

### 3. Defendant has no Authority to Issue Notices of Deficiency or Make Assessments Until the Court of Federal Claims Proceeding is Resolved.

The Service has no authority to issue notices of deficiency or assess partner level adjustments attributable to partnership items until completion of the partnership proceeding concerning those items. The partnership proceeding pending before the United States Court of Federal Claims is not yet resolved. The Service has based its assessments on its claimed right to treat the complaint filed with the Court of Federal Claims for the 2002 year of Kislev as though a decision had been rendered in its favor or as though no complaint had been filed and

consequently the partnership had defaulted on the FPAA. In other words, the Service is proceeding as though there had been a final determination in the United States Court of Federal Claims case, thereby allowing it to assess the individual partners for items affected by that decision ("affected items").

There is no statutory authority for the Service's position. Moreover, the Service's position conflicts with a fundamental principle in tax law: "Income taxes are levied on an annual basis. Each year is the origin of a new liability and of a separate cause of action." *Comm'r v. Sunnen*, 333 U.S. 591, 598 (1948). The Service cannot rely on an artificially created default on the FPAA in 2002 to create tax liability for the later years. Moreover, even if there had been a default, the Service could not assess without following the specific statutory procedures, and satisfying the conditions precedent, necessary for assessing taxes in the later years. Specifically, the Service has not issued notices of deficiency under Code Section 6213 or 6230 and indeed it cannot do so until the conclusion of the case pending in the United States Court of Federal Claims. *See, e.g., Maxwell v. Comm'r*, 87 T.C. 783 (1986) (barring the Service from assessing deficiencies attributable to a partnership item until after the close of the related partnership proceeding); *GAF Corp. & Subs. v. Comm'r*, 114 T.C. 519, 526 (2000) (determining that the Service's issuance of a notice of deficiency based on affected items was invalid where the related partnership-level proceedings were still ongoing). The Assessments are therefore invalid and the Service should be restrained from collection of the Assessments under Code Section 6225(b).

Courts have repeatedly told the Service that it cannot assess for partnership items in a particular year without a partnership determination in that year. In a recent case in the Court of Federal Claims, *Russian Recovery Fund Ltd. v. United States*, 81 Fed.Cl. 793 (2008), the court made it clear that assessments may only follow conclusion of the partnership proceeding:

> Upon conclusion of the partnership-level proceeding, the IRS may assess individual partners with tax attributable to their distributed share of the adjusted partnership items as a computational adjustment.

The court in *Russian Recovery Fund* cited a Second Circuit opinion, which came to the same conclusion:

> After the FPAA adjustments become final (i.e., after they go unchallenged for 150 days or are judicially resolved in a section 6226 proceeding), the IRS may assess partners with the tax which properly accounts for their distributive share of the adjusted partnership items, without notice, as a computational adjustment.

*Callaway v. Comm'r*, 231 F.3d 106, 109-110 (2d Cir. 2000).

The Service's position, that if a partnership challenges an FPAA in a refund jurisdiction (the United States Court of Federal Claims or a United States District Court) then the Service can ignore the challenge and proceed to assess and collect any deficiencies that might result in later years as if there had been no such proceeding, not only is unauthorized, but also leads to absurd results. For example, what if the Service believes a partnership overstated the basis of depreciable property in 2007 and it challenges the depreciation deduction in that year. It acknowledges that if the partnership challenge is in the United States Tax Court it can not proceed further. However, if the challenge is in a refund jurisdiction it claims the right to assess and collect any tax that it deems due in later years if its position as to basis were found to be correct. But how does it know how much to assess? What if the next year's return has not been filed? What if the depreciation affects future years? Can the Service assess on the basis of its guess as to resulting liabilities? Can it assess as each future year's return is filed? The answer to all of these is no . . . it must await the completion of the partnership's court proceeding just as it does in all other cases.

4.    **Following the Resolution of the Court of Federal Claims Proceeding, Defendant must Conduct Partner Level Proceedings and Issue Notices of Deficiency to Plaintiffs Before Issuing Assessments.**

Moreover, following the partnership proceeding in this case any decision resulting in a deficiency for the partners would require partner level determinations and therefore the deficiency procedures of Subchapter B would apply.  Section 6230(a)(1)(2)(A)(i) provides that Subchapter B of Chapter 63 of the Code "shall apply to any deficiency attributable to…affected items which require partner level determinations (other than penalties, additions to tax, and additional amounts that related to adjustments to partnership items) . . . ."  Code Section 6231(a)(5) states that an affected item is "any item to the extent such item is affected by a partnership item."  Thus, if the Service were successful in the pending partnership proceeding, the result of that would be to create "affected items" for Plaintiffs.  The invalid Assessments are the result of attempted adjustments of affected items without the benefit of a final partnership determination or a partner level determination.

The exception contained in the parenthetical in Section 6230(a)(2)(A)(i), "other than penalties, additions to tax, and additional amounts that related to adjustments to partnership items", does not apply to Plaintiffs' situation.  The parenthetical in Section 6230(a)(2)(A)(i) only permits Defendant to ignore the proper procedures when the deficiency is related to a computational adjustment of affected items that are *penalties, additions to tax, and additional amounts.*  Here Defendant is attempting to skip the proper procedures with respect to the asserted tax liabilities themselves, not just the asserted penalties and interest.  *See* 26 U.S.C. § 6229(g) (dealing with the period of limitation for *penalties* which states that the limitations of that section apply "in the case of any addition to tax or an additional amount imposed under subchapter A of chapter 68 which arises with respect to any tax imposed under Subtitle A in the same manner as

if such addition or additional amount were a tax imposed by subtitle A.") In other words, penalties, additions to tax, and additional amounts are **not** the tax liability itself.

Furthermore, as Defendant well knows, the applicability of any "penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item" is to be determined at the partnership level. 26 U.S.C. § 6221. *See also* 26 U.S.C. § 6226(f) (stating that the court in which a petition is filed has jurisdiction to determine not only the proper treatment of partnership items, but also "the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item".)

Thus in the case of the tax, penalties, additions to tax, or additional amounts Defendant may ignore the proper restrictions on assessment and collection only when the court having jurisdiction over the partnership items reaches its conclusion with respect to such items. Even then Defendant must follow the proper procedures unless further partner level determinations are unnecessary. It should be noted that the parenthetical language in Section 6230(a)(2)(A)(i) was added in 1987 to provide that the applicability of penalties for partnership items be determined at the partnership level proceeding, rather than at the partner level proceeding. In short, penalties imposed on partnership items are to be determined in the partnership proceeding.

It is clear that the proposed assessments are with respect to a partnership item and not to a non-partnership item of the individual Plaintiffs. It is therefore abundantly clear that the exception contained in the parenthetical language is not applicable to Plaintiffs' situation. First, Defendant is attempting to ignore the proper procedures and assess asserted tax liabilities, liabilities not excepted by the parenthetical. Second, Plaintiffs' are being assessed penalties because of adjustments to carryover losses, which are affected items (items affected by determinations as to partnership items) that cannot be assessed until completion of the

12

partnership proceeding and subsequent partner level proceeding. *See Maxwell v. Comm'r*, 87 T.C. 783 (1986) (holding that carryback losses are affected items).

As pointed out even the penalties being assessed are as a result of adjustments of affected items, not partnership items. The parenthetical language only applies to penalties for an amount "which relates to an adjustment to a *partnership item*". (Emphasis added). Thus, the parenthetical language in Section 6230(a)(2)(A)(i) only applies to penalties for partnership item adjustments, which are not at issue in Plaintiffs' 2003, 2004 and 2005 taxable years. The penalties being assessed against Plaintiffs in these years are for adjustments of affected items — Plaintiffs' carryover of the 2002 partnership loss to the 2003 through 2005 years. Finally, even if Defendant were permitted to assess Plaintiffs for penalties,[3] Defendant could not do so before the partnership level proceeding was resolved, resulting in a determination of the partnership item in question. The adjustment to the partnership item in question here, Kislev's 2002 loss, is under consideration by the Court of Federal Claims. Until that Court determines whether the loss should be disallowed, and thus whether there is an allowable adjustment to a partnership item, Defendant cannot base an assessment on a partner's later year return which might be affected by that determination.

For these reasons, the exception contained in the parenthetical in Section 6230(a)(2)(A)(i) does not apply. The general rule of Section 6230(a)(1)(2)(A)(i) governs, which states that Subchapter B of Chapter 63 of the Code applies to the Assessments and Defendant cannot avoid those restrictions.

---

[3] Plaintiffs do not believe, nor is anything contained herein intended to suggest a belief or concession, (1) that the penalties at issue in this matter are penalties attributable to an adjustment of a partnership item or (2) that a partner may be assessed for penalties attributable to partnership item adjustments without a partner level adjustment.

Assessments made without a final partnership determination or a partner level determination under the deficiency procedures of Subchapter B of Chapter 63 of the Code are not authorized under the Code or under any other statute or Treasury regulation. As previously pointed out, Code Section 6213(a) prohibits assessments, levies and collections (other than in jeopardy situations, which this is not) without following the deficiency procedures and states that such actions may be enjoined in the proper court. No notices of deficiency as described in Code Section 6212 have been issued to Plaintiffs. Senbahar Decl. ¶ 1, Elias Decl. ¶ 1, Bahar Decl. ¶ 1. Therefore, under Code Section 6213(a), the Assessments are invalid and the Service should be restrained from collecting on the Assessments.

The Service has violated both Code Sections 6213(a) and 6230 by assessing taxes before issuing either notices of deficiency under Code Section 6212 or notices of final partnership administrative adjustment for the 2003 through 2005 taxable years. The Service did not have authority to make these assessments and Plaintiffs are therefore likely to succeed in establishing that the Assessments are invalid and illegal.

**B.    There Are Sufficiently Serious Questions Going To The Merits To Make Them Fair Ground For Litigation.**

Even if this Court were unable to conclude that Plaintiffs are likely to succeed on the merits, there are at least sufficient serious questions regarding the merits of Defendant's position in making the Assessments to make the issue fair ground for litigation. The Service has not complied with the procedural requirements of Code Section 6213(a) and 6230, and there is no authority to support the Service's position that it may proceed with assessing Plaintiffs for the 2003 through 2005 tax years as though the United States Court of Claims had issued a decision in Defendant's favor.

14

C.    **Balance of Hardships Favors Issuing the Injunction.**

The balance of hardships Plaintiffs would endure absent an injunction warrants this Court's issuance of an injunction against Defendant. If there are sufficient questions regarding the merits and the balance of hardships tip in favor of the party making the request, the court should issue an injunction. As explained below, Plaintiffs will suffer permanent and irreparable harm if this Court does not enjoin the Service from collecting on the Assessments. Plaintiffs' business is dependent on significant financing that will be jeopardized if the Service is permitted to proceed with its collection efforts. Without this financing, Plaintiffs' real estate business cannot operate. By contrast, Defendant is not harmed by delaying its collection efforts until after the resolution of the partnership level proceeding as the law requires. As previously noted, the statute of limitations on Defendant's right to make assessments is suspended until one year following the completion of the partnership proceeding. 26 U.S.C. § 6229(d). Thus, if Defendant is successful in that proceeding, it may then assess and collect any tax liabilities owed by Plaintiffs.

D.    **Plaintiffs Will Suffer Permanent and Irreparable Harm if a Preliminary Injunction is Not Issued.**

A party seeking injunctive relief must show that he will be irreparably harmed if relief is not granted. *Jackson Dairy*, 596 F.2d at 72. Although, "irreparable harm" generally requires that type of injury for which monetary damages do not provide adequate relief, the Second Circuit has noted that irreparable harm is more accurately defined by those circumstances in which, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249-50 (2d Cir. 1999).

Plaintiffs are real estate developers who currently have, through various partnerships, a number of large real estate projects ongoing in the State of New York. (Compl. ¶ 28), Senbahar

15

Aff. ¶ 4, Elias Aff. ¶ 4, Bahar Aff. ¶ 4.  The partnerships include 205 East 45 LLC, Mark Hotel

Member LLC, Euro-American Lodging Corporation, Mark Hotel LLC, 1240 First Avenue LLC,

Oliver, LLC and 951 LLC.  These partnerships are the borrowers on loans that Plaintiffs Elias

and Senbahar have personally guaranteed.  Senbahar Decl. ¶¶ 4-6, Elias Decl. ¶¶ 3-4, Bahar

Decl. ¶ 3.  The aggregate amount of the financing exceeds $820 million.  Senbahar Decl. Exs. A-

U.  Plaintiffs' real estate projects are dependent on Plaintiffs' ability to draw on the financing

loan proceeds to fund the construction projects.  Senbahar Decl. ¶ 8, Elias Decl. ¶ 6, Bahar Decl.

¶ 4.  The relevant portions[4] of the loan documents concerning the respective events of default

and remedy provisions have been attached as exhibits to the declaration of Plaintiff Senbahar,

which is being filed contemporaneously herewith.

### Partnerships Affected by Defendant's Collection Efforts

#### 1.    205 East 45 LLC

Plaintiffs are partners in 205 East 45 LLC.  205 East 45 LLC entered into an Amended

and Restated Term Loan Agreement.  Senbahar Decl Ex. A.  These loans have been guaranteed

by Plaintiffs Elias and Senbahar.  Ex. B to Senbahar Decl.  Plaintiffs Senbahar and Elias

covenanted to maintain at least $5 million in liquid assets which are totally unencumbered and as

to which there are no restrictions.  Senbahar Decl. Ex. B ¶ 15(c).  Violation of this covenant is an

event of default.  Senbahar Decl. Ex. A § 11.1.6.  The amount of the Assessment for Plaintiffs

Elias and Senbahar is more than $46 million in tax, penalties and interest.  (Compl. Exs. D-F.)

The publication of a federal tax lien, or a levy on, the assets of Plaintiffs Senbahar and Elias to

satisfy this amount would reduce the unencumbered, unrestricted liquid assets of Plaintiffs

---

[4] Defendant is being provided with complete copies of these loan documents and has agreed  not
to disclose the documents to anyone other than government personnel (or independent expert
witnesses) while the parties negotiate a confidentiality agreement.  Complete copies of the loan
documents will also be provided to the Court if the Court so requests.

Senbahar and Elias below this liquidity threshold.  In fact, the effect of such a lien or levy would be that Plaintiffs Senbahar and Elias would have no unencumbered, unrestricted liquid assets. Decl. ¶ 7, Elias Decl. ¶ 5.  An event of default also occurs if an attachment or execution is levied against any substantial portion of the property of the guarantors which is not discharged or bonded within 30 days.  Senbahar Decl. Ex. A § 11.1.3.  Even if it were possible to satisfy the Assessment by furnishing a bond, it would be impossible to obtain such a bond in this case as this would require Plaintiffs Senbahar and Elias to put up a minimum of $46 million in unencumbered liquid assets.  Obtaining a bond would be tantamount to allowing the Service to levy on their assets.  Senbahar Decl. ¶ 10, Elias Decl. ¶ 8.  The loan documents provide the lender with several remedies upon the occurrence of an event of default, including the right to declare the indebtedness immediately due and payable and the right to cease making any further construction advances.  Senbahar Decl. Ex. A §§ 11.1.6, 11.3.1.

### 2.    Mark Hotel Member LLC

Plaintiffs are partners in Mark Hotel Member LLC.  Mark Hotel Member LLC, the sole owner of Mark Hotel LLC, entered into an Amended and Restated Mezzanine Loan Agreement. Senbahar Decl. Ex. K.  Plaintiffs Senbahar and Elias, as guarantors, covenanted to maintain at least $15 million in unencumbered, unrestricted liquid assets.  Senbahar Decl. Exs. L and M ¶ 13.  Among the items that can result in an event of default is a failure in the due observance or performance of this financial covenant.  Senbahar Decl. Ex. K § 10.01(9).  The Service's collection efforts, if allowed to proceed, would reduce the unencumbered, unrestricted liquid assets of Plaintiffs Elias and Senbahar below this $15 million threshold.  Senbahar Decl. ¶ 7, Elias Decl. ¶ 5.  The lender has the right, upon the occurrence of an event of default, to declare the balance of the loan immediately due and payable.  Senbahar Decl. Ex. K § 10.02.

3.    **Euro-American Lodging Corporation and Mark Hotel LLC**

Plaintiffs are partners in Euro-American Lodging Corporation and indirect partners (through Mark Hotel Member LLC) in Mark Hotel LLC. Euro-American Lodging Corporation entered into a Building Loan Mortgage and a Building Loan Agreement, which provide for a building loan, a project loan and a term loan Senbahar Decl. Exs. C-D. Mark Hotel LLC has also entered into a Leasehold Building Loan Mortgage and a Building Loan Agreement, which provide for a mortgage, a project loan, an acquisition loan, and a pre-development loan. Senbahar Decl. Exs. G-H. The terms of the loan documents for the Euro-American Lodging Corporation and the Mark Hotel LLC are substantially the same. As an inducement to the lenders to loan the funds, Plaintiffs Senbahar and Elias executed a Limited Guaranty of Payment and a Completion Costs Guaranty. Senbahar Decl. Exs. E, F, I and J. Section 2.01(h) of the Building Loan Mortgage provides that an event of default occurs if a final judgment for the payment of money in excess of $1 million is rendered against a guarantor and is not timely discharged or stayed. Senbahar Decl. Exs. D and G §§ 2.01(g), (h). The Service is seeking to levy on Plaintiffs assets to collect an asserted aggregate tax liability for Plaintiffs Elias and Senbahar of more than $46 million.

Plaintiffs Elias and Senbahar also covenanted to maintain at least $20 million in liquid assets (with respect to the Euro-American Lodging Corporation loans) and $10 million in liquid assets (with respect to the Mark Hotel LLC loans) which are totally unencumbered and as to which there are no restrictions. Senbahar Decl. Ex. E, F, I and J ¶ 13(b). Violation of these covenants constitutes an event of default. Senbahar Decl. Ex. D § 2.01(o), Ex. G § 2.01(n). The Service's collection activity, if permitted to continue, would reduce the unencumbered, unrestricted liquid assets of Plaintiffs Elias and Senbahar below these liquid asset thresholds. Senbahar Decl. ¶ 7, Elias Decl. ¶ 5. If there is an event of default, the lenders are not required to

18

make any advances provided for under the loan documents. Senbahar Decl. Exs. C and H § 4.02. The lenders may also declare the outstanding loan principal due and immediately payable. Senbahar Decl. Exs. D and G § 2.01.

### 4.    1240 First Avenue LLC

1240 First Avenue LLC entered into a Building Loan Agreement, a Project Loan Agreement and a Mezzanine Loan Agreement, which provide for a building loan, a mezzanine loan, and a project loan. (Senbahar Decl. Exs. N-P). The Project Loan Agreement incorporates the event of default provisions of the Building Loan Agreement. Senbahar Decl. Ex. O § 5(a). Plaintiffs Elias and Senbahar jointly and severally guaranteed the loans. Senbahar Decl. Exs. N and P at 17. Both the Building Loan Agreement and the Mezzanine Loan Agreement provide that there is an event of default if one or more judgments or decrees shall be entered against guarantor involving in the aggregate a liability in excess of $1 million and such judgment is not covered by insurance and has not been vacated, bonded or stayed within 30 days. Senbahar Decl. Exs. N and P § 10.1(a)(x). The Service is seeking to levy on the assets of Plaintiffs Elias and Senbahar to satisfy an asserted aggregate tax liability in excess of $46 million. (Compl. Exs. D-F.) Even if it were possible to satisfy the Assessment by furnishing a bond, it would be impossible to obtain such a bond in this case as this would require Plaintiffs Senbahar and Elias to put up a minimum of $46 million in unencumbered liquid assets. Obtaining a bond would be tantamount to allowing the Service to levy on their assets. Senbahar Decl. ¶ 10, Elias Decl. ¶ 8. Upon the occurrence of an event of default, the lenders' available remedies under the Building Loan Agreement and the Mezzanine Loan Agreement, and thus by incorporation also the Project Loan Agreement, include the ability to declare the loans immediately due and payable. Senbahar Decl. Exs. N and P § 10.1(b).

19

### 5.    Oliver, LLC and 951 LLC

Oliver, LLC and 951 LLC incurred a fee acquisition loan and a development rights loan with respect to a project being developed by these entities. The fee acquisition loan is secured by a Mortgage Assumption, Consolidation, Modification and Spreader Agreement dated as of October 12, 2007, which incorporates the terms of a Gap Mortgage, Assignment of Leases and Rents and Security Agreement. Senbahar Decl. Ex. Q § 5, Ex. R. The development rights loan is secured by a Mortgage, Assignment of Leases and Rents and Security Agreement. Senbahar Decl. Ex. T. Under both loans, there is an event of default if a final judgment for the payment of money in excess of $500,000 is rendered against a guarantor. Senbahar Decl. Exs. Q and R § 2.01(h). There is also an event of default if the unencumbered, unrestricted liquidity of the guarantors falls below $7.5 million. Senbahar Decl. Exs. R and T § 2.01(o). Plaintiffs Elias and Senbahar are guarantors of both loans. Senbahar Decl. Exs. R and T at p. 2, Ex. S § 1.01, Ex. U § 1(a). A publication of a federal tax lien or a levy on the assets of Plaintiffs Elias and Senbahar would reduce their unencumbered, unrestricted liquid assets below the $7.5 million threshold. The lenders' remedies, upon the occurrence of an event of default, include the right to declare the loan immediately due and payable. Senbahar Decl. Exs. Q and R § 2.01.

Plaintiffs rely on significant outstanding indebtedness in their real estate business. The loan documents discussed above represent more than $820 million in financing that is being used to finance ongoing developments. In order to induce the lenders to enter into the loan agreements, Plaintiffs have provided personal guaranties. If the Service were permitted to publish federal tax liens or levy on Plaintiffs' assets, Plaintiffs Elias and Senbahar would be in violation of financial covenants set forth in these guaranties. Other loan provisions discussed above would also be affected. The remedies available to the lenders under these loan documents upon the occurrence of an event of default include the right to cease funding advances and to

declare the loans immediately due and payable.  Without this financing, Plaintiffs could not proceed with their development projects and their real estate business could not operate.  Plaintiffs' business would be irreparably and permanently damaged.  Senbahar Decl. ¶ 9, Elias Decl. ¶ 7, Bahar Decl. ¶ 5.  Not only will there be no way to return Plaintiffs to the position that they presently hold, but monetary damages against the United States for the Service's invalid actions would be difficult if not impossible to obtain.  Thus, Plaintiffs will suffer permanent and irreparable harm if Defendant is permitted to proceed with its collection activity.

## IV.     CONCLUSION

For the reasons stated herein, Plaintiffs are entitled to an injunction.  Plaintiffs have established a likelihood of success on the merits.  Plaintiffs have also established sufficiently serious questions going to the merits to make them a fair ground for litigation and that the balance of hardships tips decidedly toward Plaintiffs.  In addition, Plaintiffs have shown that they would be permanently and irreparably harmed if an injunction were not granted.  For these reasons, Plaintiffs respectfully request that the Court issue an injunction against Defendant.

Respectfully submitted,

s/ Lewis S. Wiener
Lewis S. Wiener (LW1990)
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Ave., NW
Washington, DC 20004-2415
Tel: 202.383.0100
Fax: 202.637.3593

Attorney for Plaintiffs

Dated:  June 27, 2008

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Plaintiffs' Memorandum in

Support of Plaintiffs' Complaint for Preliminary Injunction has been made on June 27, 2008 via

the Court's CM/ECF system to:

> Pierre Armand
> Assistant United States Attorney
> Southern District of New York
> 86 Chambers Street, 3rd Floor
> New York, New York  10007
> Pierre.Armand@usdoj.gov

> s/ Lewis S. Wiener
> Lewis S. Wiener

# EXHIBIT 1

## TO MEMORANDUM IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR PRELIMINARY INJUNCTION

 **IRS** Department of the Treasury
Internal Revenue Service
HOLTSVILLE, NY  11742-9019



Notice Number: CP504

7103 9167 4406 0892 8382

IZAK SENBAHAR
2 E 88TH ST 10TH FLR
NEW YORK  NY   10128-0555021



*▬▬▬▬462101*

For account of IZAK & SARAH SENBAHAR

We wanted to ensure that you and your spouse receive this notice, so we've sent a copy to each of you. Each copy contains the same information related to your joint account. Any amount you owe or balance due shown should be paid only once. We will issue any refund shown only once.

This notice contains two pre-addressed coupons for your convenience. Please detach the appropriate coupon and return to us in the envelope provided. Please refer to the information below to determine the correct address:

To send **correspondence** regarding this account with **NO** payment

Use the coupon addressed to:

Internal Revenue Service
P.O. BOX 9019
HOLTSVILLE, NY  11742-9019

To send a **payment** or correspondence with a payment

Use the coupon addressed to:

Internal Revenue Service
CINCINNATI, OH  45999-0149

**IRS** Department of the Treasury
Internal Revenue Service
HOLTSVILLE, NY 11742-9019

Notice Number: CP 504
Notice Date: 05-26-2008

SSN/EIN: 0462
Caller ID: 782514

7103 9167 4406 0892 8351

IZAK SENBAHAR
2 E 88TH ST 10TH FLR
NEW YORK NY 10128-0555021

0462101*

## Urgent !!

### We intend to levy on certain assets. Please respond NOW.

(To avoid additional penalty and interest, pay the amount you owe within ten days from the date of this notice.)

Our records indicate that you haven't paid the amount you owe. The law requires that you pay your tax at the time you file your return. This is your notice, as required by Internal Revenue Code Section 6331(d), of our intent to levy (take) any state tax refunds that you may be entitled to if we don't receive your payment in full. In addition, we will begin to search for other assets we may levy. We can also file a Notice of Federal Tax Lien, if we haven't already done so. **To prevent collection action, please pay the current balance now.** If you've already paid, can't pay, or have arranged for an installment agreement, it is important that you **call us immediately** at the telephone number shown below. Current balance may include Civil Penalty, if assessed.

### Account Summary

| Form: 1040 | Tax Period: 12-31-2003 |
| --- | --- |

**Current Balance:** $10,766,761.71
Includes:
    Penalty:       $179,872.50
    Interest:      $340,782.81
    Last Payment:   $0.00

For information on your penalty & interest computations, you may call 1-800-829-8374

Questions? Call us at **1-800-829-8374**

See the enclosed Publication 594, *The IRS Collection Process*, and Notice 1219B, *Notice of Potential Third Party Contact,* for additional information.

Please mail this part with your payment, payable to United States Treasury.

Notice Number: CP 504
Notice Date: 05-26-2008

*write on your check:*

| 1040 | 12-31-2003 | 0462 |
| --- | --- | --- |

Find information about filing and paying taxes at: www.irs.gov
Enter Keyword: filing late (or) paying late

Amount Due:
$10,766,761.71

Internal Revenue Service
CINCINNATI, OH 45999-0149

IZAK SENBAHAR
2 E 88TH ST 10TH FLR
NEW YORK NY 10128-0555021

0462 ZU SENB 30 0 200312 670 01076676171



**IRS** Department of the Treasury
Internal Revenue Service
HOLTSVILLE, NY 11742-9019

Notice Number: CP504

7103 9167 4406 0892 8351

IZAK SENBAHAR
2 E 88TH ST 10TH FLR
NEW YORK NY 10128-0555021



*░░░░░6462101*

For account of IZAK & SARAH SENBAHAR

We wanted to ensure that you and your spouse receive this notice, so we've sent a copy to each of you. Each copy contains the same information related to your joint account. Any amount you owe or balance due shown should be paid only once. We will issue any refund shown only once.

This notice contains two pre-addressed coupons for your convenience. Please detach the appropriate coupon and return to us in the envelope provided. Please refer to the information below to determine the correct address:

| To send **correspondence** regarding this account with **NO** payment | To send a **payment** or correspondence with a payment |
|---|---|
| Use the coupon addressed to: | Use the coupon addressed to: |
| Internal Revenue Service<br>P.O. BOX 9019<br>HOLTSVILLE, NY 11742-9019 | Internal Revenue Service<br>CINCINNATI, OH 45999-0149 |

 **IRS** Department of the Treasury
Internal Revenue Service
HOLTSVILLE, NY 11742-9019

Notice Number: CP 504
Notice Date: 05-26-2008

**SSN/EIN:** ████-0462
**Caller ID:** 782514

7103 9167 4406 0892 8382

IZAK SENBAHAR
2 E 88TH ST 10TH FLR
NEW YORK NY 10128-0555021



*█████0462101*

## <u>Urgent !!</u>

### We intend to levy on certain assets.  Please respond NOW.

(To avoid additional penalty and interest, pay the amount you owe within ten days from the date of this notice.)

Our records indicate that you haven't paid the amount you owe.  The law requires that you pay your tax at the time you file your return.  This is your notice, as required by Internal Revenue Code Section 6331(d), of our intent to levy (take) any state tax refunds that you may be entitled to if we don't receive your payment in full.  In addition, we will begin to search for other assets we may levy.  We can also file a Notice of Federal Tax Lien, if we haven't already done so. **To prevent collection action, please pay the current balance now.**  If you've already paid, can't pay, or have arranged for an installment agreement, it is important that you **call us immediately** at the telephone number shown below.  Current balance may include Civil Penalty, if assessed.

### Account Summary

| Form: 1040 | Tax Period: 12-31-2004 |
|---|---|

**Current Balance:**   $3,296,944.79
Includes:
Penalty:          $59,371.23
Interest:         $104,214.69
Last Payment:         $0.00

For information on your penalty & interest computations, you may call 1-800-829-8374

✂ Questions?  Call us at **1-800-829-8374**

See the enclosed Publication 594, *The IRS Collection Process*, and Notice 1219B, *Notice of Potential Third Party Contact*, for additional information.

Please mail this part with your payment, payable to United States Treasury.

Notice Number: CP 504
Notice Date: **05-26-2008**

*write on your check:*

| 1040 | 12-31-2004 | ████0462 |
|---|---|---|

Find information about filing and paying taxes at: www.irs.gov
Enter Keyword: filing late (or) paying late

Amount Due:
**$3,296,944.79**

Internal Revenue Service
CINCINNATI, OH 45999-0149

٠٠٠٠٠٠٠٠٠٠٠٠٠٠٠٠٠٠٠٠٠٠٠

IZAK SENBAHAR
2 E 88TH ST 10TH FLR
NEW YORK NY 10128-0555021

████0462 ZU SENB 30 0 200412 670 00329694479

**IRS** Department of the Treasury
Internal Revenue Service
HOLTSVILLE, NY  11742-9019

000085  200512 SBR
Notice Number: CP 504
Notice Date: 05-26-2008
SSN/EIN: ████-0462
Caller ID: 782514

7103 9167 4406 0892 8412

IZAK SENBAHAR
2 E 88TH ST 10TH FLR
NEW YORK  NY  10128-0555021



*█████462101*

## Urgent !!

### We intend to levy on certain assets.  Please respond NOW.
**(To avoid additional penalty and interest, pay the amount you owe within ten days from the date of this notice.)**

Our records indicate that you haven't paid the amount you owe.  The law requires that you pay your tax at the time you file your return.  This is your notice, as required by Internal Revenue Code Section 6331(d), of our intent to levy (take) any state tax refunds that you may be entitled to if we don't receive your payment in full.  In addition, we will begin to search for other assets we may levy.  We can also file a Notice of Federal Tax Lien, if we haven't already done so.  **To prevent collection action, please pay the current balance now.**  If you've already paid, can't pay, or have arranged for an installment agreement, it is important that you **call us immediately** at the telephone number shown below.  Current balance may include Civil Penalty, if assessed.

### Account Summary

| Form: 1040 | Tax Period: 12-31-2005 |
|---|---|

**Current Balance:** $13,006,459.83
Includes:
Penalty:             $277,359.84
Interest:            $409,738.74
Last Payment:        $0.00

For information on your penalty & interest computations, you may call 1-800-829-8374

Questions?  Call us at **1-800-829-8374**
Please mail this part with your payment, payable to United States Treasury.

See the enclosed Publication 594, *The IRS Collection Process,* and Notice 1219B, *Notice of Potential Third Party Contact,* for additional information.

Notice Number: CP 504
Notice Date: 05-26-2008

write on your check:

| 1040 | 12-31-2005 | ████-0462 |
|---|---|---|

Find information about filing and paying taxes at: www.irs.gov
Enter Keyword: filing late (or) paying late

Amount Due:
$13,006,459.83

Internal Revenue Service
CINCINNATI, OH  45999-0149

||.||.|||.||.|||.||.|||.||.|||.||.|||.||.||

IZAK SENBAHAR
2 E 88TH ST 10TH FLR
NEW YORK  NY  10128-0555021

███0462 ZU SENB 30 0 200512 670 01300645983

 **IRS** Department of the Treasury
Internal Revenue Service
HOLTSVILLE, NY 11742-9019



7103 9167 4406 0892 8412

Notice Number: CP504

IZAK SENBAHAR
2 E 88TH ST 10TH FLR
NEW YORK NY 10128-0555021



*■■■■0462101*

For account of **IZAK & SARAH SENBAHAR**

We wanted to ensure that you and your spouse receive this notice, so we've sent a copy to each of you. Each copy contains the same information related to your joint account. Any amount you owe or balance due shown should be paid only once. We will issue any refund shown only once.

This notice contains two pre-addressed coupons for your convenience. Please detach the appropriate coupon and return to us in the envelope provided. Please refer to the information below to determine the correct address:

| To send **correspondence** regarding this account with **NO** payment | To send a **payment** or correspondence with a payment |
|---|---|
| Use the coupon addressed to: | Use the coupon addressed to: |
| Internal Revenue Service<br>P.O. BOX 9019<br>HOLTSVILLE, NY 11742-9019 | Internal Revenue Service<br>CINCINNATI, OH 45999-0149 |

# EXHIBIT 2

## TO MEMORANDUM IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR PRELIMINARY INJUNCTION



**IRS** Department of the Treasury
**Internal Revenue Service**
HOLTSVILLE, NY  11742-9019

Notice Number: **CP503**

SIMON ELIAS
%THOMAS A CULLINAN
999 PEACHTREE ST NE STE 2300
ATLANTA  GA   30309-4416758



*████9754101*

For account of **SIMON & JACQUELINE M C ELIAS**

We wanted to ensure that you and your spouse receive this notice, so we've sent a copy to each of you. Each copy contains the same information related to your joint account. Any amount you owe or balance due shown should be paid only once. We will issue any refund shown only once.

This notice contains two pre-addressed coupons for your convenience. Please detach the appropriate coupon and return to us in the envelope provided. Please refer to the information below to determine the correct address:

| | |
|---|---|
| To send **correspondence** regarding this account with **NO** payment | To send a **payment** or correspondence with a payment |
| Use the coupon addressed to: | Use the coupon addressed to: |
| Internal Revenue Service<br>P.O. BOX 9019<br>HOLTSVILLE, NY   11742-9019 | Internal Revenue Service<br>CINCINNATI, OH   45999-0149 |

 **IRS** Department of the Treasury
Internal Revenue Service
HOLTSVILLE, NY  11742-9019

Notice Number: CP 503
Notice Date:  06-02-2008
**SSN/EIN:** ████████-9754
**Caller ID:**

SIMON ELIAS
%THOMAS A CULLINAN
999 PEACHTREE ST NE STE 2300
ATLANTA  GA   30309-4416758



*█████9754101*

# IMPORTANT
### Immediate action is required.

We previously wrote to you about your unpaid account, but you haven't contacted us about it.  Penalties and interest on the unpaid balance are continuing to increase.  Please pay the amount you owe within ten days from the date of this notice.  If you can't pay now, call us at the number shown below.  You may be qualified for an installment agreement or payroll deduction agreement.  We want to help you resolve this bill.  However, if we don't hear from you, we will have no choice but to proceed with steps required to collect the amount you owe.
**If you already paid your balance in full or arranged for an installment agreement, please disregard this notice**.

### Account Summary

| Form: 1040 | Tax Period: 12-31-2005 |
|---|---|

**Current Balance:** $10,236,184.03
Includes:
Penalty:              $208,115.52
Interest:             $319,041.77
Last Payment:              $0.00

For information on your penalty & interest computations, you may call 1-800-829-8374

✂ Questions?  call us at **1-800-829-8374**
Please mail this part with your payment, payable to United States Treasury.

Notice Number: CP 503
Notice Date:  06-02-2008

*write on your check:*

| 1040 | 12-31-2005 | ████-9754 |
|---|---|---|

Find information about filing and paying taxes at: www.irs.gov
Enter Keyword: filing late (or) paying late

Amount Due:
$10,236,184.03

Internal Revenue Service
CINCINNATI, OH  45999-0149

SIMON ELIAS
%THOMAS A CULLINAN
999 PEACHTREE ST NE STE 2300
ATLANTA  GA   30309-4416758

IıılııIıılııIıılılıIıIıllııııIlıIılıIıııI

████9754 WW ELIA 30 0 200512 670 01023618403

**IRS** Department of the Treasury
**Internal Revenue Service**
HOLTSVILLE, NY 11742-9019

Notice Number: **CP503**

SIMON ELIAS
%THOMAS A CULLINAN
999 PEACHTREE ST NE STE 2300
ATLANTA  GA  30309-4416758



*████9754101*

This notice contains two pre-addressed coupons for your convenience. Please detach the appropriate coupon and return to us in the envelope provided. Please refer to the information below to determine the correct address:

| To send **correspondence** regarding this account with **NO** payment | To send a **payment** or correspondence with a payment |
|---|---|
| Use the coupon addressed to: | Use the coupon addressed to: |
| Internal Revenue Service<br>P.O. BOX 9019<br>HOLTSVILLE, NY  11742-9019 | Internal Revenue Service<br>CINCINNATI, OH  45999-0149 |

CAF COPY    000052    200312 SBM

 **IRS** Department of the Treasury
**Internal Revenue Service**
HOLTSVILLE, NY  11742-9019

Notice Number: CP 503
Notice Date:  06-02-2008

**SSN/EIN:**  ⬛⬛⬛-9754
**Caller ID:**

SIMON ELIAS
%THOMAS A CULLINAN
999 PEACHTREE ST NE STE 2300
ATLANTA  GA   30309-4416758



*⬛⬛⬛9754101*

# IMPORTANT
## Immediate action is required.

We previously wrote to you about your unpaid account, but you haven't contacted us about it. Penalties and interest on the unpaid balance are continuing to increase. Please pay the amount you owe within ten days from the date of this notice. If you can't pay now, call us at the number shown below. You may be qualified for an installment agreement or payroll deduction agreement. We want to help you resolve this bill. However, if we don't hear from you, we will have no choice but to proceed with steps required to collect the amount you owe. **If you already paid your balance in full or arranged for an installment agreement, please disregard this notice.**

### Account Summary

| Form: 1040 | Tax Period: 12-31-2003 |
|---|---|

**Current Balance:** $11,412,624.85
Includes:
Penalty:            $194,021.94
Interest:          $356,918.48
Last Payment:              $0.00

For information on your penalty & interest computations, you may call 1-800-829-8374

✂ Questions? call us at **1-800-829-8374**

Please mail this part with your payment, payable to United States Treasury.

Notice Number: CP 503
Notice Date: 06-02-2008

write on your check:

| 1040 | 12-31-2003 | ⬛⬛⬛-9754 |
|---|---|---|

Find information about filing and paying taxes at: www.irs.gov
Enter Keyword: filing late (or) paying late

Amount Due:
$11,412,624.85

Internal Revenue Service
CINCINNATI, OH  45999-0149

ıllıılıılıılıılıılıılıılıılıııllıılıllıılıılı

SIMON ELIAS
%THOMAS A CULLINAN
999 PEACHTREE ST NE STE 2300
ATLANTA  GA   30309-4416758

⬛⬛⬛9754 WW ELIA 30 0 200312 670 0114126248S

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NESIM BAHAR, SIMON ELIAS, JACQUELINE M. C. ELIAS, IZAK SENBAHAR and SARAH SENBAHAR, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 08 Civ. 4738 (WHP) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF IZAK SENBAHAR

I, Izak Senbahar, hereby affirm and attest that the following statements are true to the best of my knowledge and belief:

1.     I have not received notices of deficiency from the Internal Revenue Service for any of the tax years 2002 through 2005.

2.     I have been advised that none of the other plaintiffs in this case have received notices of deficiency from the Internal Revenue Service for any of the tax years 2002 through 2005.

3.     I am the tax matters partner for Kislev Partners, L.P.  I have not received a notice of final partnership administrative adjustment for the tax years 2003 through 2005.

4.     Attached to this Declaration are true and correct copies of the following documents, which were prepared, kept and maintained in the ordinary course of my real estate business:

      **Exhibit A.**     Default and remedy provisions of an Amended and Restated Term Loan Agreement dated as of September 22, 2005.

**Exhibit B.**  Covenant provisions of an Amended and Restated Guaranty dated September 22, 2005.

**Exhibit C.**  Conditions to funding provision of a Building Loan Agreement dated as of December 20, 2007.

**Exhibit D.**  Default and remedy provisions of a Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated December 20, 2007.

**Exhibit E.**  Covenant provisions of a Limited Guaranty of Payment dated December 20, 2007.

**Exhibit F.**  Covenant provisions of a Completion Costs Guaranty dated December 20, 2007.

**Exhibit G.**  Default and remedy provisions of a Leasehold Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated December 20, 2007.

**Exhibit H.**  Conditions to funding provision of a Building Loan Agreement dated as of December 20, 2007.

**Exhibit I.**  Covenant provisions of an Amended and Restated Guaranty of Payment dated December 20, 2007.

**Exhibit J.**  Covenant provisions of a Completion Costs Guaranty dated December 20, 2007

**Exhibit K.**  Default and remedy provisions of an Amended and Restated Mezzanine Loan Agreement dated December 2007.

**Exhibit L.**  Covenant provisions of an Amended and Restated Guaranty of Payment dated as of December 20, 2007.

**Exhibit M.**  Covenant provisions of a Completion Costs Guaranty dated December 20, 2007.

**Exhibit N.**  Default and remedy provisions of a Building Loan Agreement dated July 3, 2007.

**Exhibit O.**  Incorporation provision of a Project Loan Agreement dated July 3, 2007.

**Exhibit P.**  Default and remedy provisions of a Mezzanine Loan Agreement dated July 3, 2007.

**Exhibit Q.**  Incorporation provision of a Mortgage Assumption, Consolidation, Modification and Spreader Agreement dated October 12, 2007.

2

**Exhibit R.**    Default and remedy provisions of a Gap Mortgage, Assignment of Leases and Rents and Security Agreement dated October 12, 2007.

**Exhibit S.**    Definition provision of a Fee Acquisition Loan Agreement dated October 12, 2007.

**Exhibit T.**    Default and remedy provisions of a Mortgage, Assignment of Leases and Rents and Security Agreement dated April 29, 2008.

**Exhibit U.**    Definition provision of a Development Rights Acquisition Loan Agreement dated October 12, 2007.

5.    The loans listed above represent a portion of the outstanding financing that has been incurred with respect to the real estate business that I operate with Plaintiffs Simon Elias and Nesim Bahar.

6.    Plaintiff Simon Elias and I have provided personal guaranties with respect to the majority of the financing incurred in our real estate business, including the financing listed above. These guaranties included specific financial covenants.

7.    If the Internal Revenue Service were to levy on or publish a federal tax lien on my assets and Plaintiff Elias's assets, our combined unencumbered, unrestricted liquid assets would be less than $5 million. In fact, we would have no unencumbered, unrestricted liquid assets.

8.    I believe that such levies and/or liens would result in some or all of the above listed loans being accelerated or would result in no further advances under the loans. The continued vitality of these loans is critical to our development business and in particular to a number of projects which are currently under construction.

9.    If the above listed loans are impeded as a result of levies and/or liens by the Internal Revenue Service, the effect would be a substantial, material, deleterious harm to our development business, and that this harm would be permanent and irreparable.

10.    While some of our loan agreements permit us to avoid triggering events of default by putting up bonds within 30 days of an attachment or judgment being levied on our assets, it

3

would be impossible to obtain such a bond in this case as this would require us to put up a

minimum of $46 million in unencumbered liquid assets. The bonding process, remote and

tenuous at best, would be tantamount to a levy.

I declare, under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the

foregoing is true and correct to the best of my knowledge and belief.

Executed on June 26, 2008, in New York, New York.

IZAK SENBAHAR

# EXHIBIT A

## TO DECLARATION OF IZAK SENBAHAR

AMENDED AND RESTATED TERM LOAN AGREEMENT

DATED: AS OF SEPTEMBER 22, 2005

Between

205 EAST 45 LLC,
as "Borrower"

and

ANGLO IRISH BANK CORPORATION PLC,
as "Lender"

THE ALEX HOTEL
NEW YORK, NEW YORK

1.5    Guaranties and Indemnities.  As an inducement to Lender to make the Loan, Simon Elias and Izak Senbahar (hereinafter, jointly, severally and collectively called the "**Guarantor(s)**") have agreed to furnish certain guaranties and indemnities.

1.6    Loan.  Subject to all of the terms, conditions and provisions of this Agreement, and of the agreements and instruments referred to herein, Lender agrees to make the Loan and Borrower agrees to accept and repay the Loan.

2.    LOAN PROVISIONS.

2.1    Amount of Loan.

(a)    Initial Loan.  The Initial Loan shall be in the amount of Sixty Million Dollars ($60,000,000.00), as and when further provided in Section 6.1.1.

(b)    Earnout Loans.  The First Earnout Loan and the Second Earnout Loan shall each be in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000.00), in each case, as and when further provided in Section 6.1.2.

2.2    Term of Loan.  The Loan shall be for a term (hereinafter, the "**Term**") commencing on the date hereof and ending on September 22, 2015 (hereinafter, the "**Maturity Date**").

2.3    Interest Rate and Payment Terms.  The Loan shall be payable as to interest and principal in accordance with the provisions of the Note and any other note executed in connection with the Earnout Fundings.  The Note (and any other note executed in connection with the Earnout Fundings) also provides for interest at a Default Rate, Late Charges and prepayment rights and fees.

2.4    Loan Fees.   Borrower shall pay a loan fee in the amount of Two Hundred Sixty Thousand Dollars ($260,000.00) on or before the closing of the Loan.

2.5    Acceleration.  The Loan may be accelerated, at the option of Lender, following an Event of Default.  Upon such an acceleration, all principal, accrued interest and costs and expenses shall be due and payable together with interest on such principal at the Default Rate, any applicable Cost Maintenance Prepayment Fee and any other fees under the Loan Documents.

3.    SECURITY FOR THE LOAN; LOAN AND SECURITY DOCUMENTS.

3.1    Security.  The Loan together with interest thereon and all other charges and amounts payable by, and all other obligations of, Borrower to Lender, with respect to the Property, or under the Loan Documents, whenever incurred, direct or indirect, absolute or contingent, including, without limitation, the obligations of Borrower under the Interest Rate Protection Agreement (hereinafter, the "**Obligations**") shall be secured by the following security (hereinafter, the "**Security**") which Borrower agrees to provide and maintain, all in form and substance reasonably satisfactory to Lender:

liability for the payment of interest on and principal of the Loan, and for the performance of any of the terms and conditions contained in any of the Loan Documents, and shall have no liability thereunder, except each Guarantor shall be liable under the Guaranty, Environmental Indemnity or any other Loan Document, or certificate or opinion, signed by such Guarantor.

10.2.3  Additional Matters.  Nothing contained in these limited recourse provisions or elsewhere shall: (i) limit the right of Lender to obtain injunctive relief or to pursue equitable remedies under any of the Loan Documents, excluding only any injunctive relief ordering payment of obligations by any person or entity for which personal liability does not otherwise exist; or (ii) limit the liability of any attorney, law firm, architect, accountant or other professional who or which renders or provides any written opinion or certificate to Lender in connection with the Loan (even though such person or entity may be an agent or employee of Borrower or of an Exculpated Party.)

11.    EVENTS OF DEFAULT.  The following provisions deal with Default, Events of Default, notice, grace and cure periods, and certain rights of Lender following an Event of Default.

11.1    Default and Events of Default.  The term "**Default**" as used herein or in any of the other Loan Documents shall mean an Event of Default, or any fact or circumstance which constitutes, or upon the lapse of time, or giving of notice, or both, could constitute, an Event of Default. Each of the following events, unless cured within any applicable grace period set forth or referred to below in this Section 11.1, or in Section 11.2, shall constitute an "**Event of Default**":

11.1.1  Generally.  A default by Borrower in the performance of any term, provision or condition of this Agreement to be performed by Borrower, or a breach, or other failure to satisfy, any other term, provision, condition, covenant or warranty under this Agreement, and such default remains uncured beyond any applicable grace period set forth in Section 11.2 below;

11.1.2  Note, Mortgage and Other Loan Documents.  A default by Borrower in the performance of any term or provision of the Note, or of the Mortgage, or of any of the other Loan Documents, or a breach, or other failure to satisfy, any other term, provision, condition or warranty under the Note, the Mortgage or any other Loan Document, regardless of whether the then undisbursed portion of the Loan is sufficient to cover any payment of money required thereby, and such default remains uncured beyond the grace period set forth in Section 11.2 below;

11.1.3  Financial Status and Insolvency.  Borrower shall: (i) admit in writing its inability to pay its debts generally as they become due; (ii) file a petition in bankruptcy or a petition to take advantage of any insolvency act; (iii) make an assignment for the benefit of creditors; (iv) consent to, or acquiesce in, the appointment of a receiver, liquidator or trustee of itself or of the whole or any substantial part of its properties or assets; (v) file a petition or answer seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Federal Bankruptcy laws or any other applicable law; (vi) have a court of competent jurisdiction enter an order, judgment or decree appointing a receiver, liquidator or trustee of Borrower, or of the

23

whole or any substantial part of the property or assets of Borrower, and such order, judgment or decree shall remain unvacated or not set aside or unstayed for ninety (90) days; (vii) have a petition filed against it seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Federal Bankruptcy laws or any other applicable law and such petition shall remain undismissed for ninety (90) days; (viii) have, under the provisions of any other law for the relief or aid of debtors, any court of competent jurisdiction assume custody or control of Borrower or of the whole or any substantial part of its property or assets and such custody or control shall remain unterminated or unstayed for ninety (90) days; (ix) have an attachment or execution levied against any substantial portion of the property of Borrower or against any substantial portion of the Collateral which is not discharged or dissolved by a bond within thirty (30) days; or, any of the foregoing events shall occur with respect to any Guarantor; or any of the foregoing events shall occur with respect to the Hotel Manager (provided, however, that should Borrower provide Lender upon the occurrence of any of the foregoing events with respect to the Hotel Manager with a satisfactory replacement hotel manager, in Lender's sole but reasonable discretion, the occurrence of any of the foregoing events with respect to the Hotel Manager shall not constitute an Event of Default hereunder);

11.1.4 <u>Liens</u>. A lien for the performance of work, or the supply of materials, or a notice of contract, or an attachment, judgment, execution or levy is filed against the Land or the Improvements and remains unsatisfied or is not discharged or dissolved by a bond (or by cash collateral acceptable to Lender) for a period of sixty (60) days after notice of the filing thereof, unless Borrower is contesting same in accordance with Section 10.1 or same is otherwise insured over by the Title Company;

11.1.5 <u>Breach of Representation or Warranty</u>. Any material representation or warranty made by Borrower, the Hotel Manager, or either Guarantor herein or in any other instrument or document relating to the Loan, the Hotel Operating Documents, or the Property shall at the time made be materially false or misleading, or any warranty shall be materially breached;

11.1.6 <u>Guarantor Default</u>. A default by either Guarantor in the performance of any term or provision of this Agreement or any other Loan Document, to which such Guarantor is a party, including, without limitation, the Guaranty or any reaffirmation of Guaranty or additional guaranty executed in connection with the Earnout Funding, or the breach, or any other failure to satisfy any other term, provision, condition or warranty imposed upon either Guarantor in this Agreement or in any other Loan Document to which such Guarantor is a party or by which such Guarantor is bound, including, without limitation, the Guaranty or any reaffirmation of Guaranty or additional guaranty executed in connection with the Earnout Funding;

11.1.7 <u>Termination of Hotel Management Agreement</u>. The termination of the Hotel Management Agreement; <u>provided</u>, <u>however</u>, that should Borrower provide Lender upon the termination of the Hotel Management Agreement with a satisfactory replacement hotel manager and hotel management agreement, in Lender's sole but reasonable discretion, the termination of the Hotel Management Agreement shall not constitute an Event of Default hereunder;

property such curative action shall be commenced as promptly as possible. As to breaches of warranties and representations (other than those related to financial information or construction documents) there shall be a thirty (30) day grace period following notice from Lender.

11.3    Certain Lender Remedies. If an Event of Default shall occur, Lender:

11.3.1  Accelerate Debt. May declare the indebtedness evidenced by the Note and secured by the Mortgage immediately due and payable (provided that in the case of a voluntary petition in bankruptcy filed by Borrower (or after the expiration of the grace period, if any set, forth in Section 11.1.3 above an involuntary petition in bankruptcy filed against Borrower), such acceleration shall be automatic); and

11.3.2  Pursue Remedies. May pursue any and all remedies provided for hereunder, or under any one or more of the other Loan Documents.

11.3.3  Written Waivers. If a Default or an Event of Default is waived by Lender, in its sole discretion, pursuant to a specific written instrument executed by an authorized officer of Lender, the Default or Event of Default so waived shall be deemed to have never occurred.

12.    ADDITIONAL REMEDIES OF LENDER.

12.1    Remedies. Upon the occurrence and during the continuance of an Event of Default, whether or not the indebtedness evidenced by the Note and secured by the Mortgage shall be due and payable or Lender shall have instituted any foreclosure or other action for the enforcement of the Mortgage (or any other mortgage and security executed in connection with any Earnout Funding) or the Note (or any note executed in connection with any Earnout Funding), Lender may, in addition to any other remedies which Lender may have hereunder or under the other Loan Documents, and not in limitation thereof, and in Lender's sole and absolute discretion:

12.1.1  Enter and Perform. Enter upon the Property to perform obligations under leases, or to operate, maintain, repair and improve the Property and employ watchmen to protect the Property, all at the risk, cost and expense of Borrower, consent to such entry being hereby given by Borrower;

12.1.2  Discontinue Work. At any time discontinue any work commenced in respect of the Property or change any course of action undertaken by it and not be bound by any limitations or requirements of time whether set forth herein or otherwise;

12.1.3  Exercise Rights. Exercise the rights of Borrower under any contract or other agreement in any way relating to the Property and take over and use all or any part of the labor, materials, supplies and equipment contracted for by Borrower, whether or not previously incorporated into the realty; and

12.1.4  Other Actions. In connection with any work or action undertaken by Lender pursuant to the provisions of the Loan Documents,

IN WITNESS WHEREOF this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first written above.

BORROWER:                       205 EAST 45 LLC, a
                                New York limited liability company

                                By:    205 East 45 Corporation, its controlling
                                       manager

                                       By: _____
                                           Name: Izak Senbahar
                                           Title:   President

LENDER:                         ANGLO IRISH BANK CORPORATION, PLC

                                By: _____
                                    Name: Garrett Thelander
                                    Title: Senior Vice President

# EXHIBIT B

## TO DECLARATION OF IZAK SENBAHAR

## AMENDED AND RESTATED GUARANTY

This Amended And Restated Guaranty (hereinafter, the "**Guaranty**") is given pursuant to the terms and conditions of that certain Amended and Restated Loan Agreement dated as of even date (hereinafter, the "**Loan Agreement**") herewith by and between 205 EAST 45 LLC, a New York limited liability company having an address at 205 East 45th Street, New York, New York 10017 (hereinafter, the "**Borrower**") and ANGLO IRISH BANK CORPORATION PLC, a banking corporation organized under the laws of the Republic of Ireland having its principle place of business at 18/21 St. Stephen's Green, Dublin 2, Ireland and an address at 222 East 41st Street, New York, New York (hereinafter, the "**Lender**"). *Capitalized terms used herein and not otherwise specifically defined shall have the same meaning herein as in the Loan Agreement.*

FOR VALUE RECEIVED, and to induce Lender to extend credit to Borrower as provided for in the Loan Agreement and the other Loan Documents, SIMON ELIAS, an individual having an address c/o Gamma Holdings, Ltd., 135 West 52nd Street, New York, New York 10019, and IZAK SENBAHAR, an individual having an address at c/o Alexico Management Group, Inc., 150 East 58th Street, New York, New York 10155 (hereinafter, jointly, severally and collectively referred to as the "**Guarantor**"), hereby unconditionally agree as follows:

1.     Guaranty. Guarantor, as a primary party and not merely as a surety, jointly and severally, unconditionally and irrevocably guarantees to Lender the following obligations (hereinafter, the "**Guaranteed Obligations**"):

    a.     Guaranteed Principal Amount. The prompt and full payment (and not merely the collectibility) of the Guaranteed Principal Amount (hereinafter, the "**Principal Guaranty**"). As used herein, the "**Guaranteed Principal Amount**" means the amount by which (i) the outstanding principal balance of the Loan after the occurrence of an Event of Default and acceleration of the Loan exceeds (ii) sixty five percent (65%) of the Value of the Property, as set forth in an Updated Appraisal, as same may be adjusted pursuant to Section 9.18.2 of the Loan Agreement by an Alternate Appraisal. For purposes of determining the Guaranteed Principal Amount, the Lender shall, at its option, utilize either (X) the most current Updated Appraisal obtained pursuant to the terms and provisions of the Loan Agreement, or (Y) an Updated Appraisal ordered subsequent to the occurrence of an Event of Default and acceleration of the Loan.

    If the Earnout Termination Date occurs, the Guarantor's obligations with respect to the Principal Guaranty shall terminate upon satisfaction of the following conditions (the "**Principal Guaranty Termination Conditions**"):

    (i)     The Lender shall be provided with prior written notice from the Borrower or the Guarantor that the guaranty termination condition for the Payment Guaranty has been satisfied;

    (ii)     No monetary Default or Event of Default shall be occurring under the Loan; and

908181.5

of New York has a substantial relationship to the parties and to the underlying transactions embodied by the Loan Documents.

13.  Consent to Jurisdiction.  Guarantor hereby irrevocably submits to the nonexclusive personal jurisdiction of any New York State Court or any Federal Court sitting in New York over any suit, action or proceeding arising out of or relating to this Guaranty.

14.  Financial Statements and Reports.  Each Guarantor shall furnish or cause to be furnished to Lender from time to time the following financial statements and reports and other information:

   a.  As to each Guarantor, within one hundred and twenty (120) days after the end of each fiscal year, statements of net worth as of December 31st of the year just ended certified by each Guarantor, respectively, to be true, accurate and complete, all in such form and scope as previously submitted to Lender in connection with the closing of the Initial Loan;

   b.  Within sixty (60) days of the filing thereof, copies as signed of all Federal and state income tax returns;

   c.  As to each Guarantor such other financial information as Lender may reasonably require from time to time.

15.  Additional Covenants of the Guarantors.

   a.  General.  Guarantor shall pay, perform, observe and comply with all of the obligations, terms, covenants and conditions set forth in this Guaranty, the Environmental Indemnity, and the other Loan Documents to which Guarantor is a party.

   b.  Net Worth.  Guarantor covenants and agrees that for so long as the Loan or any portion thereof remains unpaid, Guarantor shall maintain a minimum combined net worth in the aggregate of not less than $50,000,000.00, net of all contingent liabilities.  Guarantor's net worth shall be established from time to time by: (i) the market value of liquid assets and marketable securities traded on a recognized exchange, and (ii) by estimates of fair market value made in good faith by Guarantor as to all other assets, as evidenced by Guarantor's most recent personal financial statements provided in accordance with the provisions of this Guaranty. Lender may dispute any estimates of fair market value made by Guarantor and, if such disputes are not resolved by Lender and Guarantor within thirty (30) days, Lender may have the value of the assets in question appraised in any manner reasonably determined by Lender, at Borrower's cost, and the results of such appraisal shall govern.

c.      Liquid Assets.  Guarantor, on a combined basis, shall at all times maintain liquid assets in the aggregate which are totally unencumbered (whether in favor of Lender or anyone else) and as to which there are no restrictions upon use thereof imposed by any agreement to which Guarantor or any of its property may be bound, of not less than $5,000,000.00 (consisting of cash or cash equivalents or obligations of, or guaranteed by, the United States of America, having a maturity of not more than one (1) year).

d.      Certificate of Compliance.  Within one hundred and twenty (120) days after the end of each fiscal year, Guarantor shall deliver to Lender Guarantor's personally signed statement certifying that the net worth covenant set forth in Section 15.b above and the unencumbered and unrestricted cash or cash equivalents covenant set forth in Section 15.c above are satisfied or, if not satisfied in any manner, setting forth Guarantor's actual minimum net worth and actual unrestricted and unencumbered cash or cash equivalents as of the period just ended.

e.      Prior to the occurrence and during the continuance of an Event of Default, the Net Worth and Liquid Assets covenants set forth in this Section 15 shall be tested no more frequently than annually.

16.   Subordination.

a.      Except as may be otherwise specifically provided for in the Loan Documents, any indebtedness (in the nature of borrowed money) of Borrower to Guarantor, or to any affiliated entity, with respect to the Property or otherwise now or hereafter existing together with any interest thereon shall be, and such indebtedness is, hereby deferred, postponed and subordinated to the prior, full satisfaction of all obligations of Borrower to the Lender.

b.      Except as may be otherwise specifically provided for in the Loan Documents with respect to Permitted Distributions, at all times until the full satisfaction of the Obligations (excluding only the Additional Interest) of Borrower to Lender with respect to the Loan (and including interest accruing on the Note after the commencement of a case by or against Borrower under the Bankruptcy Code now or hereafter in effect, which interest the parties agree shall remain a claim that is prior and superior to any claim of Guarantor or any affiliated entity notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code, as now or hereafter in effect, generally), Guarantor, and each affiliated entity, agrees not to accept any payment or satisfaction for any kind of indebtedness (in the nature of borrowed money) of Borrower to Guarantor, or any affiliated entity, and hereby assigns such indebtedness to Lender including, but not limited to, the right to file proofs of claim and to vote thereon in connection with any such case under the Bankruptcy Code, as now or hereafter in effect, and the right to vote on any plan of reorganization.

Witness the execution and delivery hereof as an instrument under seal as of the 22ND day of August, 2005.
SEPT.

GUARANTORS:

_____
Witness

_____
Witness

By: _____
Simon Elias, individually

By: _____
Izak Senbahar, individually

# EXHIBIT C

## TO DECLARATION OF IZAK SENBAHAR

BUILDING LOAN AGREEMENT

dated as of December 20, 2007

among

EURO-AMERICAN LODGING CORPORATION,
as Borrower,

and

ANGLO IRISH BANK CORPORATION PLC,
as Lender and Administrative Agent

LOCATION OF PREMISES:

Section 4, Block 1005, Lot 13
135 West 52nd Street
New York, New York

1046011.8

"Completion Date" -- June 30, 2009, as such date may be extended by Force Majeure, not to exceed six (6) months in the aggregate.

"Construction Consultant" – a construction consultant designated by Administrative Agent.

"Construction Manager" -- a construction manager or general contractor designated by the Borrower, subject to the reasonable approval of the Administrative Agent.

"Guarantor" -- Jointly and severally, Simon Elias, an individual, and Izak Senbahar, an individual and any other Person(s) who may hereafter become a guarantor of any or all of Borrower's obligations in respect of the Loan.

"Improvements" – The 291-room hotel located at 135 West 52nd Street, New York, New York, including approximately 50,000 square feet of office space.

"Loan Amount" -- $55,106,659.10.

"Maturity Date" – December 20, 2010, as may be extended pursuant to Section 9.01.

"Offsite Stored Material Amount" -- $1,000,000.

"Stored Material Amount" -- $2,000,000.

"Subcontract Amount" -- $200,000.

Section 1.02. Definitions.  The following terms, as used herein, shall have the following meanings:

"Additional Costs" -- Any costs, losses or expenses actually incurred by any Lender which it reasonably determines are attributable to its making or maintaining its Pro Rata Share of the Loan, or any reduction in any amount receivable by any Lender under the Loan or its Note.

"Administrative Agent's Office" -- Administrative Agent's Office as set forth on the signature page of this Agreement, or such other address in the United States as Administrative Agent may designate by notice to Borrower and Lenders.

"Affected Lender" -- Has the meaning specified in Section 3.05.

"Allowance Trade Contract" – Has the meaning specified in Section 8.01.

"Allowances" – Has the meaning specified in Section 8.01.

"Applicable Lending Office" -- For each Lender and for the portions of the outstanding principal balance under its Note bearing interest at the LIBO Based Rate, the lending office of such Lender (or of an affiliate of such Lender) designated as such on the signature page hereof or in the applicable Assignment and Assumption Agreement, or such other office of such Lender (or of an affiliate of

Section 4062(e) of ERISA with respect to a Pension Plan; (j) the making of any amendment to any Pension Plan which could result in the imposition of a lien or the posting of a bond or other security; and (k) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to Borrower, Guarantor of their ERISA Affiliates.

"Event of Default" -- Has the meaning given to such term in the Mortgage.

"Federal Funds Rate" -- For any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions as published by the Federal Reserve Bank of New York for such day, provided that (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the immediately preceding Business Day as so published on the next succeeding Business Day and (ii) if no such rate is so published for any day, the Federal Funds Rate for such day shall be the average of the rates quoted by three (3) Federal Funds brokers to Administrative Agent on such day on such transactions.

"Financial Statements" -- Statements of the assets, liabilities (direct or contingent), income, expenses and cash flow of Borrower and Guarantor, prepared in accordance with sound accounting principles consistently applied and for the Guarantor in substantially the same form (and notwithstanding the foregoing in substantially the same scope) as previously submitted to Administrative Agent subject to Administrative Agent's right to reasonably request additional information from Guarantor.

"Force Majeure" -- Any delay caused by any condition beyond the reasonable control of Borrower, such as an act of God, fire or other casualty, any unanticipated governmental restriction, regulation, control or other delay caused by Governmental Authorities unrelated to any act or failure to act by Borrower, any strike, lockout or other shortage or general unavailability of labor, utilities, or materials, a military invasion by an enemy of the United States, a civil riot, act of terrorism, materially adverse weather conditions, and contractor bankruptcy or any other similar event reasonably determined by Lender not to be within the reasonable control of Borrower (not including the insolvency or financial condition of Borrower or any member or partner of Borrower or any other affiliate of Borrower).

"Governmental Authorities" -- The United States, the State of New York and any political subdivision, agency, department, commission, board, bureau or instrumentality of either of them, including any local authorities, which exercises jurisdiction over Borrower, Guarantor, the Premises or the Improvements.

"Guaranty" or "Guaranties" – The guaranties of payment and performance of all or part of the Borrower's obligations to be executed by the Guarantor.

6

(24)    Pre-Development Budget.  The approval of a so called pre-development budget (the "Predevelopment Budget") which shall be a determination by the Borrower and the Administrative Agent as to which costs of completion of the Improvements as shown on the Project Cost Statement and which costs as shown on the budget annexed to the Project Loan Agreement shall be available for funding prior to the Borrower satisfaction of the conditions set forth in Section 4.03.  The Predevelopment Budget will not include any development or similar fees payable to the Borrower or any affiliate thereof;

(25)    Material Adverse Change.  The absence of any material adverse change (i) in the business condition (financial or otherwise), operations, properties or prospects of the Borrower or the Guarantor since the date of their respective financial statements most recently delivered to the Administrative Agent, and the Property, or (ii) the absence of any material adverse change in loan syndication or financial or capital market conditions generally; and

(26)    Other Loans.  The closing of the Other Loans.

Section 4.02.  Conditions Precedent to Advances for Predevelopment Budget. Lenders shall not be obligated to make advances for any portion of the Predevelopment Budget until the following conditions shall have been satisfied, in addition to the conditions set forth in Section 4.01:

(a)    There shall exist no Default or Event of Default, and no Default or Event of Default would result from the making of the advance;

(b)    The representations and warranties made to Administrative Agent and/or Lenders herein, in the other Loan Documents and in any other document, certificate or statement executed or delivered to Administrative Agent and/or Lenders in connection with the Loan (including, without limitation, the Requisition) shall be true and correct in all material respects on and as of the date of each advance with the same effect as if made on such date;

(c)    Administrative Agent shall have received a written continuation report of or endorsement to the title policy insuring the Mortgage to the date of such advance, in the form approved by Lenders' Counsel, conforming to the pending disbursement requirements set forth in EXHIBIT D and setting forth no additional exceptions (including survey exceptions) except those approved by Lenders' Counsel;

(d)    Administrative Agent and the Construction Consultant shall have received a Requisition for the advance, together with such other documentation and information as either of them may reasonably require consistent with the provisions hereof;

33

(e)     Administrative Agent shall have received proof reasonably satisfactory to Administrative Agent that at least Fifty (50)% of the amounts being requisitioned shall have been paid by Borrower, such amounts having been paid by Borrower being a portion of the Borrower's Pro-Rata Equity Amount; and

(f)     The aggregate funding hereunder and under the Project Loan Agreement for costs included within the Predevelopment Budget shall not exceed Five Million ($5,000,000.00) Dollars.

Section 4.03.  <u>Conditions Precedent to Advances after Predevelopment Budget</u>. Lenders shall not be obligated to make advances for amounts in excess of the Predevelopment Budget until the following conditions shall have been satisfied in addition to the conditions set forth in Section 4.01; provided, however, it shall be deemed to be an Event of Default under the Loan if the conditions set forth in this Section 4.03 are not met to the satisfaction of the Administrative Agent or waived by the Administrative Agent on or before December 1, 2008:

(a)     There shall exist no Default or Event of Default;

(b)     The representations and warranties made to Administrative Agent or Lenders herein, in the other Loan Documents and in any other document, certificate or statement executed or delivered to Administrative Agent or Lenders in connection with the Loan shall be true and correct in all material respects;

(c)     The Improvements, if any, shall not have been materially injured or damaged by fire or other casualty unless Administrative Agent shall have received, for the account of Lenders, insurance proceeds sufficient in the judgment of the Construction Consultant to effect the satisfactory restoration of the Improvements and to permit completion of the Improvements prior to the Completion Date;

(d)     Administrative Agent and the Construction Consultant shall have received and approved all material and information reasonably requested by the Administrative Agent and customary for this of construction loan with respect to the design and renovation of the Improvements;

(e)     Without limiting the generality of subsection (d) above, Administrative Agent shall have received and approved each of the following:

(1)     <u>Permits and Approvals</u>.  Copies of any and all authorizations (including plot plan and subdivision approvals, zoning variances, water, sewer, building and other permits) required at the then current stage of construction by Governmental Authorities or otherwise necessary for the renovation and construction, use, occupancy and operation of the Premises and/or Improvements for the purposes contemplated by the Plans in accordance with all applicable Laws;

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the day and year first above written, the execution hereof by Borrower constituting a certification by Borrower that the representations and warranties made in Article V are true and correct as of the date hereof and that the party executing on behalf of Borrower duly holds and is incumbent in the position indicated under his or her name and that each Requisition shall constitute the affirmation of Borrower that at the time thereof said representations and warranties are true and correct.

EURO-AMERICAN LODGING
CORPORATION

By: _____
Name: SIMON ELIAS
Title: PRESIDENT


Address for notices:

c/o Gama Holdings Ltd.
150 East 58th Street
New York, New York 10155
Attention: Simon Elias

ANGLO IRISH BANK CORPORATION
(as Lender and Administrative Agent)

By _____

Name:

Title:

Kieran Dowling - Director          Nicholas Lyons - Associate Director

Address for notices and Applicable Lending
Office:

Anglo Irish Bank Corporation plc
18/21 St. Stephen's Green
Dublin 2, Ireland
Attention:      Owen O'Neill, Director

With a copy to:

Anglo Irish New York Corporation
222 East 41st Street
New York, New York 10017
Attention:      Mr. Simon Seguss
Telephone:      (212) 503-2643
Telecopy:       (212) 503-3033

# EXHIBIT D

## TO DECLARATION OF IZAK SENBAHAR

If Premises located in
State of New York:

SECTION     4
BLOCK       1005
LOTS        13
Premises:   135 West 52nd Street, New York, New York

December 20, 2007

## BUILDING LOAN MORTGAGE, ASSIGNMENT OF
## LEASES AND RENTS AND SECURITY AGREEMENT
("this Mortgage")

FROM

EURO-AMERICAN LODGING CORPORATION,
a corporation organized and existing under the laws of Delaware

("Mortgagor")

Address and Chief
Executive Office of Mortgagor:   c/o Gama Holdings Ltd.
                                 150 East 58th Street
                                 New York, New York 10155

TO

ANGLO IRISH BANK CORPORATION PLC

as Administrative Agent for Lenders (as hereinafter defined)
(together with its successors in such capacity, "Mortgagee")

Address of Mortgagee:           c/o Anglo Irish New York Corporation
                                222 East 41st Street
                                New York, New York 10017

Mortgage Amount:  $55,106,659.10

This instrument prepared by, and after recording please return to:
Riemer & Braunstein LLP
7 Times Square Tower, Suite 2506
New York, New York 10036
Attention:  Steven J. Weinstein, Esq.

Block 1005
Lot 13
135 West 52nd Street
New York, NY

1047884.5

THE AMOUNT OF THIS MORTGAGE IS $55,106,659.10.

RECITAL

Mortgagor is the owner of the premises described in SCHEDULE A and the improvements located thereon and proposes to renovate said improvements. In order to finance the renovation thereof, Mortgagor will borrow the Mortgage Amount from Lenders pursuant to the Loan Agreement identified below. Mortgagor has executed and delivered its note(s), dated the date hereof, obligating Mortgagor to pay, in the aggregate, the Mortgage Amount, or so much thereof as may be advanced from time to time in accordance with the terms of the Loan Agreement. Said note(s), as the same may hereafter be amended, modified, extended, severed, assigned, renewed, replaced or restated, and including any substitute or replacement notes executed pursuant to the Loan Agreement, are hereinafter collectively referred to as the "Note". In the event that all or any part of the Premises is located in the State of New York, then, notwithstanding the language in the Granting Clause and Section 1.10 or anything else contained herein to the contrary, the maximum amount secured hereby at execution or which under any contingency may become secured hereby at any time hereafter is the Mortgage Amount and all interest, additional interest and late payment and prepayment charges in respect thereof, plus all amounts expended by Lenders or Mortgagee following a default hereunder in respect of insurance premiums and real estate taxes, and all legal costs or expenses of collection of the debt secured hereby or of the defense or prosecution of the rights and lien created hereby.

CERTAIN DEFINITIONS AND RULES OF CONSTRUCTION

Mortgagor and Mortgagee agree that, unless the context otherwise specifies or requires, the following terms shall have the meanings herein specified.

"Chattels" means Mortgagor's right, title and interest in and to all fixtures, furnishings, fittings, appliances, apparatus, equipment, building materials and components, machinery, boilers, oil burners, power systems, heating, ventilating and air conditioning systems, elevators, and all other chattels and articles of personal property, of whatever kind or nature, and any additions thereto and any replacements, proceeds or products thereof (other than those owned by lessees or suppliers of services or those claiming under or through lessees or such suppliers or leased by lessees or such suppliers from parties other than Mortgagor) now or at any time hereafter intended to be or actually affixed to, attached to, placed upon, or used in any way in connection with the complete and comfortable use, enjoyment, development, occupancy or operation of the Premises, and whether located on or off the Premises.

"Default Rate" means the rate (or, if more than one, the highest of the rates) of interest per annum provided in the Note plus 4%, but in no event to exceed the maximum rate allowed by law.

"Events of Default" means the events and circumstances described as such in Section 2.01.

"Guarantor" means the party or parties, if any, identified as such in the Loan Agreement.

"Guarantor Special Covenants" shall have the meaning given to such term in the Limited Guaranty of Payment dated the date hereof, made by Guarantor.

"Hazardous Materials" means any pollutant, effluents, emissions, contaminants, toxic or hazardous wastes, materials or substances, as any of those terms are defined from time to time in or for the purposes of any relevant environmental law, rule, regulation, code, permit, order, notice, demand letter or other binding determination (hereinafter, "Environmental Laws") including, without limitation, asbestos fibers and friable asbestos, polychlorinated biphenyls and any petroleum or hydrocarbon-based products or derivatives.

"Improvements" means Mortgagor's right, title and interest in and to all structures or buildings, and replacements thereof, now or hereafter located upon the Premises, including all plant equipment, apparatus, machinery and fixtures of every kind and nature whatsoever forming part of said structures or buildings.

"Lease" or "Leases" means any sublease or subleases of all or any portion of the Premises.

"Lenders" means, collectively, Anglo Irish Bank Corporation plc and such other lending institutions who become "Lenders" pursuant to the Loan Agreement, together with their successors and permitted assigns in accordance with the terms of the Loan Agreement.

"Loan" means the loan made by Lenders to Mortgagor pursuant to the Loan Agreement and secured hereby.

"Loan Agreement" means that certain Building Loan Agreement, dated as of the date hereof, among Mortgagor, as Borrower, Anglo Irish Bank Corporation plc and such other lending institutions who may become party thereto, as Lenders, and Mortgagee, as Administrative Agent, as the same may hereafter be amended, modified or supplemented from time to time.

"Other Loan" shall have the meaning given to such term in the Loan Agreement.

"Other Mortgages" shall have the meaning given to such term in the Loan Agreement.

"Premises" means the premises described in SCHEDULE A, including all of the easements, rights, privileges and appurtenances (including air or development rights) thereunto belonging or in anywise appertaining, and all of the estate, right, title, interest, claim or demand whatsoever of Mortgagor therein and in the streets and ways adjacent thereto, either in law or in equity, in possession or expectancy, now or hereafter acquired, and as used herein shall, unless the context otherwise requires, be deemed to include the Improvements.

"Premises Documents" means all reciprocal easement or operating agreements, declarations, development agreements, developer's or utility agreements (other than utility easements), and any similar such agreements or declarations of record now or hereafter affecting the Premises or any part thereof.

"Required Lenders" has the meaning given to such term in the Loan Agreement.

2

including, without limitation, any judgments, reasonable attorney's fees, costs of appeal bonds and printing costs, arising out of or relating to any proceeding instituted by any claimant alleging a violation by Mortgagor of any applicable lien law including, without limitation, any section of Article 3-A of the New York Lien Law.

## ARTICLE II

### EVENTS OF DEFAULT AND REMEDIES

Section 2.01. <u>Events of Default and Certain Remedies</u>.    If one or more of the following Events of Default shall happen, that is to say:

(a)    if (i) default shall be made in the payment of any principal or interest under the Note when and as the same shall become due and payable, and such default shall have continued for a period of ten (10) days or (ii) default shall be made in the payment of any other sum under the Note, this Mortgage, the Loan Agreement or any other document executed and delivered to Mortgagee or Lenders in connection with the Loan and such default shall have continued for a period of five (5) days after notice from Mortgagee to Mortgagor, or (iii) default shall be made in the payment of any tax or other charge required by Section 1.07 to be paid and said default shall have continued for a period of twenty (20) days; or

(b)    if default shall be made in the due observance or performance of any covenant, condition or agreement in the Note, the Loan Agreement, this Mortgage, any guaranty executed by Guarantor or in any other document executed or delivered to Mortgagee or Lenders in connection with the Loan (other than any such covenant, condition or agreement specifically provided for elsewhere in this Section 2.01), and such default shall have continued for a period of thirty (30) days after notice thereof shall have been given to Mortgagor by Mortgagee, unless such default cannot, with due diligence, be cured within such grace period in which case no Event of Default shall be deemed to exist so long as Mortgagor shall have commenced to cure the default within such grace period and thereafter diligently and with continuity prosecutes such cure to completion but in no event beyond ninety(90) days of such notice; or

(c)    if any representation or warranty made by Mortgagor in Section 1.01 shall be incorrect in any material respect when made, or if any other representation or warranty made to Mortgagee or Lenders in this Mortgage, the Loan Agreement, any guaranty executed by Guarantor, or in any other document, certificate or statement executed or delivered to Mortgagee or Lenders in connection with the Loan shall be incorrect in any material respect when made or remade; or

(d)    if by order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any material part thereof, or of Mortgagor shall be appointed and such order shall not be discharged or dismissed within ninety (90) days after such appointment; or

(e)    if Mortgagor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Federal Bankruptcy Act or any similar federal or state law, or if, by decree of a court of competent jurisdiction, Mortgagor shall be adjudicated a bankrupt, or be declared insolvent, or shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall consent to the appointment of a receiver or receivers of all or any material part of its property; or

(f)    if any of the creditors of Mortgagor shall file a petition in bankruptcy against Mortgagor or for reorganization of Mortgagor pursuant to the Federal Bankruptcy Act or any similar federal or state law, and if such petition shall not be discharged or dismissed within ninety (90) days after the date on which such petition was filed; or

(g)    if final judgment for the payment of money in excess of $1,000,000 shall be rendered against Mortgagor and Mortgagor shall not discharge the same or cause it to be discharged within ninety (90) days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal; or

(h)    if any of the events enumerated in clauses (d) through (g) of this Section 2.01 shall happen to Guarantor or any substantial part of its property; or

(i)    if it shall be illegal for Mortgagor to pay any tax referred to in Section 1.08 or if the payment of such tax by Mortgagor would result in the violation of applicable usury laws; or

(j)    if there shall occur a default which is not cured within the applicable grace period, if any, under any mortgage, deed of trust or other security instrument covering all or part of the Mortgaged Property regardless of whether any such mortgage, deed of trust or other security instrument is prior or subordinate hereto; it being further agreed by Mortgagor that an Event of Default hereunder shall constitute an Event of Default under any such mortgage, deed of trust or other security instrument held by Mortgagee; or

(k)    if there shall occur a default by Mortgagor which is not cured within the later of ten (10) days after notice from Mortgagee of such default or the applicable grace period, if any, under any of the Premises Documents; or if any of the Premises Documents is amended, modified, supplemented, in any material respect, or terminated without Mortgagee's prior consent, which shall not be unreasonably withheld, conditioned or delayed; or

(l)    except as contemplated by the Loan Agreement, if Mortgagor shall transfer (or suffer or permit the transfer), in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest or rights therein (including air or development rights) without, in any such case, the prior written consent of Mortgagee. As used in this clause, "transfer" shall include, without limitation, any sale, assignment, lease or conveyance except leases

for occupancy subordinate hereto and to all advances made and to be made hereunder or, in the event Mortgagor or Guarantor (or a general partner, member or co-venturer of either of them) is a partnership, joint venture, limited liability company, trust or closely-held corporation, the sale, conveyance, transfer or other disposition of more than 10%, in the aggregate, of any class of the issued and outstanding capital stock of such closely-held corporation or of the beneficial interest of such partnership, venture, limited liability company or trust, or a change of any general partner or managing member, as the case may be, or, in the event Mortgagor or Guarantor (or a general partner, co-venturer, member or beneficiary, as the case may be, of either of them) is a publicly-held corporation, the sale, conveyance, transfer or other disposition of more than 10%, in the aggregate, of the stock-holdings of any of the five (5) individuals or entities that own the greatest number of shares of each class of issued and outstanding stock. In the event Mortgagor or Guarantor is a limited partnership, and so long as a limited partner has contributed to (or remains personally liable for) the present and future partnership capital contributions required of such limited partner by the partnership agreement, such partner may sell, convey, devise, transfer or dispose of all or a part of his limited partnership interest to his spouse, children, grandchildren or a family trust in which his spouse, children or grandchildren are sole beneficiaries. Notwithstanding the foregoing, direct and indirect beneficial interests in Mortgagor may be transferred, without Mortgagee's consent, directly or indirectly through intervening entities to Izak Senbahar, Simon Elias, Nesim Bahar, Jeffrey Stoler, any of their immediate family members and/or trusts for their immediate family members so long as Izak Senbahar or Simon Elias remains in control of the day-to-day operations of Mortgagor and Mortgagor furnishes Mortgagee with prior written notice of such transfer (except transfers as a result of death). Notwithstanding the foregoing, the contemplated conversion of Mortgagor into a limited liability company and the necessary actions to be undertaken by Mortgagor in order to accomplish such conversion shall not be deemed to be a "transfer" for purposes of this subsection; or

(m)    if Mortgagor shall encumber, or agree to encumber, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest or rights therein (including air or development rights) without, in any such case, the prior written consent of Mortgagee; provided, however, that nothing in this Section 2.01(m) shall be deemed or construed to prohibit the Other Mortgages. As used in this clause, "encumber" shall include, without limitation, the placing or permitting the placing of any mortgage, deed of trust, assignment of rents or other security device. "Encumber" shall not include an involuntary lien bonded, discharged or insured over within thirty (30) days after notice thereof is received by Mortgagor (Mortgagee may grant or deny its consent under this clause and the immediately preceding clause in their sole discretion and, if consent should be given, any such transfer or encumbrance shall be subject hereto and to any other documents which evidence or secure the Loan, and, if a transfer, any such transferee shall assume all of Mortgagor's obligations hereunder and thereunder and agree to be bound by all provisions and perform all obligations contained herein and therein; consent to one such transfer or encumbrance shall not be deemed to be a waiver of the right to require consent to future or successive transfers or encumbrances); or

(n)    intentionally omitted; or

(o)    if default shall occur in the due observance or performance of any of the Guarantor Special Covenants.

then and in every such case:

I.    During the continuance of any such Event of Default, Mortgagee, by notice to Mortgagor, may declare the entire principal of the Note then outstanding (if not then due and payable), and all accrued and unpaid interest and other sums in respect thereof, to be due and payable immediately, and upon any such declaration the principal of the Note and said accrued and unpaid interest and other sums shall become and be immediately due and payable, anything herein or in the Note or the Loan Agreement to the contrary notwithstanding.

II.    During the continuance of any such Event of Default, Mortgagee personally, or by its agents or attorneys, may enter into and upon all or any part of the Premises, and each and every part thereof, and is hereby given a right and license and appointed  Mortgagor's attorney-in-fact and exclusive agent to do so, and may exclude Mortgagor, its agents and servants wholly therefrom; and having and holding the same, may use, operate, manage and control the Premises and conduct the business thereof, either personally or by its superintendents, managers, agents, servants, attorneys or receivers; and upon every such entry, Mortgagee, at the expense of the Mortgaged Property, from time to time, either by purchase, repairs or construction, may maintain and restore the Mortgaged Property, whereof it shall become possessed as aforesaid, may complete the renovation of the Improvements and in the course of such completion may make such changes in the contemplated Improvements as it may deem desirable and may insure the same; and likewise, from time to time, at the expense of the Mortgaged Property, Mortgagee may make all necessary or proper repairs, renewals and replacements and such useful alterations, additions, betterments and improvements thereto and thereon as to it may deem advisable; and in every such case Mortgagee shall have the right to manage and operate the Mortgaged Property and to carry on the business thereof and exercise all rights and powers of Mortgagor with respect thereto either in the name of Mortgagor or otherwise as it shall deem best; and Mortgagee shall be entitled to collect and receive the Rents and every part thereof, all of which shall for all purposes constitute property of Mortgagor; and in furtherance of such right Mortgagee may collect the rents payable under all leases of the Premises directly from the lessees thereunder upon notice to each such lessee that an Event of Default exists hereunder accompanied by a demand on such lessee for the payment to Mortgagee of all rents due and to become due under its lease, and Mortgagor FOR THE BENEFIT OF MORTGAGEE AND EACH SUCH LESSEE hereby covenants and agrees that the lessee shall be under no duty to question the accuracy of Mortgagee's statement of default and shall unequivocally be authorized to pay said rents to Mortgagee without regard to the truth of Mortgagee's statement of default and notwithstanding notices from Mortgagor disputing the existence of an Event of Default such that the payment of rent by the lessee to Mortgagee pursuant to such a demand shall constitute performance in full of the lessee's obligation under the lease for the payment of rents by the lessee to Mortgagor; and after deducting the

IN WITNESS WHEREOF, this Mortgage has been duly executed and delivered by Mortgagor.

EURO-AMERICAN LODGING
CORPORATION, a Delaware corporation

By: _____

Name: SIMON ELIAS

Title: PRESIDENT

# EXHIBIT E

## TO DECLARATION OF IZAK SENBAHAR

LIMITED GUARANTY OF PAYMENT

December 20, 2007

Anglo Irish Bank Corporation plc,
222 East 41st Street, 25th Floor
New York, New York 10017

Attention:    Real Estate Finance

     and

the other "Lenders", as such quoted term is
defined in the Loan Agreement
defined below

> Re:    $55,106,659.10 building loan (the "Building Loan"), $26,893,340.90 project loan (the "Project Loan") and $158,000,000.00 term loan (the "Term Loan" and, with the Building Loan and Project Loan, collectively, the "Loan") from Anglo Irish Bank Corporation plc ("Anglo") and certain other "Lenders" (as such quoted term is defined in the Loan Agreement identified below) to Euro-American Lodging Corporation ("Borrower")

Dear Sir/Madam:

     To induce Lenders to consummate the captioned transaction and to lend the indicated amount to Borrower in accordance with (i) a Building Loan Agreement (the "Building Loan Agreement"), a Project Loan Agreement (the "Project Loan Agreement") and a Term Loan Agreement (the "Term Loan Agreement"), each among Borrower, Lenders and Anglo, as a Lender and Administrative Agent for Lenders (the Building Loan Agreement, the Project Loan Agreement and the Term Loan Agreement, as amended or supplemented from time to time, collectively, the "Loan Agreement"), (ii) the Note(s) of Borrower to the respective Lenders, described in the Loan Agreement (as said notes may be amended, modified, extended, severed, assigned, renewed or restated from time to time, and including any substitute or replacement note executed pursuant to the Loan Agreement, collectively, the "Note") and (iii) a Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement made by Borrower to Administrative Agent, a Project Loan Mortgage, Assignment of Leases and Rents and Security Agreement made by Borrower to Administrative Agent and a Term Loan Mortgage, Assignment of Leases and Rents and Security Agreement made by Borrower to Administrative Agent (together with all amendments, modifications, consolidations,

material respects, have been prepared in accordance with sound accounting principles consistently applied and fairly present Guarantor's financial condition as of the respective dates thereof; no material adverse change has occurred in the financial conditions reflected therein since the respective dates thereof. Guarantor will provide the financial information in the form and at the times required pursuant to Section 6.18 of the Building Loan Agreement.

13.    Financial Covenants.  Guarantor covenants and agrees that for so long as any of the Note held by any Lender remains unpaid, or any other amount is owing by Borrower or Guarantor to Administrative Agent or any Lender hereunder or under any other Loan Document:

(a)    Net Worth.  Guarantor shall maintain at all times a minimum combined net worth of not less than $200,000,000.00, (the "Guarantor Net Worth Covenant").  Guarantor's combined net worth shall be established from time to time by: (i) the market value of liquid assets and marketable securities traded on a recognized exchange, and (ii) by estimates of fair market value made in good faith by Guarantor as to all other assets, as evidenced by Guarantor's most recent personal financial statements provided in accordance with the provisions of this Guaranty or the Loan Agreement.  Administrative Agent shall have the right to require Guarantor to update Guarantor's financial statement more frequently than annually, if Administrative Agent so requires in order to determine compliance with the Guarantor Net Worth Covenant.  Administrative Agent may dispute any estimates of fair market value made by Guarantor and, if such disputes are not resolved by Administrative Agent and Guarantor within thirty (30) days, Administrative Agent may have the value of the assets in question appraised in any manner reasonably determined by Administrative Agent, at Borrower's cost, and the results of such appraisal shall govern.

(b)    Liquid Assets.  Guarantor shall maintain at all times combined liquid assets which are totally unencumbered (whether in favor of Administrative Agent or anyone else) and as to which there are no restrictions upon use thereof imposed by any agreement to which Guarantor or any of its property may be bound, of not less than $20,000,000.00 (consisting of cash or cash equivalents or obligations of, or guaranteed by, the United States of America, having a maturity of not more than one (1) year) (the "Guarantor Liquidity Covenant", and together with the Guarantor Net Worth Covenant, the "Guarantor Special Covenants").  For purposes of clarification, compliance with the Guarantor Special Covenants shall be determined based on the combined net worth and combined liquid assets of Simon Elias and Izak Senbahar.

(c)    Certificate of Compliance.  Not later than one hundred twenty (120) days after the end of each annual period ending on December 31 in each calendar year, Guarantor shall deliver to Administrative Agent Guarantor's personally signed statement certifying that the Guarantor Special Covenants are satisfied or, if not satisfied in any manner, setting forth Guarantor's actual

7

26.   <u>Counterparts</u>.   This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original.   Said counterparts shall constitute but one and the same instrument and, if more than one Guarantor, shall be binding upon each of them individually as fully and completely as if all had signed but one instrument so that the joint and several liability of each Guarantor under this Guaranty shall be unaffected by the failure of any other Guarantor to execute any or all of said counterparts.

Very truly yours,

SIMON ELIAS

Address of Guarantor:

c/o Gama Holdings Ltd.
150 East 58th Street
New York, New York 10155

IZAK SENBAHAR

Address of Guarantor:

c/o Alexico Group LLC
150 East 58th Street
New York, New York 10155

This is to certify that this Guaranty was executed in my presence on the date hereof by Simon Elias whose signature appears above in his individual capacity.

_Caren Matyckas_
Notary Public

My Commission Expires:

CAREN MATYCKAS
NOTARY PUBLIC, State of New York
No. 60-4858863
Qualified in Westchester County
Commission Expires May 19, 20 _10_

_____

This is to certify that this Guaranty was executed in my presence on the date hereof by Izak Senbahar whose signature appears above in his individual capacity.

_Caren Matyckas_
Notary Public

My Commission Expires:

CAREN MATYCKAS
NOTARY PUBLIC, State of New York
No. 60-4858863
Qualified in Westchester County
Commission Expires May 19, 20 _10_

_____

# EXHIBIT F

## TO DECLARATION OF IZAK SENBAHAR

COMPLETION COSTS GUARANTY

December 20, 2007

Anglo Irish Bank Corporation plc
222 East 41st Street
New York, New York 10017

Attention:      Real Estate Finance

and

the other "Lenders", as such quoted term is
defined in the Building Loan Agreement
defined below

Re:    $55,106,659.10 building loan (the "Building Loan"),
$158,000,000.00 term loan (the "Term Loan") and
$26,893,340.90 project loan (the "Project Loan" and, with
the Building Loan and Term Loan, collectively, the
"Loan") from Anglo Irish Bank Corporation plc ("Anglo")
and certain other "Lenders" (as such quoted term is defined
in the Building Loan Agreement, as hereinafter defined) to
Euro-American Lodging Corporation ("Borrower")

Dear Sir/Madam:

To induce Lenders to consummate the captioned transaction in accordance
with (i) a Building Loan Agreement (the "Building Loan Agreement"), a Term Loan
Agreement (the "Term Loan Agreement") and a Project Loan Agreement (the "Project
Loan Agreement" and, together with the Building Loan Agreement and the Term Loan
Agreement, as the same may be amended, modified or supplemented from time to time,
hereinafter, collectively, the "Loan Agreement") among Borrower, as borrower, Lenders
party thereto, as lenders, and Anglo, as Administrative Agent for Lenders (in such
capacity, together with its successors in such capacity, "Administrative Agent"), (ii) the
Notes which evidence the Loan (as the same may be amended, modified, extended,
severed, assigned, renewed or restated from time to time, including any substitute or
replacement notes executed pursuant to the Loan Agreement, collectively, the "Note"),
and (iii) the Mortgages held by Administrative Agent, for the benefit of Lenders, which
secure the Loan (as same may hereafter be amended, modified or consolidated from time
to time, collectively, the "Mortgage" and the term "Mortgage" shall be deemed to include
any other agreement given to Lenders or Administrative Agent as security for the Loan),
the undersigned (hereinafter, and if there are two or more signers now or hereafter, each
of them individually and collectively, "Guarantor") hereby jointly and severally (except

Guarantor will comply promptly with all Laws now or hereafter in effect having applicability to it, the failure to comply with which is likely to have a material adverse effect on Guarantor's business or financial condition.

11.    Accuracy of Information; Full Disclosure. Neither this Guaranty nor any documents, financial statements, reports, notices, schedules, certificates, statements or other writings furnished by or on behalf of Guarantor to Administrative Agent or Lenders in connection with the negotiation of the Loan Documents or the consummation of the transactions contemplated thereby, or required herein or by the other Loan Documents to be furnished by or on behalf of Guarantor, contains any untrue or misleading statement of a material fact or omits a material fact necessary to make the statements herein or in the other Loan Documents not misleading; and to the best of Guarantor's knowledge, there is no fact which Guarantor has not disclosed to Administrative Agent in writing which materially affects adversely or, so far as Guarantor can now foresee, will materially affect adversely any of the property covered by the Mortgage or the business affairs or financial condition of Guarantor, or the ability of Guarantor to perform this Guaranty and the other Loan Documents to which Guarantor is a party.

12.    Financial Statements. The most recent financial statements heretofore delivered by Guarantor to Administrative Agent or Lenders are true, correct and complete in all material respects, have been prepared in accordance with sound accounting principles consistently applied and fairly present Guarantor's financial condition as of the respective dates thereof; no material adverse change has occurred in the financial conditions reflected therein since the respective dates thereof. Guarantor will provide the financial information in the form and at the times required pursuant to Section 6.18 of the Building Loan Agreement.

13.    Financial Covenants. Guarantor covenants and agrees that for so long as any of the Note held by any Lender remains unpaid, or any other amount is owing by Borrower or Guarantor to Administrative Agent or any Lender hereunder or under any other Loan Document:

(a)    Net Worth. Guarantor shall maintain at all times a minimum combined net worth of not less than $200,000,000, (the "Guarantor Net Worth Covenant"). Guarantor's combined net worth shall be established from time to time by: (i) the market value of liquid assets and marketable securities traded on a recognized exchange, and (ii) by estimates of fair market value made in good faith by Guarantor as to all other assets, as evidenced by Guarantor's most recent personal financial statements provided in accordance with the provisions of this Guaranty or the Loan Agreement. Administrative Agent shall have the right to require Guarantor to update Guarantor's financial statement more frequently than annually, if Administrative Agent so requires in order to determine compliance with the Guarantor Net Worth Covenant. Administrative

Agent may dispute any estimates of fair market value made by Guarantor and, if such disputes are not resolved by Administrative Agent and Guarantor within thirty (30) days, Administrative Agent may have the value of the assets in question appraised in any manner reasonably determined by Administrative Agent, at Borrower's cost, and the results of such appraisal shall govern.

(b)    <u>Liquid Assets</u>.  Guarantor shall maintain at all times combined liquid assets which are totally unencumbered (whether in favor of Administrative Agent or anyone else) and as to which there are no restrictions upon use thereof imposed by any agreement to which Guarantor or any of its property may be bound, of not less than $20,000,000 (consisting of cash or cash equivalents or obligations of, or guaranteed by, the United States of America, having a maturity of not more than one (1) year) (the "Guarantor Liquidity Covenant", and together with the Guarantor Net Worth Covenant, the "Guarantor Special Covenants").  For purposes of clarification, compliance with the Guarantor Special Covenants shall be determined based on the combined net worth and combined liquid assets of Simon Elias and Izak Senbahar.

(c)    <u>Certificate of Compliance</u>.  Not later than one hundred twenty (120) days after the end of each annual period ending on December 31 in each calendar year, Guarantor shall deliver to Administrative Agent Guarantor's personally signed statement certifying that the Guarantor Special Covenants are satisfied or, if not satisfied in any manner, setting forth Guarantor's actual minimum net worth and actual unrestricted and unencumbered cash or cash equivalents as of the period just ended.

14.    <u>Non-Waiver; Remedies Cumulative</u>.  No failure or delay on Administrative Agent's or Lenders' part in exercising any right, power or privilege under any of the Loan Documents, this Guaranty or any other document made to or with Lenders or Administrative Agent in connection with the Loan shall operate as a waiver of any such privilege, power or right or shall be deemed to constitute Lenders' or Administrative Agent's acquiescence in any default by Borrower or Guarantor under any of said documents.  A waiver by Lenders or Administrative Agent of any right or remedy under any of the Loan Documents, this Guaranty or any other document made to or with Lenders or Administrative Agent in connection with the Loan on any one occasion shall not be construed as a bar to any right or remedy which Lenders or Administrative Agent otherwise would have on any future occasion.  The rights and remedies provided in said documents are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by Law.

15.    <u>Liability Unaffected by Release</u>.  Any Guarantor, or any other party liable upon or in respect of any obligation hereby guaranteed, may be released without affecting the liability of any Guarantor not so released.

26.   Counterparts.   This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original.  Said counterparts shall constitute but one and the same instrument and, if more than one Guarantor, shall be binding upon each of them individually as fully and completely as if all had signed but one instrument so that the joint and several liability of each Guarantor under this Guaranty shall be unaffected by the failure of any other Guarantor to execute any or all of said counterparts.

Very truly yours,

SIMON ELIAS

Address of Guarantor:

c/o Gama Holdings Ltd.
150 East 58th Street
New York, New York  10155

IZAK SENBAHAR

Address of Guarantor:

c/o Alexico Group LLC
150 East 58th Street
New York, New York  10155

This is to certify that this Guaranty was executed in my presence on the date hereof by Simon Elias whose signature appears above in his individual capacity.

_____
Notary Public

My Commission Expires:

_____

CAREN MATYCKAS
NOTARY PUBLIC, State of New York
No. 60-4858863
Qualified in Westchester County
Commission Expires May 19, 20_16

This is to certify that this Guaranty was executed in my presence on the date hereof by Izak Senbahar whose signature appears above in his individual capacity.

_____
Notary Public

My Commission Expires:

_____

CAREN MATYCKAS
NOTARY PUBLIC, State of New York
No. 60-4858863
Qualified in Westchester County
Commission Expires May 19, 20_10

# EXHIBIT G

## TO DECLARATION OF IZAK SENBAHAR

If Premises located in
State of New York:

SECTION     5
BLOCK       1392
LOTS        17 and 56
Premises:   21-35 East 77th Street and 1000 Madison Avenue, New York, New York

---

Date:  December 20, 2007

## LEASEHOLD BUILDING LOAN MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT
("this Mortgage")

FROM

MARK HOTEL LLC,
a limited liability company organized and existing under the laws of New York

("Mortgagor")

Address and Chief
Executive Office of Mortgagor:     c/o Alexico Group LLC
                                   150 East 58th Street
                                   New York, New York 10155

TO

ANGLO IRISH BANK CORPORATION PLC

as Administrative Agent for Lenders (as hereinafter defined)
(together with its successors in such capacity, "Mortgagee")

Address of Mortgagee:             c/o Anglo Irish New York Corporation
                                  222 East 41st Street
                                  New York, New York 10017

Mortgage Amount:  $60,780,200.00

---

This instrument prepared by, and after recording please return to:
Riemer & Braunstein LLP
7 Times Square Tower, Suite 2506
New York, New York 10036
Attention:  Richard I. Lefkowitz, Esq.

1041706.6

"CTROA" shall have the meaning given to such term in the Loan Agreement.

"Default Rate" means the rate (or, if more than one, the highest of the rates) of interest per annum provided in the Note plus 4%, but in no event to exceed the maximum rate allowed by law.

"Events of Default" means the events and circumstances described as such in Section 2.01.

"Ground Lease" means, collectively, the leases identified in SCHEDULE A covering the property described in SCHEDULE A.

"Ground Lessor" has the meaning set forth in Section 1.18.

"Guarantor" means the party or parties, if any, identified as such in the Loan Agreement.

"Guarantor Special Covenants" shall have the meaning given to such term in the Completion Costs Guaranty, dated the date hereof, made by Guarantor, and the Non-Recourse Guaranty of Payment, dated the date hereof, made by Guarantor.

"Hazardous Materials" means any pollutant, effluents, emissions, contaminants, toxic or hazardous wastes, materials or substances, as any of those terms are defined from time to time in or for the purposes of any relevant environmental law, rule, regulation, code, permit, order, notice, demand letter or other binding determination (hereinafter, "Environmental Laws") including, without limitation, asbestos fibers and friable asbestos, polychlorinated biphenyls and any petroleum or hydrocarbon-based products or derivatives.

"Improvements" means Mortgagor's right, title and interest in and to all structures or buildings, and replacements thereof, to be erected or now or hereafter located upon the Premises, including all plant equipment, apparatus, machinery and fixtures of every kind and nature whatsoever forming part of said structures or buildings.

"Lease" or "Leases" means any sublease or subleases under which Mortgagor is the sublessor of all or any portion of the Premises.

"Lenders" means, collectively, Anglo Irish Bank Corporation plc and such other lending institutions who become "Lenders" pursuant to the Loan Agreement, together with their successors and permitted assigns in accordance with the terms of the Loan Agreement.

"Loan" means the loan made by Lenders to Mortgagor pursuant to the Loan Agreement and secured hereby.

"Loan Agreement" means that certain Building Loan Agreement, dated as of the date hereof, among Mortgagor, as Borrower, Anglo Irish Bank Corporation plc and such other lending institutions who may become party thereto, as Lenders, and Mortgagee, as

efforts (which shall not include the commencement of litigation or payment of any consideration) to obtain, an estoppel certificate from Ground Lessor pursuant to Section Thirty-Fifth (A) of the Ground Lease and shall deliver copies thereof to Mortgagee promptly upon receipt.

(e)  Further Documentation.  Mortgagor shall execute and deliver, on request of Mortgagee, such instruments as Mortgagee may reasonably request and deem useful or required to permit Mortgagee to cure any default by Mortgagor under the Ground Lease beyond the lapse of any applicable grace and cure period or permit Mortgagee to take such action as Mortgagee considers desirable to cure or remedy such default and preserve the interest of Mortgagee in the Mortgaged Property.

ARTICLE II

EVENTS OF DEFAULT AND REMEDIES

Section 2.01.  Events of Default and Certain Remedies.  If one or more of the following Events of Default shall happen, that is to say:

(a)  if (i) default shall be made in the payment of any principal or interest under the Note when and as the same shall become due and payable, and such default shall have continued for a period of ten (10) days or (ii) default shall be made in the payment of any other sum under the Note, this Mortgage, the Loan Agreement or any other document executed and delivered to Mortgagee or Lenders in connection with the Loan and such default shall have continued for a period of five (5) days after notice from Mortgagee to Mortgagor, or (iii) default shall be made in the payment of any tax or other charge required by Section 1.07 to be paid and said default shall have continued for a period of twenty (20) days; or

(b)  if default shall be made in the due observance or performance of any covenant, condition or agreement in the Note, the Loan Agreement, this Mortgage, any guaranty executed by Guarantor or in any other document executed or delivered to Mortgagee or Lenders in connection with the Loan (other than any such covenant, condition or agreement specifically provided for elsewhere in this Section 2.01), and such default shall have continued for a period of thirty (30) days after notice thereof shall have been given to Mortgagor by Mortgagee, unless such default cannot, with due diligence, be cured within such grace period in which case no Event of Default shall be deemed to exist so long as Mortgagor shall have commenced to cure the default within such grace period and thereafter diligently and with continuity prosecutes such cure to completion but in no event beyond ninety (90) days of such notice; or

(c)  if any representation or warranty made by Mortgagor in Section 1.01 shall be incorrect in any material respect when made, or if any other representation or warranty made to Mortgagee or Lenders in this Mortgage, the

23

Loan Agreement, any guaranty executed by Guarantor, or in any other document, certificate or statement executed or delivered to Mortgagee or Lenders in connection with the Loan shall be incorrect in any material respect when made or remade; or

      (d)    if by order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any material part thereof, or of Mortgagor shall be appointed and such order shall not be discharged or dismissed within ninety (90) days after such appointment; or

      (e)    if Mortgagor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Federal Bankruptcy Act or any similar federal or state law, or if, by decree of a court of competent jurisdiction, Mortgagor shall be adjudicated a bankrupt, or be declared insolvent, or shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall consent to the appointment of a receiver or receivers of all or any material part of its property; or

      (f)    if any of the creditors of Mortgagor shall file a petition in bankruptcy against Mortgagor or for reorganization of Mortgagor pursuant to the Federal Bankruptcy Act or any similar federal or state law, and if such petition shall not be discharged or dismissed within ninety (90) days after the date on which such petition was filed; or

      (g)    if final judgment for the payment of money in excess of $1,000,000 shall be rendered against Mortgagor and Mortgagor shall not discharge the same or cause it to be discharged within ninety (90) days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal; or

      (h)    if any of the events enumerated in clauses (d) through (g) of this Section 2.01 shall happen to Guarantor or any substantial part of its property; or

      (i)    if it shall be illegal for Mortgagor to pay any tax referred to in Section 1.08 or if the payment of such tax by Mortgagor would result in the violation of applicable usury laws; or

      (j)    if there shall occur a default which is not cured within the applicable grace period, if any, under any mortgage, deed of trust or other security instrument covering all or part of the Mortgaged Property regardless of whether any such mortgage, deed of trust or other security instrument is prior or subordinate hereto; it being further agreed by Mortgagor that an Event of Default hereunder shall constitute an Event of Default under any such mortgage, deed of trust or other security instrument held by Mortgagee (provided, however, in no event shall a default under the Mezzanine Loan be deemed an Event of Default

hereunder unless the act or omission resulting in such Event of Default under the Mezzanine Loan also constitutes an Event of Default hereunder); or

(k)    if there shall occur a default by Mortgagor which is not cured within the later of ten (10) days after notice from Mortgagee of such default or the applicable grace period, if any, under any of the Premises Documents; or if any of the Premises Documents is amended, modified, supplemented, in any material respect, or terminated without Mortgagee's prior consent, which shall not be unreasonably withheld, conditioned or delayed; or

(l)    except as contemplated by the Loan Agreement, if Mortgagor shall transfer (or suffer or permit the transfer), in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest or rights therein (including air or development rights) without, in any such case, the prior written consent of Mortgagee; provided, however, that nothing in this Section 2.01(l) shall be deemed or construed to prohibit the pledge of the ownership interests in Mortgagor in connection with the Mezzanine Loan.  As used in this clause, "transfer" shall include, without limitation, any sale, assignment, lease or conveyance except leases for occupancy subordinate hereto and to all advances made and to be made hereunder, leases permitted by the Loan Agreement, proprietary leases appurtenant to the Units (as defined in the Loan Agreement), leases or subleases of the Units, the Coop Transfer (as defined in the Loan Agreement), conveyance of the Unsold Shares (as defined in the Loan Agreement) of the Units in accordance with the Loan Agreement and conveyance of the stock and proprietary leases appurtenant to the Units that are not Unsold Shares or, in the event Mortgagor or Guarantor (or a general partner, member or co-venturer of either of them) is a partnership, joint venture, limited liability company, trust or closely-held corporation, the sale, conveyance, transfer or other disposition of more than 10%, in the aggregate, of any class of the issued and outstanding capital stock of such closely-held corporation or of the beneficial interest of such partnership, venture, limited liability company or trust, or a change of any general partner or managing member, as the case may be, or, in the event Mortgagor or Guarantor (or a general partner, co-venturer, member or beneficiary, as the case may be, of either of them) is a publicly-held corporation, the sale, conveyance, transfer or other disposition of more than 10%, in the aggregate, of the stock-holdings of any of the five (5) individuals or entities that own the greatest number of shares of each class of issued and outstanding stock. In the event Mortgagor or Guarantor is a limited partnership, and so long as a limited partner has contributed to (or remains personally liable for) the present and future partnership capital contributions required of such limited partner by the partnership agreement, such partner may sell, convey, devise, transfer or dispose of all or a part of his limited partnership interest to his spouse, children, grandchildren or a family trust in which his spouse, children or grandchildren are sole beneficiaries.  Notwithstanding the foregoing, direct and indirect beneficial interests in Mortgagor may be transferred, without Mortgagee's consent, directly or indirectly through intervening entities to Izak Senbahar, Simon Elias, Nesim

Bahar, Jeffrey Stoler, any of their immediate family members and/or trusts for their immediate family members so long as Izak Senbahar or Simon Elias remains in control of the day-to-day operations of Mortgagor and Mortgagor furnishes Mortgagee with prior written notice of such transfer (except transfers as a result of death); or

(m)    if Mortgagor shall encumber, or agree to encumber, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest or rights therein (including air or development rights) without, in any such case, the prior written consent of Mortgagee; provided, however, that nothing in this Section 2.01(m) shall be deemed or construed to prohibit the Other Mortgages or loans secured by the stock and proprietary lease of any Unit that does not constitute Unsold Shares. As used in this clause, "encumber" shall include, without limitation, the placing or permitting the placing of any mortgage, deed of trust, assignment of rents or other security device. "Encumber" shall not include an involuntary lien bonded, discharged or insured over within thirty (30) days after notice thereof is received by Mortgagor (Mortgagee may grant or deny its consent under this clause and the immediately preceding clause in their sole discretion and, if consent should be given, any such transfer or encumbrance shall be subject hereto and to any other documents which evidence or secure the Loan, and, if a transfer, any such transferee shall assume all of Mortgagor's obligations hereunder and thereunder and agree to be bound by all provisions and perform all obligations contained herein and therein; consent to one such transfer or encumbrance shall not be deemed to be a waiver of the right to require consent to future or successive transfers or encumbrances); or

(n)    if default shall occur in the due observance or performance of any of the Guarantor Special Covenants; or

(o)    intentionally omitted; or

(p)    if Mortgagor repays the Mezzanine Loan prior to the repayment of the Loan and the Other Loans, provided, however, that the Mezzanine Loan may be paid prior to the Loan or Other Loans if paid from separate funds of Guarantor or affiliate(s) of Guarantor so long as prior to or simultaneously therewith Mortgagee receives (i) a certificate from Mortgagor to the effect that it has no indebtedness of any kind, other than the Loan, the Other Loans and payables to be paid in the ordinary course of business, including, without limitation, the costs of renovation and rehabilitation of the Improvements, (ii) a certificate from Guarantor to the effect that their combined net worth and liquidity equal or exceed the amounts set forth in the Guarantor Special Covenants and (iii) evidence reasonably satisfactory to Mortgagee that (1) Mortgagor has been released from any and all liability under the Mezzanine Loan (except such liability that by the terms of the loan documents governing the Mezzanine Loan specifically survives repayment) and (2) such loan documents have been cancelled and terminated (to the extent contemplated by, and in accordance with

the terms of, such loan documents) and any lien, encumbrance or security interest securing the Mezzanine Loan has been terminated, satisfied or discharged; or

(q)    if there exists a default beyond the lapse of any applicable notice and grace period under the Ground Lease;

(r)    if Mortgagor fails to comply with the covenant set forth in paragraphs (c), (d) or (e) Section 1.18 within five (5) Business Days of its receipt of written notice from Mortgagee requesting compliance therewith (which five (5) Business Day period shall be in addition to any other period for performance provided in such paragraphs);

then and in every such case:

I.    During the continuance of any such Event of Default, Mortgagee, by notice to Mortgagor, may declare the entire principal of the Note then outstanding (if not then due and payable), and all accrued and unpaid interest and other sums in respect thereof, to be due and payable immediately, and upon any such declaration the principal of the Note and said accrued and unpaid interest and other sums shall become and be immediately due and payable, anything herein or in the Note or the Loan Agreement to the contrary notwithstanding.

II.    During the continuance of any such Event of Default, Mortgagee personally, or by its agents or attorneys, may enter into and upon all or any part of the Premises, and each and every part thereof, and is hereby given a right and license and appointed  Mortgagor's attorney-in-fact and exclusive agent to do so, and may exclude Mortgagor, its agents and servants wholly therefrom; and having and holding the same, may use, operate, manage and control the Premises and conduct the business thereof, either personally or by its superintendents, managers, agents, servants, attorneys or receivers; and upon every such entry, Mortgagee, at the expense of the Mortgaged Property, from time to time, either by purchase, repairs or construction, may maintain and restore the Mortgaged Property, whereof it shall become possessed as aforesaid, may complete the construction of the Improvements and in the course of such completion may make such changes in the contemplated Improvements as it may deem desirable and may insure the same; and likewise, from time to time, at the expense of the Mortgaged Property, Mortgagee may make all necessary or proper repairs, renewals and replacements and such useful alterations, additions, betterments and improvements thereto and thereon as to it may deem advisable; and in every such case Mortgagee shall have the right to manage and operate the Mortgaged Property and to carry on the business thereof and exercise all rights and powers of Mortgagor with respect thereto either in the name of Mortgagor or otherwise as it shall deem best; and Mortgagee shall be entitled to collect and receive the Rents and every part thereof, all of which shall for all purposes constitute property of Mortgagor; and in furtherance of such right Mortgagee may collect the rents payable under all leases of the Premises directly from the lessees thereunder upon notice to each such lessee that an Event of Default exists hereunder accompanied

by a demand on such lessee for the payment to Mortgagee of all rents due and to become due under its lease, and Mortgagor FOR THE BENEFIT OF MORTGAGEE AND EACH SUCH LESSEE hereby covenants and agrees that the lessee shall be under no duty to question the accuracy of Mortgagee's statement of default and shall unequivocally be authorized to pay said rents to Mortgagee without regard to the truth of Mortgagee's statement of default and notwithstanding notices from Mortgagor disputing the existence of an Event of Default such that the payment of rent by the lessee to Mortgagee pursuant to such a demand shall constitute performance in full of the lessee's obligation under the lease for the payment of rents by the lessee to Mortgagor; and after deducting the expenses of conducting the business thereof and of all maintenance, repairs, renewals, replacements, alterations, additions, betterments and improvements and amounts necessary to pay for taxes, assessments, insurance and prior or other proper charges upon the Mortgaged Property or any part thereof, as well as just and reasonable compensation for the services of Mortgagee and for all attorneys, counsel, agents, clerks, servants and other employees by it engaged and employed, Mortgagee shall apply the moneys arising as aforesaid, first, to the payment of the principal of the Note and the interest thereon, when and as the same shall become payable and in such order and proportions as Mortgagee shall elect and second, to the payment of any other sums required to be paid by Mortgagor hereunder or under the Loan Agreement.

III.   Mortgagee, with or without entry, personally or by its agents or attorneys, insofar as applicable, may:

(1)   sell the Mortgaged Property to the extent permitted and pursuant to the procedures provided by law (including, without limitation, if all or any part of the Premises is located in the State of New York, in accordance with Article 14 of the New York Real Property Actions and Proceedings Law), and all estate, right, title and interest, claim and demand therein, and right of redemption thereof, at one (1) or more sales as an entity or in parcels or parts, and at such time and place upon such terms and after such notice thereof as may be required or permitted by law; or

(2)   institute proceedings for the complete or partial foreclosure hereof; or

(3)   take such steps to protect and enforce its rights whether by action, suit or proceeding in equity or at law for the specific performance of any covenant, condition or agreement in the Note, the Loan Agreement or herein, or in aid of the execution of any power herein granted, or for any foreclosure hereunder, or for the enforcement of any other appropriate legal or equitable remedy or otherwise as Mortgagee shall elect.

(4)   Mortgagee may pay any and all rental payments or similar sums to be paid by Mortgagor the payment of which is then due under the

IN WITNESS WHEREOF, this Mortgage has been duly executed and delivered by Mortgagor.

MARK HOTEL LLC

By:    Mark Hotel Member LLC,
       its sole member

       By_____
       Izak Senbahar
       Co-Manager

# EXHIBIT H

## TO DECLARATION OF IZAK SENBAHAR

BUILDING LOAN AGREEMENT

dated as of December 20, 2007

among

MARK HOTEL LLC,
as Borrower,

and

ANGLO IRISH BANK CORPORATION PLC,
as Lender and Administrative Agent

LOCATION OF PREMISES:

Section 5, Block 1392, Lots 17 and 56
21-35 East 77th Street and 1000 Madison Avenue
New York, New York

BUILDING LOAN AGREEMENT ("this Agreement") dated as of December 20, 2007 by and among MARK HOTEL LLC, a New York limited liability company ("Borrower"), ANGLO IRISH BANK CORPORATION PLC (in its individual capacity and not as Administrative Agent, "Anglo"; Anglo and each other lender who may become a Lender pursuant to Sections 3.05, 7.20 or 8.13, each, a "Lender" and collectively, "Lenders") and ANGLO IRISH BANK CORPORATION PLC, as Administrative Agent for Lenders (together with its successors in such capacity, "Administrative Agent").

Borrower desires that Lenders extend credit as provided herein, and Lenders are prepared to extend such credit on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained, Borrower, Administrative Agent and Lenders hereby agree as follows:

## ARTICLE I

## PARTICULAR TERMS, DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.01.    Particular Terms.    As used in this Agreement, the following terms shall have the respective meanings indicated opposite each of them; where the meaning of any term is stated to be "None", provisions involving the application of that term shall be disregarded.

"Aggregate Change Order Amount" -- $500,000.

"Borrower's Architects" -- [1] Schuman Lichtenstein Claman and Efron Architects.

"Borrower's Interest in the Premises" -- Leasehold.

"Change Order Amount" -- $500,000.

"Commitment Fee" -- The amount identified as such in the Supplemental Fee Letter.

"Completion Date" – November 30, 2008, as such date may be extended by Force Majeure, not to exceed six (6) months in the aggregate.

"Construction Consultant" – Merritt & Harris, Inc. or other firm designated by Administrative Agent.

"Construction Manager" – F.J. Sciame Construction Co., Inc.

"Guarantor" (of Completion Costs) -- Jointly and severally, Simon Elias, an individual and Izak Senbahar, an individual and any other Person(s) who may hereafter become a guarantor of any or all of Borrower's obligations in respect of the Loan.

---

[1] The architects and/or engineers responsible for preparing the Plans and supervising construction of the Improvements, and any successor engaged with Administrative Agent's consent.

"Escrow Account" -- That certain escrow account at Citibank, N.A. in the name of "The Mark Hotel Owners Corp. Escrow Account", or any replacement account subject to the reasonable approval of Administrative Agent.

"Escrow Agent" – Kramer Levin Naftalis & Frankel LLP, or another escrow agent approved by Administrative Agent, which approval shall not be unreasonably withheld, conditioned or delayed.

"Event of Default" -- Has the meaning given to such term in the Mortgage.

"Existing Cooperative Documents" – Has the meaning specified in Section 6.20(b)(1).

"Federal Funds Rate" -- For any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions as published by the Federal Reserve Bank of New York for such day, provided that (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the immediately preceding Business Day as so published on the next succeeding Business Day and (ii) if no such rate is so published for any day, the Federal Funds Rate for such day shall be the average of the rates quoted by three (3) Federal Funds brokers to Administrative Agent on such day on such transactions.

"Financial Statements" -- Statements of the assets, liabilities (direct or contingent), income, expenses and cash flow of Borrower and Guarantor, prepared in accordance with sound accounting principles consistently applied and for the Guarantor in substantially the same form (and notwithstanding the foregoing in substantially the same scope) as previously submitted to Administrative Agent subject to Administrative Agent's right to reasonably request additional information from Guarantor.

"Force Majeure" -- Any delay caused by any condition beyond the reasonable control of Borrower, such as an act of God, fire or other casualty, any unanticipated governmental restriction, regulation, control or other delay caused by Governmental Authorities unrelated to any act or failure to act by Borrower, any strike, lockout or other shortage or general unavailability of labor, utilities, or materials, a military invasion by an enemy of the United States, a civil riot, act of terrorism, materially adverse weather conditions, and contractor bankruptcy or any other similar event reasonably determined by Lender not to be within the reasonable control of Borrower (not including the insolvency or financial condition of Borrower or any member or partner of Borrower or any other affiliate of Borrower).

"Governmental Authorities" -- The United States, the State of New York and any political subdivision, agency, department, commission, board, bureau or instrumentality of either of them, including any local authorities, which exercises jurisdiction over Borrower, Guarantor, the Premises or the Improvements.

"Ground Lease" -- Has the meaning given to such term in the Mortgage.

"Guaranty" -- The guaranty(ies) of the performance of all or part of Borrower's obligations, as indicated in Section 1.01, to be executed by Guarantor.

copies of any Premises Documents which contain any requirements or specifications in respect of construction of the Improvements;

(2)    Title Documents.  Copies of any documents listed as exceptions to title in the title policy required hereby which are relevant to the construction or use of the Improvements; and

(3)    Requisition.  If the Initial Advance consists in whole or in part of advances for Direct Costs, a copy of the Requisition therefor.

Section 4.02.    Conditions to Advances After the Initial Advance.  Lenders' obligation to make advances of proceeds of the Loan after the Initial Advance shall be subject to the satisfaction of the following conditions:

(a)    There shall exist no Default or Event of Default, and no Default or Event of Default would result from the making of the advance;

(b)    The representations and warranties made to Administrative Agent and/or Lenders herein, in the other Loan Documents and in any other document, certificate or statement executed or delivered to Administrative Agent and/or Lenders in connection with the Loan (including, without limitation, the Requisition) shall be true and correct in all material respects on and as of the date of the advance with the same effect as if made on such date;

(c)    Administrative Agent shall have received a written continuation report of or endorsement to the title policy insuring the Mortgage to the date of such advance, in the form approved by Lenders' Counsel, conforming to the pending disbursement requirements set forth in EXHIBIT D and setting forth no additional exceptions (including survey exceptions) except those approved by Lenders' Counsel;

(d)    Administrative Agent and the Construction Consultant shall have received a Requisition for the advance, together with such other documentation and information as either of them may reasonably require consistent with the provisions hereof; and

(e)    Administrative Agent shall have received proof reasonably satisfactory to Administrative Agent that at least 17.31% of the Direct and Indirect Costs being requisitioned shall have been or are being concurrently paid by Borrower and/or Mezzanine Lender.

Section 4.03.    Conditions to Last Direct Costs Advance.  In addition to the requirements of Section 4.02, in the case of the last Direct Costs Loan advance as provided in Section 2.04, Administrative Agent shall also have received and approved a report from the Construction Consultant to the effect that construction of the Improvements (exclusive of the interior retail and commercial space) has been substantially completed, and any necessary utilities and roads have been finished and made available for use, substantially in accordance with the Plans and that it has received satisfactory evidence of receipt of a temporary certificate of occupancy for the Improvements (other than the retail and commercial spaces).

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the day and year first above written, the execution hereof by Borrower constituting a certification by Borrower that the representations and warranties made in Article V are true and correct as of the date hereof and that the party executing on behalf of Borrower duly holds and is incumbent in the position indicated under his or her name and that each Requisition shall constitute the affirmation of Borrower that at the time thereof said representations and warranties are true and correct.

MARK HOTEL LLC

By:     Mark Hotel Member LLC, its sole member

        By_____
        Izak Senbahar
        Co-Manager

Address for notices:

c/o Alexico Group LLC
150 East 58th Street, 33rd Floor
New York, New York 10155
Attention:     Mr. Izak Senbahar

ANGLO IRISH BANK CORPORATION
(as Lender and Administrative Agent)

By

Name:

Title:

**Kieran Dowling - Director**        **Nicholas Lyons - Associate Director**

Address for notices and Applicable Lending Office:

Anglo Irish Bank Corporation plc
18/21 St. Stephen's Green
Dublin 2, Ireland
Attention:    Owen O'Neill, Director

With a copy to:

Anglo Irish New York Corporation
222 East 41st Street
New York, New York 10017
Attention:    Mr. Simon Seguss
Telephone:    (212) 503-2643
Telecopy:     (212) 503-3033

STATE OF NEW YORK        )
                         :  ss.:
COUNTY OF NEW YORK       )

On the 17th day of DECEMBER in the year 2007, before me, the undersigned, a notary public in and for said state, personally appeared Izak Senbahar, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

**DOMINADOR E. ALMEDA**
**Notary Public, State of New York**
**No. 02AL6064479**
**Qualified in New York County**
**Commission Expires September 24, 2009**

My Commission Expires:

_____

STATE OF Ireland          )
                          ) ss.:
COUNTY OF Dublin          )

On the 13ᵗʰ day of December in the year 2007, before me, the undersigned, a notary public in and for said state, personally appeared *William Bowling Png / Niall Ené Lyons*, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

My Commission Expires: *15 For Life*

JOHN O'CONNOR
168 PEMBROKE ROAD.
BALLSBRIDGE. DUBLIN 4.
Notary Public for the County & City of Dublin
Ireland
Commissioned for Life

APOSTILLE

(Convention de La Haye du 5 octobre 1961)

1. Country  Ireland

This public document

2. has been signed by John O'Connor

3. acting in the capacity of Notary Public

4. bears the seal/stamp of.....................

Certified

5. at Dublin....................6. the 17.12.07

7. By the Department of Foreign Affairs

8. No. 73607/07

9. Seal/stamp:                    10. Signature:

# EXHIBIT I

## TO DECLARATION OF IZAK SENBAHAR

THIS AMENDED AND RESTATED GUARANTY OF PAYMENT AMENDS,
RESTATES AND SUPERSEDES THAT LIMITED CERTAIN GUARANTY OF
PAYMENT DATED AS OF FEBRUARY 15, 2006 EXECUTED BY SIMON ELIAS
AND IZAK SENBAHAR

**AMENDED AND RESTATED GUARANTY OF PAYMENT**

December 20, 2007

Anglo Irish Bank Corporation plc,
222 East 41st Street, 25th Floor
New York, New York 10017

Attention:      <u>Real Estate Finance</u>

     and

the other "Lenders", as such quoted term is
defined in the Loan Agreement
defined below

Re:    $60,780,200.00 building loan (the "Building Loan"),
$22,719,800.00 project loan (the "Project Loan"),
$112,500,000.00 acquisition loan (the "Acquisition Loan"),
$14,000,000.00 pre-development loan (the "Pre-
Development Loan") (the Building Loan, the Project Loan,
the Acquisition Loan and the Pre-Development Loan,
collectively, the "Loan") from Anglo Irish Bank
Corporation plc ("Anglo") and certain other "Lenders" (as
such quoted term is defined in the Loan Agreement
identified below) to Mark Hotel LLC <u>("Borrower")</u>

Dear Sir/Madam:

     To induce Lenders to consummate the captioned transaction and to lend
the indicated amount to Borrower in accordance with (i) a Building Loan Agreement (the
"Building Loan Agreement"), a Project Loan Agreement (the "Project Loan
Agreement"), an Amended and Restated Leasehold Acquisition Loan Agreement (the
"Acquisition Loan Agreement"), and an Amended and Restated Pre-Development Loan
Agreement (the "Pre-Development Loan Agreement"), each among Borrower, Lenders
and Anglo, as a Lender and Administrative Agent for Lenders (the Building Loan

Guarantor is a party have not resulted and will not result in any breach of, or constitute a default under, any mortgage, deed of trust, lease, bank loan or credit agreement, corporate charter, by-laws, partnership agreement or other instrument to which Guarantor is a party or by which Guarantor may be bound or affected, subject, however, to the disposition of the Yellowstone II Case.

10.    <u>Compliance with Laws</u>.  To the best of Guarantor's knowledge, Guarantor is in compliance with, and the transactions contemplated by the Loan Documents and this Guaranty do not and will not violate any provision of, or require any filing, registration, consent or approval under, any Laws presently in effect having applicability to Guarantor, the failure to comply with which is likely to have a material adverse effect on Guarantor's business or financial condition. Guarantor will comply promptly with all Laws now or hereafter in effect having applicability to it, the failure to comply with which is likely to have a material adverse effect on Guarantor's business or financial condition.

11.    <u>Accuracy of Information; Full Disclosure</u>.  Neither this Guaranty nor any documents, financial statements, reports, notices, schedules, certificates, statements or other writings furnished by or on behalf of Guarantor to Lenders in connection with the negotiation of the Loan Documents or the consummation of the transactions contemplated thereby, or required herein or by the Loan Documents to be furnished by or on behalf of Guarantor, contains any untrue or misleading statement of a material fact or omits a material fact necessary to make the statements herein or in the Loan Documents not misleading; and, to the best of Guarantor's knowledge, there is no fact which Guarantor has not disclosed to Lenders in writing which materially affects adversely or, so far as Guarantor can now foresee, will materially affect adversely the property covered by the Mortgage or the business affairs or financial condition of Guarantor, or the ability of Guarantor to perform this Guaranty and the Loan Documents to which Guarantor is a party.

12.    <u>Financial Statements</u>.  The most recent financial statements heretofore delivered by Guarantor to Lenders are true, correct and complete in all material respects, have been prepared in accordance with sound accounting principles consistently applied and fairly present Guarantor's financial condition as of the respective dates thereof; no material adverse change has occurred in the financial conditions reflected therein since the respective dates thereof. Guarantor will provide the financial information in the form and at the times required pursuant to Section 6.18 of the Building Loan Agreement.

13.    <u>Financial Covenants</u>.  Guarantor covenants and agrees that for so long as any of the Note held by any Lender remains unpaid, or any other amount is owing by Borrower or Guarantor to Administrative Agent or any Lender hereunder or under any other Loan Document:

(a)    <u>Net Worth</u>. Guarantor shall maintain at all times a minimum combined net worth of not less than $250,000,000.00, (the "Guarantor

Net Worth Covenant"). Guarantor's combined net worth shall be established from time to time by: (i) the market value of liquid assets and marketable securities traded on a recognized exchange, and (ii) by estimates of fair market value made in good faith by Guarantor as to all other assets, as evidenced by Guarantor's most recent personal financial statements provided in accordance with the provisions of this Guaranty or the Loan Agreement. Administrative Agent shall have the right to require Guarantor to update Guarantor's financial statement more frequently than annually, if Administrative Agent so requires in order to determine compliance with the Guarantor Net Worth Covenant. Administrative Agent may dispute any estimates of fair market value made by Guarantor and, if such disputes are not resolved by Administrative Agent and Guarantor within thirty (30) days, Administrative Agent may have the value of the assets in question appraised in any manner reasonably determined by Administrative Agent, at Borrower's cost, and the results of such appraisal shall govern.

(b)     <u>Liquid Assets</u>. Guarantor shall maintain at all times combined liquid assets which are totally unencumbered (whether in favor of Administrative Agent or anyone else) and as to which there are no restrictions upon use thereof imposed by any agreement to which Guarantor or any of its property may be bound, of not less than $10,000,000.00 (consisting of cash or cash equivalents or obligations of, or guaranteed by, the United States of America, having a maturity of not more than one (1) year) (the "Guarantor Liquidity Covenant", and together with the Guarantor Net Worth Covenant, the "Guarantor Special Covenants"). For purposes of clarification, compliance with the Guarantor Special Covenants shall be determined based on the combined net worth and combined liquid assets of Simon Elias and Izak Senbahar.

(c)     <u>Certificate of Compliance</u>. Not later than one hundred twenty (120) days after the end of each annual period ending on December 31 in each calendar year, Guarantor shall deliver to Administrative Agent Guarantor's personally signed statement certifying that the Guarantor Special Covenants are satisfied or, if not satisfied in any manner, setting forth Guarantor's actual minimum net worth and actual unrestricted and unencumbered cash or cash equivalents as of the period just ended.

14.     <u>Non-Waiver; Remedies Cumulative</u>. No failure or delay on Lenders' part in exercising any right, power or privilege under any of the Loan Documents, this Guaranty or any other document made to or with Lenders in connection with the Loan shall operate as a waiver of any such privilege, power or right or shall be deemed to constitute Lenders' acquiescence in any default by Borrower or Guarantor under any of said documents. A waiver by Lenders of any right or remedy under any of the Loan Documents, this Guaranty or any other document made to or with Lenders in connection with the Loan on any one occasion shall not be construed as a bar to any right or remedy which Lenders otherwise would have on any future occasion. The rights and remedies provided in said documents are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law.

26.    <u>Counterparts</u>.    This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original.    Said counterparts shall constitute but one and the same instrument and, if more than one Guarantor, shall be binding upon each of them individually as fully and completely as if all had signed but one instrument so that the joint and several liability of each Guarantor under this Guaranty shall be unaffected by the failure of any other Guarantor to execute any or all of said counterparts.

Very truly yours,

SIMON ELIAS

Address of Guarantor:

c/o Gama Holdings Ltd.
150 East 58th Street
New York, New York 10155

IZAK SENBAHAR

Address of Guarantor:

c/o Alexico Group LLC
150 East 58th Street
New York, New York 10155

This is to certify that this Guaranty was executed in my presence on the date hereof by Izak Senbahar whose signature appears above in his individual capacity.

_____
Notary Public

DOMINADOR E. ALMEDA
Notary Public, State of New York
No. 02AL6064479
Qualified in New York County
Commission Expires September 24, 2009

My Commission Expires:

_____

This is to certify that this Guaranty was executed in my presence on the date hereof by Simon Elias whose signature appears above in his individual capacity.

Notary Public

DOMINADOR E. ALMEDA
Notary Public, State of New York
No. 02AL6064479
Qualified in New York County
Commission Expires September 24, 2009

My Commission Expires:

_____

# EXHIBIT J

## TO DECLARATION OF IZAK SENBAHAR

COMPLETION COSTS GUARANTY

December 20, 2007

Anglo Irish Bank Corporation plc
222 East 41st Street
New York, New York 10017

Attention:      Real Estate Finance

    and

the other "Lenders", as such quoted term is
defined in the Building Loan Agreement
defined below

> Re:    $60,780,200.00 building loan (the "Building Loan") and
> $22,719,800.00 project loan (the "Project Loan" and, with
> the Building Loan, collectively, the "Loan") from Anglo
> Irish Bank Corporation plc ("Anglo") and certain other
> "Lenders" (as such quoted term is defined in the Building
> Loan Agreement, as hereinafter defined) to Mark Hotel
> LLC ("Borrower")

Dear Sir/Madam:

    To induce Lenders to consummate the captioned transaction in accordance with (i) a Building Loan Agreement ("the Building Loan Agreement") and a Project Loan Agreement (as the same may be amended, modified or supplemented from time to time, hereinafter, collectively, the "Agreement") among Borrower, as borrower, Lenders party thereto, as lenders, and Anglo, as Administrative Agent for Lenders (in such capacity, together with its successors in such capacity, "Administrative Agent"), (ii) the Notes which evidence the Loan (as the same may be amended, modified, extended, severed, assigned, renewed or restated from time to time, including any substitute or replacement notes executed pursuant to the Agreement, collectively, the "Note"), and (iii) the Mortgages held by Administrative Agent, for the benefit of Lenders, which secure the Loan (as same may hereafter be amended, modified or consolidated from time to time, collectively, the "Mortgage" and the term "Mortgage" shall be deemed to include any other agreement given to Lenders or Administrative Agent as security for the Loan), the undersigned (hereinafter, and if there are two or more signers now or hereafter, each of them individually and collectively, "Guarantor") hereby jointly and severally (except in the case of paragraphs 7 through 12 below which are made severally by each Guarantor) represents, warrants and covenants to Lenders as follows *(capitalized terms used herein*

10.     Compliance with Laws.  To the best of Guarantor's knowledge, Guarantor is in compliance with, and the transactions contemplated by the Loan Documents and this Guaranty do not and will not violate any provision of, or require any filing, registration, consent or approval under, any Law presently in effect having applicability to Guarantor, the failure to comply with which is likely to have a material adverse effect on Guarantor's business or financial condition. Guarantor will comply promptly with all Laws now or hereafter in effect having applicability to it, the failure to comply with which is likely to have a material adverse effect on Guarantor's business or financial condition.

11.     Accuracy of Information; Full Disclosure.  Neither this Guaranty nor any documents, financial statements, reports, notices, schedules, certificates, statements or other writings furnished by or on behalf of Guarantor to Administrative Agent or Lenders in connection with the negotiation of the Loan Documents or the consummation of the transactions contemplated thereby, or required herein or by the other Loan Documents to be furnished by or on behalf of Guarantor, contains any untrue or misleading statement of a material fact or omits a material fact necessary to make the statements herein or in the other Loan Documents not misleading; and to the best of Guarantor's knowledge, there is no fact which Guarantor has not disclosed to Administrative Agent in writing which materially affects adversely or, so far as Guarantor can now foresee, will materially affect adversely any of the property covered by the Mortgage or the business affairs or financial condition of Guarantor, or the ability of Guarantor to perform this Guaranty and the other Loan Documents to which Guarantor is a party.

12.     Financial Statements.   The most recent financial statements heretofore delivered by Guarantor to Administrative Agent or Lenders are true, correct and complete in all material respects, have been prepared in accordance with sound accounting principles consistently applied and fairly present Guarantor's financial condition as of the respective dates thereof; no material adverse change has occurred in the financial conditions reflected therein since the respective dates thereof. Guarantor will provide the financial information in the form and at the times required pursuant to Section 6.18 of the Building Loan Agreement.

13.     Financial Covenants.  Guarantor covenants and agrees that for so long as any of the Note held by any Lender remains unpaid, or any other amount is owing by Borrower or Guarantor to Administrative Agent or any Lender hereunder or under any other Loan Document:

(a)     Net Worth. Guarantor shall maintain at all times a minimum combined net worth of not less than $250,000,000, (the "Guarantor Net Worth Covenant").  Guarantor's combined net worth shall be established from time to time by: (i) the market value of liquid assets and marketable securities traded on a recognized exchange, and (ii) by estimates of fair market value made in good faith by Guarantor as to all

other assets, as evidenced by Guarantor's most recent personal financial statements provided in accordance with the provisions of this Guaranty or the Loan Agreement. Administrative Agent shall have the right to require Guarantor to update Guarantor's financial statement more frequently than annually, if Administrative Agent so requires in order to determine compliance with the Guarantor Net Worth Covenant. Administrative Agent may dispute any estimates of fair market value made by Guarantor and, if such disputes are not resolved by Administrative Agent and Guarantor within thirty (30) days, Administrative Agent may have the value of the assets in question appraised in any manner reasonably determined by Administrative Agent, at Borrower's cost, and the results of such appraisal shall govern.

(b)     <u>Liquid Assets</u>.  Guarantor shall maintain at all times combined liquid assets which are totally unencumbered (whether in favor of Administrative Agent or anyone else) and as to which there are no restrictions upon use thereof imposed by any agreement to which Guarantor or any of its property may be bound, of not less than $10,000,000 (consisting of cash or cash equivalents or obligations of, or guaranteed by, the United States of America, having a maturity of not more than one (1) year) (the "Guarantor Liquidity Covenant", and together with the Guarantor Net Worth Covenant, the "Guarantor Special Covenants").  For purposes of clarification, compliance with the Guarantor Special Covenants shall be determined based on the combined net worth and combined liquid assets  of Simon Elias and Izak Senbahar.

(c)     <u>Certificate of Compliance</u>.  Not later than one hundred twenty (120) days after the end of each annual period ending on December 31 in each calendar year, Guarantor shall deliver to Administrative Agent Guarantor's personally signed statement certifying that the Guarantor Special Covenants are satisfied or, if not satisfied in any manner, setting forth Guarantor's actual minimum net worth and actual unrestricted and unencumbered cash or cash equivalents as of the period just ended.

14.     <u>Non-Waiver; Remedies Cumulative</u>.   No failure or delay on Administrative Agent's or Lenders' part in exercising any right, power or privilege under any of the Loan Documents, this Guaranty or any other document made to or with Lenders or Administrative Agent in connection with the Loan shall operate as a waiver of any such privilege, power or right or shall be deemed to constitute Lenders' or Administrative Agent's acquiescence in any default by Borrower or Guarantor under any of said documents.  A waiver by Lenders or Administrative Agent of any right or remedy under any of the Loan Documents, this Guaranty or any other document made to or with Lenders or Administrative Agent in connection with the Loan on any one occasion shall not be construed as a bar to any right or remedy which Lenders or Administrative Agent otherwise would have on any future occasion.  The rights and remedies provided in said

26.    Counterparts.    This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original.  Said counterparts shall constitute but one and the same instrument and, if more than one Guarantor, shall be binding upon each of them individually as fully and completely as if all had signed but one instrument so that the joint and several liability of each Guarantor under this Guaranty shall be unaffected by the failure of any other Guarantor to execute any or all of said counterparts.

Very truly yours,

SIMON ELIAS

Address of Guarantor:

c/o Gama Holdings Ltd.
150 East 58th Street
New York, New York  10155

IZAK SENBAHAR

Address of Guarantor:

c/o Alexico Group LLC
150 East 58th Street
New York, New York  10155

This is to certify that this Guaranty was executed in my presence on the date hereof by Izak Senbahar whose signature appears above in his individual capacity.

_____

Notary Public

My Commission Expires:

DOMINADOR E. ALMEDA
Notary Public, State of New York
No. 02AL6064479
Qualified in New York County
Commission Expires September 24, 2009

_____

This is to certify that this Guaranty was executed in my presence on the date hereof by Simon Elias whose signature appears above in his individual capacity.

_Miriade E. A_

Notary Public

My Commission Expires:

DOMINADOR E. ALMEDA
Notary Public, State of New York
No. 02AL6064479
Qualified in New York County
Commission Expires September 24, 2009

_____

# EXHIBIT K

## TO DECLARATION OF IZAK SENBAHAR

# AMENDED AND RESTATED
# MEZZANINE LOAN AGREEMENT

dated as of December __, 2007

among

## MARK HOTEL MEMBER LLC,
as Borrower,

and

## FILLMORE EAST MS FINANCE SUBSIDIARY LLC,
as Lender

LOCATION OF PREMISES:

Section 5, Block 1392, Lots 17 and 56
21-35 East 77th Street and 1000 Madison Avenue
New York, New York

ARTICLE I

PARTICULAR TERMS, DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.01.    Particular Terms.    As used in this Agreement, the following terms shall have the respective meanings indicated opposite each of them; where the meaning of any term is stated to be "None", provisions involving the application of that term shall be disregarded.

"Aggregate Change Order Amount" -- $500,000.

"Change Order Amount" -- $500,000.

"Commitment Fee" -- $174,820.00.

"Completion Date" – November 30, 2008, as such date may be extended by Force Majeure, not to exceed six (6) months in the aggregate, but in no event shall the Completion Date be extended beyond the Maturity Date.

"Construction Consultant" – Bob Mackenzie, PE, or other Person or firm designated by Lender.

"Construction Manager" – F.J. Sciame Construction Co., Inc., or such other construction manager approved by Lender.

"Guarantor" -- Jointly and severally, Simon Elias, an individual, and Izak Senbahar, an individual and any other Person(s) who may hereafter become a guarantor of any or all of Borrower's obligations in respect of the Loan.

"Guarantor Special Covenants" – As defined in the Guaranty.

"Improvements" -- 15-story luxury mixed use development comprised of a 118-key first class hotel, approximately 42 hotel cooperative units containing approximately 66,479 net saleable square feet of space, on floors 9 through and including the penthouse and retail/commercial space containing approximately 18,200 net rentable square feet of space.

"Loan Amount" – $43,275,000, of which $25,793,011.00 has been advanced in connection with the Original Loan, and $17,481,989.00 will be advanced subject to and in accordance with the provisions contained herein.

"Maturity Date" – February 15, 2009, or such other date on which the final payment of the Principal Amount becomes due and payable, by declaration of acceleration or otherwise under the terms of this Agreement.

"Offsite Stored Material Amount" -- $1,000,000.

"Sponsor" -- Has the meaning specified in Section 6.20.

"Stored Material Amount" -- $2,000,000.

reasonable control of Borrower or Owner (not including the insolvency or financial condition of Borrower, Owner or any member or partner of Borrower or Owner or any other Affiliate of Borrower or Owner).

"Governmental Authorities" -- The United States, the State of New York and any political subdivision, agency, department, commission, board, bureau or instrumentality of either of them, including any local authorities, which exercises jurisdiction over Borrower, Owner, Guarantor, the Collateral, the Premises or the Improvements.

"Ground Lease" – individually and collectively, (i) that certain lease, dated August 1, 1981, between Avon Associates, Inc. and Madison Avenue Hotel Partners (now known as Madison Avenue Hotel Partners, L.P.), a memoranda of which was recorded in the Office of the City Register of the County of New York (the "Register's Office") in Reel 577, Page 912; and (ii) that certain lease, dated August 1, 1981, between Avon Associates, Inc. and Madison Avenue Hotel Partners (now known as Madison Avenue Hotel Partners, L.P.), a memoranda of which was recorded in the Register's Office in Reel 577, Page 916.

"Ground Lessor" – The "Lessor" as defined in the Ground Lease.

"Guarantor Special Covenants" – As defined in the Guaranty.

"Guaranty" – Collectively, the Payment Guaranty, the Completion Guaranty and the Recourse Guaranty.

"Hazardous Materials" – means any pollutant, effluents, emissions, contaminants, toxic or hazardous wastes, materials or substances, as any of those terms are defined from time to time in or for the purposes of any relevant environmental law, rule, regulation, code, permit, order, notice, demand letter or other binding determination (hereinafter, "**Environmental Laws**") including, without limitation, asbestos fibers and friable asbestos, polychlorinated biphenyls and any petroleum or hydrocarbon-based products or derivatives.

"Hotel" -- The portion of the Improvements constituting the 118-key first class hotel.

"Hotel Assets" shall mean all Improvements, structures, facilities, appurtenances, furniture, fixtures, equipment and any other personal property utilized in connection with the operation of the Hotel.

"Hotel Management Agreement" – The hotel management agreement to be entered into between Hotel Manager and Owner with respect to the Hotel, or any other hotel manager reasonably approved by Lender.

"Hotel Manager" – An Affiliate of Owner controlled by Izak Senbahar and/or Simon Elias.

"Indemnity" -- An agreement from Borrower and Guarantor or, if there is no Guarantor, such other Persons as shall be satisfactory to Lender, whereby, among other things, Lender is indemnified regarding Hazardous Materials.

a servicing agreement (the "**Servicing Agreement**") between Lender and Servicer; provided, however, such delegation will not release Lender from any of its obligations under the Loan Documents. The Borrower shall also be responsible for the payment of all reasonable costs and expenses of the Servicer, if any, in connection with the Loan. Any action or inaction taken by the Servicer pursuant to this Agreement and the Loan Documents shall be binding to the same extent as if taken by Lender, and the Borrower shall be entitled to rely on all actions and directions given by Servicer with respect to all matters concerning the Loan and Loan Documents unless and until Borrower receives contrary written instructions from the Lender.

ARTICLE X

EVENTS OF DEFAULT

Section 10.01. Events of Default.  Any of the following events shall be an "Event of Default":

(1)     if (i) Borrower shall fail to make any payment of any principal or interest under the Note when and as the same shall become due and payable, and such default shall have continued for a period of ten (10) days or (ii) default shall be made in the payment of any other sum under the Note, this Agreement, the Security Instrument or any other document executed and delivered to Lender in connection with the Loan and such default shall have continued for a period of five (5) days after notice from Lender to Borrower; or

(2)     if any representation or warranty made to Lender in this Agreement or in any other Loan Document, or which is contained in any certificate, document, opinion, financial or other statement furnished at any time in connection with the Loan, shall prove to have been incorrect in any material respect on or as of the date made; or

(3)     if Borrower shall fail to perform or observe any term, covenant or agreement contained in this Agreement or in any other Loan Document (other than obligations specifically referred to elsewhere in this Section 10.01, if any) or in any other document executed or delivered to Lender in connection with the Loan, and such failure shall remain unremedied for thirty (30) days after notice thereof from Lender unless such default cannot, with due diligence, be cured within such grace period in which case no Event of Default shall be deemed to exist so long as Borrower shall have commenced to cure the default within such grace period and thereafter diligently and with continuity prosecutes such cure to completion but in no event beyond ninety (90) days of such notice; or

(4)     if Borrower shall (a) generally not, or be unable to, or shall admit in writing its inability to, pay its debts as such debts become due; or (b) make an assignment for the benefit of creditors, petition or apply to any tribunal for the appointment of a custodian, receiver or trustee for it or for all or any material part of its assets; or (c) commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation Law of any jurisdiction,

**Members**") provided that at all times after any such transfer and at all times during the term of the Loan, Izak Senbahar and/or Simon Elias, directly or indirectly, (i) maintain no less than a fifty-one percent (51%) ownership interest in Borrower and Owner (except transfer as a result of death), and (ii) remain in control of the day-to-day operations of Borrower and Owner. Notwithstanding the foregoing, Lender shall not unreasonably withhold or delay its consent to transfers in excess of 49% of the ownership interests in Borrower or Owner, directly or indirectly, to any Family Members, provided that after such transfer or transfers, Izak Senbahar and/or Simon Elias remain in control, directly or indirectly (i) of the Borrower and Owner, and (ii) of any such entity that such interests are transferred to; or

(8)    if Borrower or Owner shall encumber, or agree to encumber, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Premises, or any interest or rights therein (including air or development rights) without, in any such case, the prior written consent of Lender; provided, however, that nothing in this Section 10.01(8) shall be deemed or construed to prohibit the Senior Mortgage. "Encumber" shall not include an involuntary lien bonded, discharged or insured over within thirty (30) days after notice thereof is received by Owner or Borrower. (Lender may grant or deny its consent under this clause and the immediately preceding clause in its sole discretion; consent to one such transfer or encumbrance shall not be deemed to be a waiver of the right to require consent to future or successive transfers or encumbrances); or

(9)    if default shall occur in the due observance or performance of any of the Guarantor Special Covenants; or

(10)    if there exists a default beyond the lapse of any applicable notice and grace period under the Ground Lease; or

(11)    if Borrower fails to comply with any provisions of Section 6.20, Section 9.01 or Section 9.02 herein regarding (a) the payment of monies for a period of ten (10) days after receipt of notice of such failure from Lender, or (b) any other non-monetary provisions within thirty (30) days after receipt of notice of such failure from Lender.

Section 10.02. Remedies.    If any Event of Default shall occur and be continuing, (i) Borrower shall pay Lender interest on the outstanding principal balance under the Note at the Default Rate and (ii) Lender may (a) declare the outstanding balance of the Note, all interest thereon, and all other amounts payable under this Agreement and other Loan Documents to be forthwith due and payable, whereupon such balance, all such interest, and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest, or further notice of any kind, all of which are hereby expressly waived by Borrower and/or (b) exercise any remedies provided in any of the Loan Documents or by Law.

**[Signature Page to Amended and Restated Mezzanine Loan Agreement]**

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the day and year first above written, the execution hereof by Borrower constituting a certification by Borrower that the representations and warranties made in Article V are true and correct as of the date hereof and that the party executing on behalf of Borrower duly holds and is incumbent in the position indicated under his or her name and that each Requisition shall constitute the affirmation of Borrower that at the time thereof said representations and warranties are true and correct.

**MARK HOTEL MEMBER LLC**, a New York limited liability company

By: _____
Name: Izak Senbahar
Title:  Co-Manager

Address for notices:

c/o Alexico Group LLC
150 East 58th Street, 33rd Floor
New York, New York 10155
Attention:     Mr. Izak Senbahar

[Signature Page to Amended and Restated Mezzanine Loan Agreement, continued]

**FILLMORE EAST MS FINANCE SUBSIDIARY, LLC,** a Delaware limited liability company

By:
Name:      Michael O. Reinardy
Title:      Senior Vice President

Address for notices:

c/o Fillmore Capital Partners, LLC
Four Embarcadero Center
Suite 710
San Francisco, CA 94111
Attention:    Mr. Ronald E. Silva

With a copy to:

Windels Marx Lane & Mittendorf LLP
156 West 56th Street
New York, New York 10019
Attention:    Tina J. Gagliano, Esq.

**[Acknowledgment Page to Amended and Restated Mezzanine Loan Agreement]**

STATE OF NEW YORK    )
                       :  ss.:

COUNTY OF NEW YORK  )

On the _10_ day of _Dec_ in the year 2007, before me, the undersigned, a notary public in and for said state, personally appeared Izak Senbahar, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____

Notary Public       **DOMINADOR E. ALMEDA**
                             **Notary Public, State of New York**
                                **No. 02AL6064479**
                          **Qualified in New York County**
My Commission Expires:     **Commission Expires September 24, 2009**

_____

[Acknowledgment Page to Amended and Restates Mezzanine Loan Agreement, continued]

## ACKNOWLEDGMENT

STATE OF CALIFORNIA                    )

COUNTY OF _San Francisco_____    )


On__December 17, 2007___ before me, Heather E. Nickel, Notary Public, personally appeared _Michael Reinadu_, personally known to me to be the person whose name is subscribed to the within instrument and acknowledges to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_Heather E Nickel_ (signature of notary)



HEATHER E. NICKEL
Commission # 1644474
Notary Public - California
San Francisco County
My Comm. Expires Feb 11, 2010

# EXHIBIT L

## TO DECLARATION OF IZAK SENBAHAR

## AMENDED AND RESTATED GUARANTY OF PAYMENT

       **THIS AMENDED AND RESTATED GUARANTY OF PAYMENT** dated as of December *20*, 2007 (this "**Guaranty**"), between **FILLMORE EAST MS FINANCE SUBSIDIARY, LLC**, a Delaware limited liability company, having an address c/o Fillmore Capital Partners, LLC, Four Embarcadero Center, San Francisco, California 94111 (the "**Lender**"), and **SIMON ELIAS**, an individual residing at 400 East 51st Street, New York, New York 10022, and **IZAK SENBAHAR**, an individual residing at 2 East 88th Street, 10th Floor, New York, New York 10128 (collectively, the "**Guarantor**"), amends and restates the Original Guaranty as more particularly defined herein.

       **WHEREAS**, Anglo Irish Bank Corporation, PLC ("**Originating Lender**") made a loan to Mark Hotel Member LLC (the "**Borrower**") in the original principal sum of Twenty Five Million Seven Hundred Ninety Three Thousand Eleven and 47/100 Dollars ($25,793,011.47) (the "**Original Loan**") pursuant to that certain Mezzanine Loan Agreement dated as of February 15, 2006 (the "**Initial Loan Agreement**"), as amended by that certain First Omnibus Amendment to Loan Agreement and Loan Documents dated as of May 2, 2007 (the "**First Omnibus Amendment**") by and between Originating Lender and Borrower, which Original Loan is evidenced by, among other things, an Amended and Restated Promissory Note dated as of May 2, 2007 (the "**Original Note**") made by Borrower to Originating Lender and secured by, among other things, that certain Ownership Interest Pledge and Security Agreement dated as of February 15, 2006 (the "**Original Security Instrument**") by Borrower to Originating Lender, pursuant to which Borrower granted Originating Lender a first priority lien on, among other things, the collateral as more fully described in the Original Security Instrument (the Original Security Instrument, together with the other documents executed in connection with the Original Loan (as amended, supplemented or otherwise modified from time to time) are collectively referred to herein as the "**Original Loan Documents**");

       **WHEREAS**, Originating Lender assigned all its right, title and interest in and to the Original Loan, the Initial Loan Agreement, the First Omnibus Amendment and the Original Loan Documents to Lender pursuant to that certain Assignment and Assumption Agreement dated as of May 2, 2007 between Originating Lender and Lender;

       **WHEREAS**, Borrower and Lender amended the Initial Loan Agreement and First Omnibus Amendment and the Original Loan Documents pursuant to that certain (i) Second Omnibus Amendment to Loan Agreement and Loan Documents dated as of August 15, 2007 (the "**Second Omnibus Amendment**") and (ii) Third Omnibus Amendment to Loan Agreement and Loan Documents dated as of November 30, 2007 (the "**Third Omnibus Amendment**") (the Initial Loan Agreement, the First Omnibus Amendment, the Second Omnibus Amendment and the Third Omnibus Amendment are hereinafter collectively referred to as the "**Original Loan Agreement**");

filing, registration, consent or approval under, any Laws presently in effect having applicability to Guarantor, the failure to comply with which is likely to have a material adverse effect on Guarantor's business or financial condition. Guarantor will comply promptly with all Laws now or hereafter in effect having applicability to it, the failure to comply with which is likely to have a material adverse effect on Guarantor's business or financial condition.

11.     <u>Accuracy of Information; Full Disclosure</u>. Neither this Guaranty nor any documents, financial statements, reports, notices, schedules, certificates, statements or other writings furnished by or on behalf of Guarantor to Lender in connection with the negotiation of the Loan Documents or the consummation of the transactions contemplated thereby, or required herein or by the Loan Documents to be furnished by or on behalf of Guarantor, contains any untrue or misleading statement of a material fact or omits a material fact necessary to make the statements herein or in the Loan Documents not misleading; and, to the best of Guarantor's knowledge, there is no fact which Guarantor has not disclosed to Lender in writing which materially affects adversely or, so far as Guarantor can now foresee, will materially affect adversely the Collateral or the property covered by the Senior Mortgage or the business affairs or financial condition of Guarantor, or the ability of Guarantor to perform this Guaranty and the Loan Documents to which Guarantor is a party.

12.     <u>Financial Statements</u>. The most recent financial statements heretofore delivered by Guarantor to Lender are true, correct and complete in all material respects, have been prepared in accordance with sound accounting principles consistently applied and fairly present Guarantor's financial condition as of the respective dates thereof; no material adverse change has occurred in the financial conditions reflected therein since the respective dates thereof. Guarantor will provide the financial information in the form and at the times required pursuant to Section 6.18 of the Loan Agreement.

13.     <u>Financial Covenants</u>. Guarantor covenants and agrees that for so long as any of the Note remains unpaid, or any other amount is owing by Borrower or Guarantor to Lender hereunder or under any other Loan Document:

(a)     <u>Net Worth</u>. Guarantor shall maintain at all times a minimum combined net worth of not less than $250,000,000.00, (the "**Guarantor Net Worth Covenant**"). Guarantor's combined net worth shall be established from time to time by: (i) the market value of liquid assets and marketable securities traded on a recognized exchange, and (ii) by estimates of fair market value made in good faith by Guarantor as to all other assets, as evidenced by Guarantor's most recent personal financial statements provided in accordance with the provisions of this Guaranty or the Loan Agreement. Lender shall have the right to require Guarantor to update Guarantor's financial statement not more frequently than annually, if Lender so requires in order to determine compliance with the Guarantor Net Worth Covenant. Lender may dispute any estimates of fair market value made by Guarantor and, if such disputes are not resolved by Lender and Guarantor within thirty (30) days, Lender may have the value of the

assets in question appraised in any manner reasonably determined by Lender, at Borrower's cost, and the results of such appraisal shall govern.

(b)    Liquid Assets.    Guarantor shall maintain at all times combined liquid assets which are totally unencumbered (whether in favor of Lender or anyone else) and as to which there are no restrictions upon use thereof imposed by any agreement to which Guarantor or any of its property may be bound, of not less than $15,000,000.00 (consisting of cash or cash equivalents or obligations of, or guaranteed by, the United States of America, having a maturity of not more than one (1) year) (the "**Guarantor Liquidity Covenant**", and together with the Guarantor Net Worth Covenant, the "**Guarantor Special Covenants**"). For purposes of clarification, compliance with Guarantor Special Covenants shall be determined based on the combined net worth and combined liquid assets of Simon Elias and Izak Senbahar.

(c)    Certificate of Compliance.    Not later than one hundred twenty (120) days after the end of each annual period ending on December 31 in each calendar year, Guarantor shall deliver to Lender Guarantor's personally signed statement certifying that the Guarantor Special Covenants are satisfied or, if not satisfied in any manner, setting forth Guarantor's actual minimum net worth and actual unrestricted and unencumbered cash or cash equivalents as of the period just ended.

14.    Intentionally Omitted.

15.    Non-Waiver; Remedies Cumulative.    No failure or delay on Lender's part in exercising any right, power or privilege under any of the Loan Documents, this Guaranty or any other document made to or with Lender in connection with the Loan shall operate as a waiver of any such privilege, power or right or shall be deemed to constitute Lender's acquiescence in any default by Borrower or Guarantor under any of said documents. A waiver by Lender of any right or remedy under any of the Loan Documents, this Guaranty or any other document made to or with Lender in connection with the Loan on any one occasion shall not be construed as a bar to any right or remedy which Lender otherwise would have on any future occasion. The rights and remedies provided in said documents are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law.

16.    Liability Unaffected by Release.    Any Guarantor, or any other party liable upon or in respect of any obligation hereby guaranteed, may be released without affecting the liability of any Guarantor not so released.

17.    Transfers of Interests in Loan.    Guarantor recognizes that Lender may sell and transfer interests in the Loan to one or more participants and/or assignees in accordance with Section 8.13 of the Loan Agreement and that all documentation, financial statements, appraisals and other data, or copies thereof, relevant to Borrower, any Guarantor or the Loan, may be exhibited to or delivered on a confidential basis by

[Signature Page to Amended and Restated Guaranty of Payment]

**IN WITNESS WHEREOF,** the parties hereto have executed this Guaranty as of the day and year first written above.

SIMON ELIAS

Address of Guarantor:

c/o Gama Holdings Ltd.
135 West 52nd Street
New York, New York  10019

IZAK SENBAHAR

Address of Guarantor:

c/o Alexico Group LLC
150 East 58th Street
New York, New York  10155

[Signature Page to Amended and Restated Guaranty of Payment, continued]

This is to certify that this Guaranty was executed in my presence on the date hereof by Simon Elias whose signature appears above in the capacity indicated.

_____
Notary Public

**DOMINADOR E. ALMEDA**
Notary Public, State of New York
No. 02AL6064479
Qualified in New York County
Commission Expires September 24, 2009

My Commission Expires:

_____


This is to certify that this Guaranty was executed in my presence on the date hereof by Izak Senbahar whose signature appears above in the capacity indicated.

_____
Notary Public

**DOMINADOR E. ALMEDA**
Notary Public, State of New York
No. 02AL6064479
Qualified in New York County
Commission Expires September 24, 2009

My Commission Expires:

_____

**[Signature Page to Amended and Restated Promissory Note]**

IN WITNESS WHEREOF, Maker has executed and delivered this Note as of the date first above written.

**MARK HOTEL MEMBER LLC**, a New York limited liability company

By: _____

Name:

Title:

# EXHIBIT M

## TO DECLARATION OF IZAK SENBAHAR

COMPLETION COSTS GUARANTY

December 2̄8̄, 2007

Fillmore East MS Finance Subsidiary LLC
c/o Fillmore Capital Partners, LLC
Four Embarcadero Center
San Francisco, California 94111

Re:   $43,275,000.00 mezzanine construction loan (the "**Loan**")
from Fillmore East MS Finance Subsidiary, LLC
("**Lender**") to Mark Hotel Member LLC ("**Borrower**")

Dear Sir/Madam:

To induce Lender to consummate the captioned transaction in accordance
with (i) that certain Amended and Restated Mezzanine Loan Agreement dated the date
hereof (as the same may be amended, modified or supplemented from time to time, the
"**Loan Agreement**" among Borrower, as borrower, and Lender, as lender, (ii) that
certain Amended and Restated Promissory Note dated the date hereof given by Borrower
to Lender, which evidences the Loan (as the same may be amended, modified, extended,
severed, assigned, renewed or restated from time to time, including any substitute or
replacement notes executed pursuant to the Loan Agreement, the "**Note**"), and (iii) that
certain Amended and Restated Pledge and Security Agreement dated the date hereof and
made by Borrower to Lender, whereby Borrower has pledged its 100% membership
interest in each of Mark Hotel LLC and Mark Hotel Sponsor LLC to Lender (as same
may hereafter be amended, modified or consolidated from time to time, the "**Security
Instrument**"), the undersigned (hereinafter, and if there are two or more signers now or
hereafter, each of them individually and collectively, "Guarantor") hereby jointly and
severally (except in the case of paragraphs 7 through 12 below which are made severally
by each Guarantor) represents, warrants and covenants to Lender as follows *(capitalized
terms used herein without definition having their respective meanings ascribed thereto in
the Loan Agreement)*:

1.   Authorization and Enforceability of Loan Documents.   The
Agreement, Note, Security Instrument and all other documents executed and
delivered by Borrower to Lender in connection with the Loan (collectively, the
"**Loan Documents**") have been duly authorized and executed by the signatories
thereto (other than Lender) and are legal, valid and binding instruments,
enforceable against such parties (other than Lender) in accordance with their
respective terms subject to the effect of bankruptcy, insolvency, reorganization,

misleading statement of a material fact or omits a material fact necessary to make the statements herein or in the other Loan Documents not misleading; and to the best of Guarantor's knowledge, there is no fact which Guarantor has not disclosed to Lender in writing which materially affects adversely or, so far as Guarantor can now foresee, will materially affect adversely any of the Collateral covered by the Security Instrument or the business affairs or financial condition of Guarantor, or the ability of Guarantor to perform this Guaranty and the other Loan Documents to which Guarantor is a party.

      12.   <u>Financial Statements</u>.  The most recent financial statements heretofore delivered by Guarantor to Lender are true, correct and complete in all material respects, have been prepared in accordance with sound accounting principles consistently applied and fairly present Guarantor's financial condition as of the respective dates thereof; no material adverse change has occurred in the financial conditions reflected therein since the respective dates thereof. Guarantor will provide the financial information in the form and at the times required pursuant to Section 6.18 of the Loan Agreement.

      13.   <u>Financial Covenants</u>.  Guarantor covenants and agrees that for so long as any of the Note held by Lender remains unpaid, or any other amount is owing by Borrower or Guarantor to Lender hereunder or under any other Loan Document:

      (a)   <u>Net Worth</u>. Guarantor shall maintain at all times a minimum combined net worth of not less than $250,000,000, (the "Guarantor Net Worth Covenant"). Guarantor's combined net worth shall be established from time to time by: (i) the market value of liquid assets and marketable securities traded on a recognized exchange, and (ii) by estimates of fair market value made in good faith by Guarantor as to all other assets, as evidenced by Guarantor's most recent personal financial statements provided in accordance with the provisions of this Guaranty or the Loan Agreement. Lender shall have the right to require Guarantor to update Guarantor's financial statement more frequently than annually, if Lender so requires in order to determine compliance with the Guarantor Net Worth Covenant. Lender may dispute any estimates of fair market value made by Guarantor and, if such disputes are not resolved by Lender and Guarantor within thirty (30) days, Lender may have the value of the assets in question appraised in any manner reasonably determined by Lender, at Borrower's cost, and the results of such appraisal shall govern.

      (b)   <u>Liquid Assets</u>. Guarantor shall maintain at all times combined liquid assets which are totally unencumbered (whether in favor of Lender or anyone else) and as to which there are no restrictions upon use thereof imposed by any agreement to which Guarantor or any of its property may be bound, of not less than $15,000,000 (consisting of cash or cash equivalents or obligations of, or guaranteed by, the United States of America, having a maturity of not more than one (1) year) (the

"**Guarantor Liquidity Covenant**", and together with the Guarantor Net Worth Covenant, the "**Guarantor Special Covenants**"). For purposes of clarification, compliance with the Guarantor Special Covenants shall be determined based on the combined net worth and combined liquid assets of Simon Elias and Izak Senbahar.

(c)  Certificate of Compliance. Not later than one hundred twenty (120) days after the end of each annual period ending on December 31 in each calendar year, Guarantor shall deliver to Lender Guarantor's personally signed statement certifying that the Guarantor Special Covenants are satisfied or, if not satisfied in any manner, setting forth Guarantor's actual minimum net worth and actual unrestricted and unencumbered cash or cash equivalents as of the period just ended.

14.  Non-Waiver; Remedies Cumulative.  No failure or delay on Lender's part in exercising any right, power or privilege under any of the Loan Documents, this Guaranty or any other document made to or with Lender in connection with the Loan shall operate as a waiver of any such privilege, power or right or shall be deemed to constitute Lender's acquiescence in any default by Borrower or Guarantor under any of said documents. A waiver by Lender of any right or remedy under any of the Loan Documents, this Guaranty or any other document made to or with Lender in connection with the Loan on any one occasion shall not be construed as a bar to any right or remedy which Lender otherwise would have on any future occasion. The rights and remedies provided in said documents are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by Law.

15.  Liability Unaffected by Release.  Any Guarantor, or any other party liable upon or in respect of any obligation hereby guaranteed, may be released without affecting the liability of any Guarantor not so released.

16.  Not a Payment Guaranty.  In no event shall this Guaranty be deemed to constitute a guaranty of the payment of the principal or the interest evidenced by the Note and secured by the Security Instrument.

17.  Transfers of Interests in Loan.  Guarantor recognizes that, subject to the provisions of Section 8.13 of the Loan Agreement, Lender may sell and transfer interests in the Loan to one or more participants and/or assignees and that all documentation, financial statements, appraisals and other data, or copies thereof, relevant to Borrower, any Guarantor or the Loan, may be exhibited to or delivered on a confidential basis to any such participant or assignee or prospective participant or assignee and retained by any such participant or assignee.

18.  Separate Indemnity/Other Guaranty.  Guarantor acknowledges and agrees that Lender's rights (and Guarantor's obligations) under this Guaranty shall be in addition to all of Lender's rights (and all of Guarantor's obligations) under any other guaranty or any indemnity agreement (including the Indemnity)

**[Signature Page to Completion Costs Guaranty]**

Very truly yours,

SIMON ELIAS

Address of Guarantor:

c/o Gama Holdings Ltd.
150 East 58th Street
New York, New York  10155

IZAK SENBAHAR

Address of Guarantor:

c/o Alexico Group LLC
150 East 58th Street
New York, New York  10155

This is to certify that this Guaranty was executed in my presence on the date hereof by Simon Elias whose signature appears above in his individual capacity.

Notary Public

**DOMINADOR E. ALMEDA**
Notary Public, State of New York
No. 02AL6064479
Qualified in New York County
Commission Expires September 24, 2009

My Commission Expires:

_____

This is to certify that this Guaranty was executed in my presence on the date hereof by Izak Senbahar whose signature appears above in his individual capacity.

Notary Public

**DOMINADOR E. ALMEDA**
Notary Public, State of New York
No. 02AL6064479
Qualified in New York County
Commission Expires September 24, 2009

My Commission Expires:

_____

# EXHIBIT N

## TO DECLARATION OF IZAK SENBAHAR

BUILDING LOAN AGREEMENT

Dated as of July 3, 2007

among

**1240 FIRST AVENUE LLC,**
as Borrower,

**HYPO REAL ESTATE CAPITAL CORPORATION,**
as Agent,

and

**THE LENDERS NAMED HEREIN,**
as Lenders

national emergency; (viii) unavailability of materials to the extent not within the reasonable control of Borrower or any Trade Contractor; (ix) strikes, lockouts or other labor trouble and (x) any other event or circumstance not within the reasonable control of Borrower or any Trade Contractor, but "Force Majeure Event" shall not include (A) inefficiencies on the part of any Borrower Party, Construction Manager, Architect or any Trade Contractor or other design professional, (B) late performance caused by failure to hire an adequate number of Trade Contractors, supervisors and/or laborers or by the failure to order supplies and materials in an orderly or timely fashion; (C) any cause or occurrence which Borrower, Construction Manager, Architect or any Trade Contractor could reasonably avoid or circumvent; and (D) delays, stoppage or any other interference with the construction of the Improvements caused by insolvency, bankruptcy or any lack of funds of Construction Manager, Architect, any Trade Contractor or any Borrower Party (except to the extent such lack of funds arises from any Lender's default in its obligation to provide such funds in accordance with the terms of this Agreement).

"**Funding Statement**" means that certain Funding Statement, dated as of the date hereof, executed by Borrower and Agent in connection with the closing of the Loan.

"**Governmental Authority**" means any foreign or domestic national or federal government, any state, regional, local or other political subdivision thereof with jurisdiction and any Person with jurisdiction exercising executive, legislative, judicial, regulatory, administrative or quasi- administrative functions of or pertaining to government or quasi-governmental issues (including, without limitation, any court, authority, arbiter, department, office, agency, board, commission, bureau or instrumentality) of any nature whatsoever, whether now or hereafter in existence.

"**Gross Revenue**" means all revenue derived from the ownership and operation of the Property from whatever source, including, but not limited to, Rents, but excluding (a) sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, (b) non-recurring revenues, (c) security deposits (except to the extent properly utilized under the applicable Lease to offset a loss of Rent under the applicable Lease), (d) refunds and uncollectible accounts, (e) Insurance Proceeds, (f) Awards (other than business interruption or other loss of income insurance related to business interruption or loss of income for the period in question), (g) Net Sales Proceeds and (h) any disbursements to Borrower of any funds established by the Loan Documents (except to the extent funded from the Reserve Funds).

"**Gross up Amounts**" shall have the meaning specified in Section 2.4.8.

"**Guaranties**" means the Completion Guaranty, the Guaranty of Recourse Obligations and the Environmental Indemnity, and each, individually, a "**Guaranty**".

"**Guarantor**" means Senbahar and Elias, jointly and severally.

"**Guaranty Obligations**" means any obligations (other than endorsements in the ordinary course of business of negotiable instruments for deposit or collection) guarantying any Indebtedness, leases, dividends or other obligations of any other Person in any manner, whether direct or indirect, and including, any obligation, whether or not contingent, (a) to purchase any

17

or the other Loan Documents; (b) an assumption of this Agreement, the Note, the Security Instrument and the other Loan Documents as so modified by the proposed Transferee, subject to the provisions of Section 11.22; (c) payment of all of Agent's and any Lender's expenses incurred in connection with such Transfer; (d) the delivery of a nonconsolidation opinion reflecting the proposed Transfer satisfactory in form and substance to Agent; (e) the proposed Transferee's continued compliance with the representations, warranties and covenants set forth in of this Agreement; (f) the delivery of evidence satisfactory to Agent that the single purpose nature and bankruptcy remoteness of Borrower, its shareholders, partners or members, as the case may be, following such Transfers are in accordance with the standards of Agent; (g) the proposed Transferee's ability to satisfy Agent's then-current underwriting standards; or (h) such other conditions as Agent shall determine to be in the interest of Agent, including, without limitation, the creditworthiness, reputation and qualifications of the Transferee with respect to the Loan and the Property.

## ARTICLE X

## DEFAULTS

### Section 10.1    Event of Default.

(a)    Each of the following events shall constitute an event of default hereunder (each, an "Event of Default"):

(i)    Loan Payments. If (A) any payment of principal or interest due (whether at maturity, by acceleration or as part of any payment, prepayment or otherwise) on the Loan pursuant to the Notes, this Agreement or any of the other Loan Documents, is not paid on or prior to the date the same is due, or (B) any other portion of the Debt or any other amounts payable under the Loan, which by the terms of the Loan Documents becomes due and payable (whether at maturity, by acceleration or as part of any payment, prepayment or otherwise), is not paid upon the earlier to occur of (1) the Maturity Date and (2) the date which is five (5) days after the date on which Agent gives Borrower notice that such payment is past due;

(ii)    Taxes and Other Charges. If Borrower shall fail to pay any of the Taxes or Other Charges when due, subject to Borrower's right to contest the same in accordance with Section 5.1.2;

(iii)    Policies. If the Policies are not kept in full force and effect;

(iv)    Transfers. If any voluntary Transfer shall occur, other than (A) a Permitted Transfer or (B) any Lien or Encumbrance against the Property which has not, within thirty (30) days of such Lien or Encumbrance being filed against the Property, been (x) discharged of record or (y) fully bonded, to the reasonable satisfaction of Agent;

(v)    Representations and Warranties. If any representation or warranty made by any Borrower Party herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Agent and/or Lenders shall have been false, inaccurate or misleading in any material respect as of the

*149*

date the representation or warranty was made or repeated or deemed repeated unless disclosed prior to the date remade;

(vi)    Assignment to Creditors. If any Borrower Party (1) shall make an assignment for the benefit of creditors, (2) shall generally not be paying its debts as they become due, (3) has admitted in writing its inability to pay debts or (4) is not Solvent;

(vii)    Bankruptcy. If a receiver, liquidator or trustee shall be appointed for any Borrower Party or if any Borrower Party shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy Legal Requirement, or any similar federal or state Legal Requirement, shall be filed by or against, consented to, or acquiesced in by, any Borrower Party, or if any proceeding for the dissolution or liquidation of any Borrower Party shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by such Borrower Party, upon the same not being discharged, stayed or dismissed within one hundred and twenty (120) days;

(viii)    Assignment of Loan. If any Borrower Party attempts to Transfer its rights under this Agreement or any of the other Loan Documents or any interest herein or therein;

(ix)    Ownership.    If Borrower breaches any representation, warranty or covenant contained in Section 4.1.32;

(x)    Judgments. If one or more judgments or decrees shall be entered against Borrower involving in the aggregate a liability in excess of $500,000 and shall not be covered by insurance and shall not have been vacated or bonded and stayed within thirty (30) days or against Guarantor involving in the aggregate a liability in excess of $1,000,000 and shall not be covered by insurance and shall not have been vacated or bonded and stayed within thirty (30) days;

(xi)    Reserved;

(xii)    Reserved;

(xiii)    Reserved;

(xiv)    Cross Default. If there shall be a default under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents whether as to Borrower or the Property, or if any other such event shall occur or condition shall exist if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Agent to accelerate the maturity of all or any portion of the Debt;

(xv)    Construction Suspended.    If construction of the Improvements shall, after being commenced, cease or be suspended for thirty (30) consecutive Business Days (except as provided for in the Construction Schedule) for any reason other than a Force Majeure Event;

150

(xvi) Construction Not Progressing. If, in the reasonable judgment of the Construction Consultant, (A) any of the Improvements cannot be completed by the Final Completion Date or (B) Substantial Completion cannot occur by the Substantial Completion Date, making allowance, in either case, for any permitted delay arising as a result of the occurrence of a Force Majeure Event;

(xvii) Attachment. If the Property shall be taken, attached or sequestered on execution or other process of law in any action against Borrower;

(xviii) Abandonment. If Borrower requests a termination of the Loan, confesses inability to continue or complete construction of the Improvements in accordance with this Agreement;

(xix) Fraudulent Submission. If any voucher or invoice is fraudulently submitted by Borrower in connection with any Advance for services performed or for materials used in or furnished for the Property; or

(xx) Condominium Documents. If any Borrower Party shall default under and as defined in any Condominium Document and such default remains uncured beyond any applicable notice or cure period provided for under such Condominium Document;

(xxi) Failure to Deposit into Accounts. If Borrower shall be in default of its obligations to make deposits into any Account as and when required by the terms of **Article VII** of this Agreement;

(xxii) Invalidity. If any Loan Document shall fail to be in full force and effect or to give Agent or Lenders the Liens, rights, powers and privileges purported to be created thereby, or if any Borrower Party shall assert that any Loan Document is not in full force and effect or fails to give Agent or Lenders the Liens, rights, powers and privileges purported to be created thereby; or

(xxiii) Additional Defaults. If Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in **subsections (i) to (xxii)** above (including, without limitation, any covenant contained in **Sections 5.1, 5.2, 5.3, 5.4** or **Article VIII** not specifically mentioned above), for fifteen (15) days after notice to Borrower from Agent, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Agent in the case of any other Default; provided, however, that if such non monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed one hundred and twenty (120) days.

(b) Upon the occurrence of an Event of Default (other than an Event of Default described in **clauses (iv), (vi), (vii)** or **(viii)** above) and at any time during the continuance thereof Agent may, in addition to any other rights or remedies available to it

pursuant to this Agreement and the other Loan Documents or at law, in equity or otherwise, take such action, without notice or demand, that Agent deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, whereupon the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately become due and payable and Agent may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including without limitation, all rights or remedies available at law, in equity or otherwise; and upon any Event of Default described in **clauses (iv), (vi), (vii)** or **(viii)** above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 10.2    Rights and Remedies of Agent and Lenders.

10.2.1 Remedies.

(a)    Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Agent against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law, in equity or otherwise may be exercised by Agent at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Agent shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property. Any such actions taken by Agent shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Agent may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Agent permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default exists (i) Agent is not subject to any "**one action**" or "**election of remedies**" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Agent shall remain in full force and effect until Agent has exhausted all of its remedies against the Property and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b)    Agent shall have the right from time to time following the occurrence of an Event of Default to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Agent in its sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Agent may foreclose the Security Instrument to recover such delinquent payments, or (ii) in the event Agent elects to accelerate less than the entire outstanding principal balance of the Loan, Agent may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Agent may accelerate and such other sums secured by the Security Instrument as Agent may elect. Notwithstanding one or more

*152*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:
1240 FIRST AVENUE LLC,
a Delaware limited liability company

By: _____
Name: Simon Elias
Title: Manager

[Signatures continue on following page]

[SIGNATURE PAGE TO BUILDING LOAN AGREEMENT]

**AGENT:**
**HYPO REAL ESTATE CAPITAL**
**CORPORATION,**
a Delaware corporation

By: _____
    Name: SAMUEL KIRSCHNER
    Title: MANAGING DIRECTOR

By: _____
    Name: BRIAN SCHARF
    Title: SENIOR ASSOCIATE

**LENDER[S]:**
**HYPO REAL ESTATE CAPITAL**
**CORPORATION,**
a Delaware corporation

By: _____
    Name: SAMUEL KIRSCHNER
    Title: MANAGING DIRECTOR

By: _____
    Name: BRIAN SCHARF
    Title: SENIOR ASSOCIATE

Applicable Lending Office:
622 Third Avenue
29th Floor
New York, New York 10017
Attention: Chief Financial Officer

[SIGNATURE PAGE TO BUILDING LOAN AGREEMENT]

# ACKNOWLEDGMENT

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF NEW YORK )

On the __29__ day of _June_____, in the year 2007 before me, the undersigned, a Notary Public in and for said State, personally appeared _Simon Elias_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Liya W. Beaujean_
Notary Public

LIYA W. BEAUJEAN
Notary Public, State of New York
No. 01BE5078278
Qualified in Westchester County
Commission Expires May 19, 2011

[ACKNOWLEDGMENT TO BUILDING LOAN AGREEMENT]

## ACKNOWLEDGMENT

STATE OF NEW YORK     )
                                        )ss.:
COUNTY OF NEW YORK )

On the 2ⁿᵈ day of JULY _____, in the year 2007 before me, the undersigned, a Notary Public in and for said State, personally appeared SAMUEL HIRSCHER, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
                                                              Notary Public

STEPHANE ZAVIDOW
NOTARY PUBLIC STATE OF NEW YORK
NO. 02ZA6165835
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES 5/14/2011

[ACKNOWLEDGMENT TO BUILDING LOAN AGREEMENT]

## ACKNOWLEDGMENT

STATE OF NEW YORK     )
                                          )ss.:
COUNTY OF NEW YORK )

On the 2nd day of July         , in the year 2007 before me, the undersigned,
a Notary Public in and for said State, personally appeared Brian Scharf        ,
personally known to me or proved to me on the basis of satisfactory evidence to be the
individual(s) whose name(s) is (are) subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and
that by his/her/their signature(s) on the instrument, the individual(s) or the person upon
behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

STEPHANE ZAVIDOW
NOTARY PUBLIC STATE OF NEW YORK
NO. 02ZA6165835
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES 5/14/2011

[ACKNOWLEDGMENT TO BUILDING LOAN AGREEMENT]

## ACKNOWLEDGMENT

STATE OF NEW YORK     )
                      )ss.:
COUNTY OF NEW YORK)

On the 2nd day of July , in the year 2007 before me, the undersigned, a Notary Public in and for said State, personally appeared Samuel Kirschner personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

STEPHANE ZAVIDOW
NOTARY PUBLIC STATE OF NEW YORK
NO. 02ZA6165835
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES 5/14/2011

[ACKNOWLEDGMENT TO BUILDING LOAN AGREEMENT]

## ACKNOWLEDGMENT

STATE OF NEW YORK    )
                                       )ss.:
COUNTY OF NEW YORK )

On the ___2nd___ day of __July__ _____, in the year 2007 before me, the undersigned, a Notary Public in and for said State, personally appeared __Brian Schaar__, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

                                                _____
                                                Notary Public

                                                STEPHANE ZAVIDOW
                                    NOTARY PUBLIC STATE OF NEW YORK
                                                NO. 02ZA6165835
                                        QUALIFIED IN NEW YORK COUNTY
                                        COMMISSION EXPIRES 5/14/2011

[ACKNOWLEDGMENT TO BUILDING LOAN AGREEMENT]

# EXHIBIT O

## TO DECLARATION OF
## IZAK SENBAHAR

PROJECT LOAN AGREEMENT

Dated as of July 3, 2007

among

1240 FIRST AVENUE LLC,
as Borrower,

HYPO REAL ESTATE CAPITAL CORPORATION,
as Agent

and

THE LENDERS NAMED HEREIN,
as Lenders

in the Property free and clear of all defects and encumbrances not approved by Agent's counsel, which shall contain no unacceptable survey exceptions, full coverage against mechanics' and materialmen's liens, such affirmative insurance and endorsements as Agent's counsel may require, an undertaking by the issuer thereof to provide the written notice of title continuation or endorsement referred to in Section 2 above and a pending disbursements clause in the form of **Exhibit B**; and

(c)    Borrower shall have simultaneously made a requisition for an Advance under the BLA and satisfied all conditions to the receipt of an Advance.

(d)    Subject to the terms of the BLA as incorporated herein, the Commitments shall not have been terminated.

4.    Reallocation of Costs.  If at any time the undisbursed balance of Loan proceeds for any category of cost or expense shown on **Exhibit A** is, excessive or deficient, the excess or deficiency may be reallocated in accordance with the terms of **Section 8.1.5** of the BLA.

5.    Certain General Conditions and Representations; Incorporation of Certain Provisions of BLA.

(a)    The provisions of Sections 1.2, 2.1.1(b), 2.1.2 (other than the provisions thereof that Agent in good faith determines are inapplicable to the Loan hereunder) through and including Section 2.1.5, 2.1.7, 2.1.8, 2.2, 2.3 (provided that Borrower shall not be obligated to pay any Extension Fee hereunder so long as Borrower has already paid such Extension Fee with respect to the Total Loan pursuant to the BLA), 2.4, 2.5, 2.6, 2.7, 2.8, 2.9, 2.10, 3.4, Article IV, 5.1 (other than Section 5.1.20), 5.2, 5.3, Article VI, Article VII (other than to the extent relating to the Building Loan Trust Account), Section 8.2, Articles IX through and including XIII, and all the related definitions in the BLA (other than the definitions of those terms that are otherwise defined herein), are hereby incorporated herein by reference, as if fully and completely set forth herein, so that said provisions, as incorporated herein, shall refer to and apply in all respects to the Loan, the Loan Amount, each Lender's Ratable Share, the Mortgage, the Notes and this Agreement, provided, however, that, as used in said provisions as incorporated herein, the terms "Direct Costs Loan" and "Indirect Costs Loan" shall each refer to the Loan.

(b)    The provisions of Section 10.2.5(a) of the BLA (as incorporated herein) shall also include the right of Agent, upon the occurrence and during the continuation of an Event of Default, to complete the marketing, sale and leasing of saleable or leasable space in the Improvements, enter into new sales contracts or other individual Unit contracts and/or leases and occupancy agreements with respect to the Units, and modify or amend existing sales contracts or other individual Unit contracts or leases and occupancy agreements, all as Agent shall deem to be necessary or desirable and all on terms acceptable to Agent.

6.    Counterparts.  This Agreement may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute but one and the same agreement.

3

Project Loan Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**
1240 FIRST AVENUE LLC,
a Delaware limited liability company

By:_____
    Name: Simon Elias
    Title:  Manager

[Signatures continue on following page]

[SIGNATURE PAGE TO PROJECT LOAN AGREEMENT]

**AGENT:**

HYPO REAL ESTATE CAPITAL
CORPORATION,
a Delaware corporation

By: _____

    Name:   **Samuel Kirschner**
    Title:    **Managing Director**

By: _____

    Name: BRIAN SCHARF
    Title: SENIOR ASSOCIATE

**LENDER:**

HYPO REAL ESTATE CAPITAL
CORPORATION,
a Delaware corporation

By: _____

    Name:   **Samuel Kirschner**
    Title:    **Managing Director**

By: _____

    Name: BRIAN SCHARF
    Title: SENIOR ASSOCIATE

Applicable Lending Office:
622 Third Avenue
29th Floor
New York, New York 10017
Attention: Chief Financial Officer

[SIGNATURE PAGE TO PROJECT LOAN AGREEMENT]

# EXHIBIT P

## TO DECLARATION OF IZAK SENBAHAR

# MEZZANINE LOAN AGREEMENT

Dated as of July 3, 2007

among

## 1240 FIRST AVENUE MEMBER LLC,
as Borrower,

## HYPO REAL ESTATE CAPITAL CORPORATION,
as Agent,

and

## THE LENDERS NAMED HEREIN,
as Lenders

NY 238449766

Construction Manager, Architect, any Trade Contractor or any Borrower Party (except to the extent such lack of funds arises from any Lender's default in its obligation to provide such funds in accordance with the terms of this Agreement).

"**Funding Statement**" means that certain Funding Statement, dated as of the date hereof, executed by Borrower and Agent in connection with the closing of the Loan.

"**Governmental Authority**" means any foreign or domestic national or federal government, any state, regional, local or other political subdivision thereof with jurisdiction and any Person with jurisdiction exercising executive, legislative, judicial, regulatory, administrative or quasi- administrative functions of or pertaining to government or quasi-governmental issues (including, without limitation, any court, authority, arbiter, department, office, agency, board, commission, bureau or instrumentality) of any nature whatsoever, whether now or hereafter in existence.

"**Gross Revenue**" means all revenue derived from the ownership and operation of the Property from whatever source, including, but not limited to, Rents, but excluding (a) sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, (b) non recurring revenues, (c) security deposits (except to the extent properly utilized under the applicable Lease to offset a loss of Rent under the applicable Lease), (d) refunds and uncollectible accounts, (e) Insurance Proceeds, (f) Awards (other than business interruption or other loss of income insurance related to business interruption or loss of income for the period in question), (g) Net Sales Proceeds and (h) any disbursements to Mortgage Borrower of any funds established by the Mortgage Loan Documents (except to the extent funded from the Reserve Funds).

"**Gross up Amounts**" shall have the meaning specified in **Section 2.4.8**.

"**Guaranties**" means the Completion Guaranty, the Guaranty of Recourse Obligations and the Environmental Indemnity, and each, individually, a "**Guaranty**".

"**Guarantor**" means Senbahar and Elias, jointly and severally.

"**Guaranty Obligations**" means any obligations (other than endorsements in the ordinary course of business of negotiable instruments for deposit or collection) guarantying any Indebtedness, leases, dividends or other obligations of any other Person in any manner, whether direct or indirect, and including, any obligation, whether or not contingent, (a) to purchase any such Indebtedness or other obligation or any property constituting security therefor, (b) to advance or provide funds or other support for the payment or purchase of such Indebtedness or obligation or to maintain working capital, solvency or other balance sheet condition of such other Person (including, without limitation, keep well agreements, maintenance agreements, comfort letters or similar agreement or arrangement), (c) to lease or purchase any property, securities or services primarily for the purpose of assuring the owner of such Indebtedness or obligation, or (d) to otherwise assure or hold harmless the owner of such Indebtedness or obligation against loss in respect thereof.

"**Guaranty of Recourse Obligations**" means that certain Guaranty of Recourse Obligations, dated as of the date hereof, from Guarantor in favor of Agent for the ratable benefit

**Section 9.4    Agent's Rights.**

Without obligating Agent to grant any consent under **Section 9.2** which Agent may grant or withhold in its sole discretion, Agent reserves the right to condition the consent required hereunder upon (a) a modification of the terms hereof and of this Agreement, the Note or the other Loan Documents; (b) an assumption of this Agreement, the Note, the Security Documents and the other Loan Documents as so modified by the proposed Transferee, subject to the provisions of **Section 11.22**; (c) payment of all of Agent's and any Lender's expenses incurred in connection with such Transfer; (d) the delivery of a nonconsolidation opinion reflecting the proposed Transfer satisfactory in form and substance to Agent; (e) the proposed Transferee's continued compliance with the representations, warranties and covenants set forth in Articles IV and V of this Agreement; (f) the delivery of evidence satisfactory to Agent that the single purpose nature and bankruptcy remoteness of Borrower, Mortgage Borrower and their respective shareholders, partners or members, as the case may be, following such Transfers are in accordance with the standards of Agent; (g) the proposed Transferee's ability to satisfy Agent's then-current underwriting standards; or (h) such other conditions as Agent shall determine to be in the interest of Agent, including, without limitation, the creditworthiness, reputation and qualifications of the Transferee with respect to the Loan, the Collateral and the Property.

## ARTICLE X

## DEFAULTS

**Section 10.1    Event of Default.**

(a)    Each of the following events shall constitute an event of default hereunder (each, an "**Event of Default**"):

(i)    Loan Payments.  If (A) any payment of principal or interest due (whether at maturity, by acceleration or as part of any payment, prepayment or otherwise) on the Loan pursuant to the Notes, this Agreement or any of the other Loan Documents, is not paid on or prior to the date the same is due, or (B) any other portion of the Debt or any other amounts payable under the Loan, which by the terms of the Loan Documents becomes due and payable (whether at maturity, by acceleration or as part of any payment, prepayment or otherwise), is not paid upon the earlier to occur of (1) the Maturity Date and (2) the date which is five (5) days after the date on which Agent gives Borrower notice that such payment is past due;

(ii)    Taxes and Other Charges.  If Borrower shall fail to pay or cause Mortgage Borrower to pay any of the Taxes or Other Charges when due, subject to Borrower's and Mortgage Borrower's right to contest the same in accordance with **Section 5.1.2**;

(iii)    Policies.  If the Policies are not kept in full force and effect;

(iv)    Transfers.  If any voluntary Transfer shall occur, other than (A) a Permitted Transfer or (B) any Lien against the Collateral which has not, within thirty (30) days of such Lien being filed against the Collateral, been (x) discharged of record or (y) fully bonded, to the reasonable satisfaction of Agent;

130

(v)     Representations and Warranties.  If any representation or warranty made by any Borrower Party herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Agent and/or Lenders shall have been false, inaccurate or misleading in any material respect as of the date the representation or warranty was made or repeated or deemed repeated unless disclosed prior to the date remade;

(vi)     Assignment to Creditors  If any Borrower Party (1) shall make an assignment for the benefit of creditors, (2) shall generally not be paying its debts as they become due, (3) has admitted in writing its inability to pay debts or (4) is not Solvent ;

(vii)     Bankruptcy.  If a receiver, liquidator or trustee shall be appointed for any Borrower Party or if any Borrower Party shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy Legal Requirement, or any similar federal or state Legal Requirement, shall be filed by or against, consented to, or acquiesced in by, any Borrower Party, or if any proceeding for the dissolution or liquidation of any Borrower Party shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by such Borrower Party, upon the same not being discharged, stayed or dismissed within one hundred and twenty (120) days;

(viii)     Assignment of Loan.  If any Borrower Party attempts to Transfer its rights under this Agreement or any of the other Loan Documents or any interest herein or therein;

(ix)     Ownership.  If Borrower breaches any representation, warranty or covenant contained in **Section 4.1.32**;

(x)     Judgments.  If one or more judgments or decrees shall be entered against Borrower involving in the aggregate a liability in excess of $500,000 and shall not be covered by insurance and shall not have been vacated or bonded and stayed within thirty (30) days or against Guarantor involving in the aggregate a liability in excess of $1,000,000 and shall not be covered by insurance and shall not have been vacated or bonded and stayed within thirty (30) days;

(xi)     Reserved:

(xii)     Mortgage Loan Event of Default.  If (A) a Mortgage Loan Event of Default shall occur and be continuing beyond any notice, grace and cure periods in any of the Mortgage Loan Documents, and shall not have been waived or settled by Mortgage Agent or cured by Mortgage Borrower, or (B) Mortgage Borrower enters into or otherwise suffers or permits any amendment, waiver, supplement, termination, extension, renewal, replacement or other modification of any Mortgage Loan Document without the prior written consent of Agent, such consent not to be unreasonably withheld;

(xiii)     Reserved;

131

(xiv)    Cross Default.  If there shall be a default under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents whether as to Borrower or the Collateral, or if any other such event shall occur or condition shall exist if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Agent to accelerate the maturity of all or any portion of the Debt;

(xv)    Construction  Suspended.    If  construction  of  the Improvements, shall, after being commenced, cease or be suspended for thirty (30) consecutive Business Days (except as provided for in the Construction Schedule) for any reason other than a Force Majeure Event;

(xvi)    Construction Not Progressing.    If, in the reasonable judgment of the Construction Consultant, (A) any of the Improvements cannot be completed by the Final Completion Date or (B) Substantial Completion cannot occur by the Substantial Completion Date, making allowance, in either case, for any permitted delay arising as a result of the occurrence of a Force Majeure Event;

(xvii)    Attachment.  If the Property shall be taken, attached or sequestered on execution or other process of law in any action against Borrower;

(xviii)    Abandonment.  If Borrower requests a termination of the Loan, confesses inability to continue or complete construction of the Improvements in accordance with this Agreement;

(xix)    Fraudulent Submission.    If any voucher or invoice is fraudulently submitted by Borrower or Mortgage Borrower in connection with any Advance for services performed or for materials used in or furnished for the Property; or

(xx)    Condominium Documents.    If any Borrower Party shall default under and as defined in any Condominium Document and such default remains uncured beyond any applicable notice or cure period provided for under such Condominium Document;

(xxi)    Failure to Deposit into Accounts. If Borrower shall be in default of its obligations to make deposits into any Account as and when required by the terms of **Article VII** of this Agreement;

(xxii)    Invalidity.  If any Loan Document shall fail to be in full force and effect or to give Agent or Lenders the Liens, rights, powers and privileges purported to be created thereby, or if any Borrower Party shall assert that any Loan Document is not in full force and effect or fails to give Agent or Lenders the Liens, rights, powers and privileges purported to be created thereby;

(xxiii)    Additional Defaults.  If Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in **subsections (i) to (xxii)** above (including, without limitation, any covenant contained in **Sections 5.1, 5.2, 5.3, 5.4** or **Article VIII** not specifically mentioned above), for fifteen (15) days after notice to Borrower from Agent, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Agent in the case of any other Default;

132

provided, however, that if such non monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed one hundred and twenty (120) days.

(b)    Upon the occurrence of an Event of Default (other than an Event of Default described in **clauses (iv)**, **(vi)**, **(vii)** or **(viii)** above) and at any time during the continuance thereof Agent may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law, in equity or otherwise, take such action, without notice or demand, that Agent deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, whereupon the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately become due and payable and Agent may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including without limitation, all rights or remedies available at law, in equity or otherwise; and upon any Event of Default described in **clauses (iv)**, **(vi)**, **(vii)** or **(viii)** above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

**Section 10.2    Rights and Remedies of Agent and Lenders.**

**10.2.1 Remedies.**

(a)    Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Agent against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law, in equity or otherwise may be exercised by Agent at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Agent shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Collateral. Any such actions taken by Agent shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Agent may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Agent permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default exists (i) Agent is not subject to any **"one action"** or **"election of remedies"** law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Agent shall remain in full force and effect until Agent has exhausted all of its remedies against the Collateral under the Security Documents, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

133

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**
1240 FIRST AVENUE MEMBER LLC,
a Delaware limited liability company

By: _____
    Name: Simon Elias
    Title: Manager

[Signatures continue on following page]

[SIGNATURE PAGE TO MEZZANINE LOAN AGREEMENT]

**AGENT:**
**HYPO REAL ESTATE CAPITAL**
**CORPORATION,**
a Delaware corporation

By: _____

    Name:    **Samuel Kirschner**
    Title:     **Managing Director**

By: _____

    Name:  BRIAN SCHARF
    Title:   SENIOR ASSOCIATE

**LENDER[S]:**
**HYPO REAL ESTATE CAPITAL**
**CORPORATION,**
a Delaware corporation

By: _____

    Name:    **Samuel Kirschner**
    Title:     **Managing Director**

By: _____

    Name:  BRIAN SCHARF
    Title:   SENIOR ASSOCIATE

Applicable Lending Office:
622 Third Avenue
29th Floor
New York, New York  10017
Attention:  Chief Financial Officer

[SIGNATURE PAGE TO MEZZANINE LOAN AGREEMENT]

# EXHIBIT Q

## TO DECLARATION OF IZAK SENBAHAR

BLOCK:     1345
LOTS:      25, 26, 27, 28 and 29
COUNTY:   New York
ADDRESS:  951, 953, 957, 959 and 961 First Avenue, New York, New York

As of October 12, 2007

## MORTGAGE ASSUMPTION, CONSOLIDATION, MODIFICATION AND SPREADER AGREEMENT

by and among

BANK OF AMERICA, N.A.

as Administrative Agent for "Lenders" (as hereinafter defined),
(together with its successors in such capacity, as Mortgagee)

and

OLIVER, LLC and 951 LLC

(as Mortgagor)

This instrument prepared by, and after recording please return to:

Schiff Hardin LLP
900 Third Avenue, 23rd Floor
New York, New York 10022
Attention: Graham R. Hone, Esq.

NY 50210386v4

2.    The liens of each mortgage which comprises and constitutes the Existing Mortgages are hereby spread to encumber that portion of the Premises not heretofore encumbered by any such mortgage as if the entire Premises had originally been described in and encumbered by each such mortgage comprising and constituting the Existing Mortgages.

3.    The liens of each mortgage which comprises and constitutes the Existing Mortgages, as spread hereby, and lien of the New Mortgage are hereby consolidated and coordinated so that together they shall hereafter constitute in law but one first mortgage, a valid and enforceable single lien upon the Premises, securing the Consolidated Indebtedness, together with interest accrued and to accrue thereon and all other sums secured thereby.

4.    Mortgagor hereby agrees and promises to pay the Consolidated Indebtedness and interest thereon at the rate(s) of interest and on the terms provided for the payment of principal and interest in the notes delivered by Mortgagor pursuant to and in accordance with that certain Note Consolidation Agreement (said notes, as the same may be amended, modified, extended, severed, assigned, renewed, replaced or restated, and including any substitute or replacement notes executed pursuant to the Loan Agreement are hereinafter referred to, collectively, as the "Note"), which consolidates, amends and restates the Existing Note and the New Note.

5.    The Existing Mortgages and the New Mortgage, as spread and consolidated, are hereby amended and restated in their entirety to be on the terms and provisions set forth in the New Mortgage except that (i) the definition therein of the term "Note" shall mean the Note as defined herein, (ii) the definition therein of the term

4

"Mortgage Amount" shall mean $28,320,000 and (iii) the definition therein of the term "Loan" shall mean the Loan as defined herein, and Mortgagor hereby agrees to comply with and be bound by all such terms, covenants and conditions

6.    Mortgagor hereby certifies that this Agreement secures the same indebtedness evidenced by the Existing Notes and the New Note, as consolidated, amended and restated by the Note and secured by the Existing Mortgages and the New Mortgage, as spread, consolidated and modified hereby, and secures no new or further indebtedness or obligation.

7.    Mortgagor represents and warrants that there exist no defenses, offsets or counterclaims with respect to its obligations under the Existing Mortgages and the New Mortgage, as consolidated, modified and spread hereby, or its obligations in respect of the Note.

8.    The terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their heirs, representatives, successors and assigns.

9.    This Agreement and the rights and obligations of the parties hereto shall in all respects be governed by, and construed and enforced in accordance with, the laws of the State of New York (without giving effect to New York's choice of law principles).

10.    This Agreement may be executed in multiple counterparts, each of which shall constitute an original and together which shall constitute but one and the same instrument.

11.    The information set forth on the cover hereof is incorporated herein.

NY 50210386v4

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each of the parties hereto as of the day and year first above written.

BANK OF AMERICA, N.A. (as Administrative Agent)

By _____

Dale S. Blumenthal
Vice President


OLIVER LLC, a New York limited liability company

By _____

Izak Senbahar
Manager


951 LLC, a New York limited liability company

By _____

Izak Senbahar
Manager

STATE OF NEW YORK          )
                          :   ss.:
COUNTY OF NEW YORK        )


On the 12th day of October in the year 2007, before me, the undersigned, a notary public in and for said state, personally appeared Dale S. Blumenthal, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____

Notary Public

My Commission Expires:

LYNN P. ANDERSON
Notary Public, State of New York
No. 01AN5015264
Qualified in Queens County
Commission Expires July 19, 2009

_____

STATE OF NEW YORK                    )
                                     :   ss.:
COUNTY OF NEW YORK                   )


On the 12th day of October in the year 2007, before me, the undersigned, a notary public in and for said state, personally appeared Izak Senbahar, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

My Commission Expires:

_____

LYNN P. ANDERSON
Notary Public, State of New York
No. 01AN5015264
Qualified in Queens County
Commission Expires July 19, 2009

# EXHIBIT R

## TO DECLARATION OF IZAK SENBAHAR

SECTION:   5
BLOCK:      1345
LOTS:       25, 26, 27, 28 and 29
Premises:   951, 953, 957, 959 and 961 First Avenue, New York, New York

---

Date:  October 12, 2007

## GAP MORTGAGE, ASSIGNMENT OF
## LEASES AND RENTS AND SECURITY AGREEMENT
### ("this Mortgage")

### FROM

### OLIVER, LLC,
a limited liability company organized and existing under the laws of New York
and
### 951 LLC,
a limited liability company organized and existing under the laws of New York
(jointly and severally, individually and collectively, "Mortgagor")

Address and Chief
Executive Office of Mortgagor:   150 East 58th Street
New York, New York 10155

### TO

### BANK OF AMERICA, N.A.,
as Administrative Agent for Lenders (as hereinafter defined)
(together with its successors in such capacity, "Mortgagee")

Address of Mortgagee:          1185 Avenue of the Americas, 16th Floor
New York, New York 10036

Mortgage Amount:  $19,111,079.06

---

This instrument prepared by, and after recording please return to:
Schiff Hardin LLP
900 Third Avenue, 23rd Floor
New York, New York 10022
Attention:  Graham R. Hone, Esq.

"Guarantor" means the party or parties, if any, identified as such in the Loan Agreement.

"Hazardous Materials" means any pollutant, effluents, emissions, contaminants, toxic or hazardous wastes, materials or substances, as any of those terms are defined from time to time in or for the purposes of any relevant environmental law, rule, regulation, code, permit, order, notice, demand letter or other binding determination (hereinafter, "Environmental Laws") including, without limitation, asbestos fibers and friable asbestos, polychlorinated biphenyls and any petroleum or hydrocarbon-based products or derivatives.

"Improvements" means all structures or buildings, and replacements thereof, to be erected or now or hereafter located upon the Premises, including all plant equipment, apparatus, machinery and fixtures of every kind and nature whatsoever forming part of said structures or buildings.

"Lease" or "Leases" means any lease or leases of all or any portion of the Premises.

"Lenders" means, collectively, Bank of America, N.A. and such other lending institutions who become "Lenders" pursuant to the Loan Agreement, together with their successors and permitted assigns in accordance with the terms of the Loan Agreement.

"Loan" means that portion of the loan in the Mortgage Amount made by Lenders to Mortgagor pursuant to the Loan Agreement and secured hereby.

"Loan Agreement" means that certain Fee Acquisition Loan Agreement, dated as of the date hereof, among Mortgagor, as Borrower, Bank of America, N.A., as Lender, and Mortgagee, as Administrative Agent, as the same may hereafter be amended, modified or supplemented from time to time.

"Other Loan" shall have the meaning given to such term in the Loan Agreement.

"Other Mortgages" shall have the meaning given to such term in the Loan Agreement.

"Premises" means the premises described in Schedule A, including all of the easements, rights, privileges and appurtenances (including air or development rights) thereunto belonging or in anywise appertaining, and all of the estate, right, title, interest, claim or demand whatsoever of Mortgagor therein and in the streets and ways adjacent thereto, either in law or in equity, in possession or expectancy, now or hereafter acquired, and as used herein shall, unless the context otherwise requires, be deemed to include the Improvements.

"Premises Documents" means all reciprocal easement or operating agreements, declarations, development agreements, developer's or utility agreements (other than utility easements), and any similar such agreements or declarations of record now or hereafter affecting the Premises or any part thereof.

## ARTICLE II

## EVENTS OF DEFAULT AND REMEDIES

Section 2.01. <u>Events of Default and Certain Remedies</u>.   If one or more of the following Events of Default shall happen, that is to say:

(a)    if (i) default shall be made in the payment of any principal, interest, fees or other sums under the Note or the Loan Agreement, in any such case, when and as the same shall become due and payable, whether at maturity or by acceleration or as part of any payment or prepayment or otherwise, in each case, as herein or in the Note or Loan Agreement provided, and such default shall have continued for a period of ten (10) days or (ii) default shall be made in the payment of any tax or other charge required by Section 1.07 to be paid and said default shall have continued for a period of twenty (20) days, subject to the exclusion pertaining to involuntary liens in Section 2.01(m); or

(b)    if default shall be made in the due observance or performance of any covenant, condition or agreement in the Note, the Loan Agreement, this Mortgage, any guaranty executed by Guarantor or in any other document executed or delivered to Mortgagee or Lenders in connection with the Loan (other than any such covenant, condition or agreement specifically provided for elsewhere in this Section 2.01), and such default shall have continued for a period of thirty (30) days after notice thereof shall have been given to Mortgagor by Mortgagee, unless such default cannot, with due diligence, be cured within such grace period in which case no Event of Default shall be deemed to exist so long as Mortgagor shall have commenced to cure the default within such grace period and thereafter diligently and with continuity prosecutes such cure to completion but in no event beyond ninety (90) days of such notice; or

(c)    if any representation or warranty made by Mortgagor in Section 1.01 shall be incorrect in any material respect when made, or if any other representation or warranty made to Mortgagee or Lenders in this Mortgage, the Loan Agreement, any guaranty executed by Guarantor, or in any other document, certificate or statement executed or delivered to Mortgagee or Lenders in connection with the Loan shall be incorrect in any material respect when made or remade; or

(d)    if by order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any material part thereof, or of Mortgagor shall be appointed and such order shall not be discharged or dismissed within ninety (90) days after such appointment; or

(e)    if Mortgagor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Federal Bankruptcy Act or any similar federal or state law, or if, by decree of a court of competent jurisdiction, Mortgagor shall be adjudicated a bankrupt, or be declared insolvent, or shall make

16

an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall consent to the appointment of a receiver or receivers of all or any material part of its property; or

(f)    if any of the creditors of Mortgagor shall file a petition in bankruptcy against Mortgagor or for reorganization of Mortgagor pursuant to the Federal Bankruptcy Act or any similar federal or state law, and if such petition shall not be discharged or dismissed within ninety (90) days after the date on which such petition was filed; or

(g)    if final judgment for the payment of money in excess of $500,000 shall be rendered against Mortgagor and Mortgagor shall not discharge the same or cause it to be discharged within ninety (90) days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal; or

(h)    if any of the events enumerated in clauses (d) through (g) of this Section 2.01 shall happen to Guarantor or any substantial part of its property; or

(i)    if it shall be illegal for Mortgagor to pay any tax referred to in Section 1.08 or if the payment of such tax by Mortgagor would result in the violation of applicable usury laws; or

(j)    if there shall occur a default which is not cured within the applicable grace period, if any, under any mortgage, deed of trust or other security instrument covering all or part of the Mortgaged Property regardless of whether any such mortgage, deed of trust or other security instrument is prior or subordinate hereto; it being further agreed by Mortgagor that an Event of Default hereunder shall constitute an Event of Default under any such mortgage, deed of trust or other security instrument held by Mortgagee; or

(k)    if there shall occur a default which is not cured within the later of ten (10) days after notice from Mortgagee of such default or the applicable grace period, if any, under any of the Premises Documents; or if any of the Premises Documents is amended, modified, supplemented or terminated without Mortgagee's prior consent, which shall not be unreasonably withheld, conditioned or delayed; or

(l)    except as contemplated by the Loan Agreement, if Mortgagor shall transfer (or suffer or permit the transfer), in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest or rights therein (including air or development rights) without, in any such case, the prior written consent of Mortgagee. As used in this clause, "transfer" shall include, without limitation, any sale, assignment, lease or conveyance except leases for occupancy subordinate hereto and to all advances made and to be made hereunder or, in the

17

event Mortgagor or Guarantor (or a general partner, member or co-venturer of either of them) is a partnership, joint venture, limited liability company, trust or closely-held corporation, the sale, conveyance, transfer or other disposition of more than 10%, in the aggregate, of any class of the issued and outstanding capital stock of such closely-held corporation or of the beneficial interest of such partnership, venture, limited liability company or trust, or a change of any general partner or managing member, as the case may be, or, in the event Mortgagor or Guarantor (or a general partner, co-venturer, member or beneficiary, as the case may be, of either of them) is a publicly-held corporation, the sale, conveyance, transfer or other disposition of more than 10%, in the aggregate, of the stock-holdings of any of the five (5) individuals or entities that own the greatest number of shares of each class of issued and outstanding stock. In the event Mortgagor or Guarantor is a limited partnership, and so long as a limited partner has contributed to (or remains personally liable for) the present and future partnership capital contributions required of such limited partner by the partnership agreement, such partner may sell, convey, devise, transfer or dispose of all or a part of his limited partnership interest to his spouse, children, grandchildren or a family trust in which his spouse, children or grandchildren are sole beneficiaries. Notwithstanding the foregoing, direct and indirect beneficial interests in Mortgagor may be transferred, without Mortgagee's consent, directly or indirectly through intervening entities to Izak Senbahar, Simon Elias, Nesim Bahar, Steven Elghanayan, any of their immediate family members and/or trusts for their immediate family members so long as Izak Senbahar and/or Simon Elias, directly or indirectly through intervening entities, remain in control of the day-to-day operations of Mortgagor and Mortgagor furnishes Mortgagee with prior written notice of such transfer (except transfers as a result of death); or

　　　　(m)　if Mortgagor shall encumber, or agree to encumber, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest or rights therein (including air or development rights) without, in any such case, the prior written consent of Mortgagee; provided, however, that nothing in this Section 2.01(m) shall be deemed or construed to prohibit the Other Mortgages or declaration of zoning lot restrictions, zoning lot development agreement and/or easement agreement entered into in connection with the acquisition of Additional Property pursuant to a Development Rights Purchase Agreement (as such terms are defined in the Development Rights Loan Agreement (as defined in the Loan Agreement)). As used in this clause, "encumber" shall include, without limitation, the placing or permitting the placing of any mortgage, deed of trust, assignment of rents or other security device. "Encumber" shall not include an involuntary lien bonded, discharged or insured over within thirty (30) days after notice thereof is received by Mortgagor (Mortgagee may grant or deny its consent under this clause and the immediately preceding clause in their sole discretion and, if consent should be given, any such transfer or encumbrance shall be subject hereto and to any other documents which evidence or secure the Loan, and, if a transfer, any such transferee shall assume all of Mortgagor's obligations hereunder and thereunder and agree to be bound by all provisions and perform all obligations contained

18

herein and therein; consent to one such transfer or encumbrance shall not be deemed to be a waiver of the right to require consent to future or successive transfers or encumbrances); or

(n)     if at any time the aggregate outstanding principal amount of the Note and the Other Notes (as defined in the Loan Agreement) shall exceed 52% of the then current "as is" appraised value of the Premises and Improvements (the "LTV Test") as determined by an appraisal conducted by Mortgagee, or on Mortgagee's behalf by an independent appraiser selected by it, which appraisal shall be conducted at any time but not more frequently than once in any twelve (12) month period, and which appraisal shall be conclusive absent manifest error and shall be conducted at Mortgagor's expense, and, within thirty (30) days after notice of the circumstances described above is given by Mortgagee to Mortgagor, Mortgagor fails either (x) to reduce the outstanding principal amount of the Note or the Other Notes (by a payment on the Note or the Other Notes to Mortgagee accompanied by any applicable prepayment premium or other payment provided for in the Note), or (y) to provide Mortgagee with (1) additional collateral reasonably acceptable to Mortgagee or (2) a letter of credit reasonably acceptable to Mortgagee, in each case in an amount which would be sufficient to cause compliance with the LTV Test; or

(o)     if the combined net worth or unencumbered and unrestricted liquidity of Guarantor falls below $50,000,000 and $7,500,000 respectively;

then and in every such case:

I.     During the continuance of any such Event of Default, Mortgagee, by notice to Mortgagor, may declare the entire principal of the Note then outstanding (if not then due and payable), and all accrued and unpaid interest and other sums in respect thereof, to be due and payable immediately, and upon any such declaration the principal of the Note and said accrued and unpaid interest and other sums shall become and be immediately due and payable, anything herein or in the Note or the Loan Agreement to the contrary notwithstanding.

II.     During the continuance of any such Event of Default, Mortgagee personally, or by its agents or attorneys, may enter into and upon all or any part of the Premises, and each and every part thereof, and is hereby given a right and license and appointed Mortgagor's attorney-in-fact and exclusive agent to do so, and may exclude Mortgagor, its agents and servants wholly therefrom; and having and holding the same, may use, operate, manage and control the Premises and conduct the business thereof, either personally or by its superintendents, managers, agents, servants, attorneys or receivers; and upon every such entry, Mortgagee, at the expense of the Mortgaged Property, from time to time, either by purchase, repairs or construction, may maintain and restore the Mortgaged Property, whereof it shall become possessed as aforesaid, may complete demolition of the existing improvements; and likewise, from time to time, at the expense of the Mortgaged Property, Mortgagee may make all necessary or proper

19

     IN WITNESS WHEREOF, this Mortgage has been duly executed and delivered by Mortgagor.

                      OLIVER, LLC, a New York limited liability company

                      By_____
                           Izak Senbahar
                           Manager

                      951 LLC, a New York limited liability company

                      By_____
                           Izak Senbahar
                           Manager

STATE OF NEW YORK        )
                         :  ss.:
COUNTY OF NEW YORK       )


     On the 12th day of October in the year 2007, before me, the undersigned, a notary public in and for said state, personally appeared Izak Senbahar, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

My Commission Expires:

_____

LYNN P. ANDERSON
Notary Public, State of New York
No. 01AN5015264
Qualified in Queens County
Commission Expires July 19, 2009

# EXHIBIT S

## TO DECLARATION OF IZAK SENBAHAR

FEE ACQUISITION LOAN AGREEMENT

dated as of October 12, 2007

among

OLIVER, LLC and 951 LLC,
as Borrower

and

BANK OF AMERICA, N.A.,
as Lender and Administrative Agent,

LOCATION OF PREMISES:

Block 1345, Lots 25, 26, 27, 28 and 29
951, 953, 957, 959 and 961 First Avenue
New York, New York

NY 50210127v5

FEE ACQUISITION LOAN AGREEMENT ("this Agreement") dated as of October 12, 2007 by and among OLIVER, LLC, a New York limited liability company ("Oliver"), and 951 LLC, a New York limited liability company ("951"; Oliver and 951, jointly and severally, individually and collectively, "Borrower"), BANK OF AMERICA, N.A. (in its individual capacity and not as Administrative Agent, "BofA"; BofA and each other lender who may become a Lender pursuant to Section 3.05, Section 7.20 or Section 8.13, each, a "Lender" and collectively, "Lenders") and BANK OF AMERICA, N.A., as Administrative Agent for Lenders (together with its successors in such capacity, "Administrative Agent").

Borrower desires that Lenders extend credit as provided herein, and Lenders are prepared to extend such credit on the terms and conditions hereinafter set forth. A portion of the Loan shall be used to take by assignment the mortgages (collectively, the "Existing Mortgage") described on Exhibit A attached hereto and made a part hereof and the notes (collectively, the "Existing Note") described in and secured by the Existing Mortgage, a portion of the Loan shall be used to acquire the fee premises known as 953 First Avenue, New York, New York and the balance of the Loan shall be used to finance a portion of Borrower's equity in the Mortgaged Property.

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained, Borrower, Administrative Agent and Lenders hereby agree as follows:

ARTICLE I

PARTICULAR TERMS, DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.01.    Particular Terms.  As used in this Agreement, the following terms shall have the respective meanings indicated opposite each of them; where the meaning of any term is stated to be "None", provisions involving the application of that term shall be disregarded.

"Borrower's Interest in the Premises" - Fee.

"Commitment Fee" -- The amount identified as such in the Supplemental Fee Letter.

"Guarantor" (of Payment) -- Jointly and severally, Simon Elias, an individual, Izak Senbahar, an individual, and Steven Elghanayan, an individual, and any other Person(s) who may hereafter become a guarantor of any or all of Borrower's obligations in respect of the Loan.

"Loan Amount" -- $28,320,000.

"Maturity Date" -- November 1, 2008.

Section 1.02.    Definitions.  The following terms, as used herein, shall have the following meanings:

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the day and year first above written, the execution hereof by Borrower constituting a certification by Borrower that the representations and warranties made in Article V are true and correct as of the date hereof and that the party executing on behalf of Borrower duly holds and is incumbent in the position indicated under his or her name and that each Requisition shall constitute the affirmation of Borrower that at the time thereof said representations and warranties are true and correct.

OLIVER, LLC, a New York limited liability company

By_____
    Izak Senbahar
    Manager

951 LLC, a New York limited liability company

By_____
    Izak Senbahar
    Manager

Address for notices:

c/o Alexico Management Group
150 East 58th Street
New York, New York 10155
Attention:    Mr. Izak Senbahar

BANK OF AMERICA, N.A. (as Lender and
Administrative Agent)

By _____

    Dale S. Blumenthal
    Vice President

Address for notices and Applicable Lending
Office:

Bank of America, N.A.
1185 Avenue of the Americas, 16th Floor
New York, New York 10036
Attention:    Mr. Stephen M. Soled
Telephone:    212/819-6128
Telecopy:    212/819-6111

# EXHIBIT T

## TO DECLARATION OF
## IZAK SENBAHAR

SECTION:     5
BLOCK:        1345
LOTS:          25, 26, 27, 28 and 29
Premises:     951, 953, 957, 959 and 961 First Avenue, New York, New York

Date:  April 29, 2008

## MORTGAGE, ASSIGNMENT OF
## LEASES AND RENTS AND SECURITY AGREEMENT
("this Mortgage")

FROM

OLIVER, LLC,
a limited liability company organized and existing under the laws of New York
and
951 LLC,
a limited liability company organized and existing under the laws of New York
(jointly and severally, individually and collectively, "Mortgagor")

Address and Chief
Executive Office of Mortgagor:   150 East 58th Street
New York, New York 10155

TO

BANK OF AMERICA, N.A.,
as Administrative Agent for Lenders (as hereinafter defined)
(together with its successors in such capacity, "Mortgagee")

Address of Mortgagee:            1185 Avenue of the Americas, 16th Floor
New York, New York 10036

Mortgage Amount:   $2,300,000

This instrument prepared by, and after recording please return to:
Schiff Hardin LLP
900 Third Avenue, 23rd Floor
New York, New York 10022
Attention:   Graham R. Hone, Esq.

NY 50315980v3

"Fee Acquisition Loan Agreement" means that certain Fee Acquisition Loan Agreement, dated October 12, 2007, among Mortgagor, as Borrower, Bank of America, N.A., as Lender, and Mortgagee, as Administrative Agent, as the same may hereafter be amended, modified or supplemented from time to time.

"Guarantor" means the party or parties, if any, identified as such in the Loan Agreement.

"Hazardous Materials" means any pollutant, effluents, emissions, contaminants, toxic or hazardous wastes, materials or substances, as any of those terms are defined from time to time in or for the purposes of any relevant environmental law, rule, regulation, code, permit, order, notice, demand letter or other binding determination (hereinafter, "Environmental Laws") including, without limitation, asbestos fibers and friable asbestos, polychlorinated biphenyls and any petroleum or hydrocarbon-based products or derivatives.

"Improvements" means all structures or buildings, and replacements thereof, to be erected or now or hereafter located upon the Premises, including all plant equipment, apparatus, machinery and fixtures of every kind and nature whatsoever forming part of said structures or buildings.

"Lease" or "Leases" means any lease or leases of all or any portion of the Premises.

"Lenders" means, collectively, Bank of America, N.A. and such other lending institutions who become "Lenders" pursuant to the Loan Agreement, together with their successors and permitted assigns in accordance with the terms of the Loan Agreement.

"Loan" means the Subloan (as defined in the Loan Agreement) made by Lenders to Mortgagor pursuant to the Loan Agreement and secured hereby.

"Loan Agreement" means that certain Development Rights Acquisition Loan Agreement, dated as of October 12, 2007, among Mortgagor, as Borrower, Bank of America, N.A., as Lender, and Mortgagee, as Administrative Agent, as the same may hereafter be amended, modified or supplemented from time to time.

"Other Loan" shall have the meaning given to such term in the Loan Agreement.

"Other Mortgages" shall have the meaning given to such term in the Loan Agreement.

"Premises" means the premises described in <u>Schedule A</u>, including all of the easements, rights, privileges and appurtenances (including air or development rights) thereunto belonging or in anywise appertaining, and all of the estate, right, title, interest, claim or demand whatsoever of Mortgagor therein and in the streets and ways adjacent thereto, either in law or in equity, in possession or expectancy, now or hereafter acquired, and as used herein shall, unless the context otherwise requires, be deemed to include the Improvements.

NY 50315980v3

ARTICLE II

EVENTS OF DEFAULT AND REMEDIES

Section 2.01. <u>Events of Default and Certain Remedies</u>.   If one or more of the following Events of Default shall happen, that is to say:

(a)    if (i) default shall be made in the payment of any principal, interest, fees or other sums under the Note or the Loan Agreement, in any such case, when and as the same shall become due and payable, whether at maturity or by acceleration or as part of any payment or prepayment or otherwise, in each case, as herein or in the Note or Loan Agreement provided, and such default shall have continued for a period of ten (10) days or (ii) default shall be made in the payment of any tax or other charge required by Section 1.07 to be paid and said default shall have continued for a period of twenty (20) days, subject to the exclusion pertaining to involuntary liens in Section 2.01(m); or

(b)    if default shall be made in the due observance or performance of any covenant, condition or agreement in the Note, the Loan Agreement, this Mortgage, any guaranty executed by Guarantor or in any other document executed or delivered to Mortgagee or Lenders in connection with the Loan (other than any such covenant, condition or agreement specifically provided for elsewhere in this Section 2.01), and such default shall have continued for a period of thirty (30) days after notice thereof shall have been given to Mortgagor by Mortgagee, unless such default cannot, with due diligence, be cured within such grace period in which case no Event of Default shall be deemed to exist so long as Mortgagor shall have commenced to cure the default within such grace period and thereafter diligently and with continuity prosecutes such cure to completion but in no event beyond ninety (90) days of such notice; or

(c)    if any representation or warranty made by Mortgagor in Section 1.01 shall be incorrect in any material respect when made, or if any other representation or warranty made to Mortgagee or Lenders in this Mortgage, the Loan Agreement, any guaranty executed by Guarantor, or in any other document, certificate or statement executed or delivered to Mortgagee or Lenders in connection with the Loan shall be incorrect in any material respect when made or remade; or

(d)    if by order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property or any material part thereof, or of Mortgagor shall be appointed and such order shall not be discharged or dismissed within ninety (90) days after such appointment; or

(e)    if Mortgagor shall file a petition in bankruptcy or for an arrangement or for reorganization pursuant to the Federal Bankruptcy Act or any similar federal or state law, or if, by decree of a court of competent jurisdiction, Mortgagor shall be adjudicated a bankrupt, or be declared insolvent, or shall make

16

an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall consent to the appointment of a receiver or receivers of all or any material part of its property; or

(f)     if any of the creditors of Mortgagor shall file a petition in bankruptcy against Mortgagor or for reorganization of Mortgagor pursuant to the Federal Bankruptcy Act or any similar federal or state law, and if such petition shall not be discharged or dismissed within ninety (90) days after the date on which such petition was filed; or

(g)     if final judgment for the payment of money in excess of $500,000 shall be rendered against Mortgagor and Mortgagor shall not discharge the same or cause it to be discharged within ninety (90) days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal; or

(h)     if any of the events enumerated in clauses (d) through (g) of this Section 2.01 shall happen to Guarantor or any substantial part of its property; or

(i)     if it shall be illegal for Mortgagor to pay any tax referred to in Section 1.08 or if the payment of such tax by Mortgagor would result in the violation of applicable usury laws; or

(j)     if there shall occur a default which is not cured within the applicable grace period, if any, under any mortgage, deed of trust or other security instrument covering all or part of the Mortgaged Property regardless of whether any such mortgage, deed of trust or other security instrument is prior or subordinate hereto; it being further agreed by Mortgagor that an Event of Default hereunder shall constitute an Event of Default under any such mortgage, deed of trust or other security instrument held by Mortgagee; or

(k)     if there shall occur a default which is not cured within the later of ten (10) days after notice from Mortgagee of such default or the applicable grace period, if any, under any of the Premises Documents; or if any of the Premises Documents is amended, modified, supplemented or terminated without Mortgagee's prior consent, which shall not be unreasonably withheld, conditioned or delayed; or

(l)     except as contemplated by the Loan Agreement, if Mortgagor shall transfer (or suffer or permit the transfer), in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest or rights therein (including air or development rights) without, in any such case, the prior written consent of Mortgagee. As used in this clause, "transfer" shall include, without limitation, any sale, assignment, lease or conveyance except leases for occupancy subordinate hereto and to all advances made and to be made hereunder or, in the

17

event Mortgagor or Guarantor (or a general partner, member or co-venturer of either of them) is a partnership, joint venture, limited liability company, trust or closely-held corporation, the sale, conveyance, transfer or other disposition of more than 10%, in the aggregate, of any class of the issued and outstanding capital stock of such closely-held corporation or of the beneficial interest of such partnership, venture, limited liability company or trust, or a change of any general partner or managing member, as the case may be, or, in the event Mortgagor or Guarantor (or a general partner, co-venturer, member or beneficiary, as the case may be, of either of them) is a publicly-held corporation, the sale, conveyance, transfer or other disposition of more than 10%, in the aggregate, of the stock-holdings of any of the five (5) individuals or entities that own the greatest number of shares of each class of issued and outstanding stock. In the event Mortgagor or Guarantor is a limited partnership, and so long as a limited partner has contributed to (or remains personally liable for) the present and future partnership capital contributions required of such limited partner by the partnership agreement, such partner may sell, convey, devise, transfer or dispose of all or a part of his limited partnership interest to his spouse, children, grandchildren or a family trust in which his spouse, children or grandchildren are sole beneficiaries. Notwithstanding the foregoing, direct and indirect beneficial interests in Mortgagor may be transferred, without Mortgagee's consent, directly or indirectly through intervening entities to Izak Senbahar, Simon Elias, Nesim Bahar, Steven Elghanayan, any of their immediate family members and/or trusts for their immediate family members so long as Izak Senbahar and/or Simon Elias, directly or indirectly through intervening entities, remain in control of the day-to-day operations of Mortgagor and Mortgagor furnishes Mortgagee with prior written notice of such transfer (except transfers as a result of death); or

(m)    if Mortgagor shall encumber, or agree to encumber, in any manner, either voluntarily or involuntarily, by operation of law or otherwise, all or any portion of the Mortgaged Property, or any interest or rights therein (including air or development rights) without, in any such case, the prior written consent of Mortgagee; provided, however, that nothing in this Section 2.01(m) shall be deemed or construed to prohibit the Other Mortgages or declaration of zoning lot restrictions, zoning lot development agreement and/or easement agreement entered into in connection with the acquisition of Additional Property pursuant to a Development Rights Purchase Agreement (as such terms are defined in the Loan Agreement). As used in this clause, "encumber" shall include, without limitation, the placing or permitting the placing of any mortgage, deed of trust, assignment of rents or other security device. "Encumber" shall not include an involuntary lien bonded, discharged or insured over within thirty (30) days after notice thereof is received by Mortgagor (Mortgagee may grant or deny its consent under this clause and the immediately preceding clause in their sole discretion and, if consent should be given, any such transfer or encumbrance shall be subject hereto and to any other documents which evidence or secure the Loan, and, if a transfer, any such transferee shall assume all of Mortgagor's obligations hereunder and thereunder and agree to be bound by all provisions and perform all obligations contained herein and therein; consent to one such transfer or encumbrance shall

NY 50315980v3

not be deemed to be a waiver of the right to require consent to future or successive transfers or encumbrances); or

(n)    if at any time the aggregate outstanding principal amount of the Note, any other notes then evidencing any other Subloan (collectively, the "Other Development Rights Notes") and the Other Notes (as defined in the Loan Agreement) shall exceed 52% of the then current "as is" appraised value of the Premises and Improvements (the "LTV Test") as determined by an appraisal conducted by Mortgagee, or on Mortgagee's behalf by an independent appraiser selected by it, which appraisal shall be conducted at any time but not more frequently than once in any twelve (12) month period, and which appraisal shall be conclusive absent manifest error and shall be conducted at Mortgagor's expense, and, within thirty (30) days after notice of the circumstances described above is given by Mortgagee to Mortgagor, Mortgagor fails either (x) to reduce the outstanding principal amount of the Note, the Other Development Rights Notes or the Other Notes (by a payment on the Note, the Other Development Rights Notes or the Other Notes to Mortgagee accompanied by any applicable prepayment premium or other payment provided for in the Loan Agreement), or (y) to provide Mortgagee with (1) additional collateral reasonably acceptable to Mortgagee or (2) a letter of credit reasonably acceptable to Mortgagee, in each case in an amount which would be sufficient to cause compliance with the LTV Test; or

(o)    if the combined net worth or unencumbered and unrestricted liquidity of Guarantor falls below $50,000,000 and $7,500,000 respectively;

then and in every such case:

I.    During the continuance of any such Event of Default, Mortgagee, by notice to Mortgagor, may declare the entire principal of the Note then outstanding (if not then due and payable), and all accrued and unpaid interest and other sums in respect thereof, to be due and payable immediately, and upon any such declaration the principal of the Note and said accrued and unpaid interest and other sums shall become and be immediately due and payable, anything herein or in the Note or the Loan Agreement to the contrary notwithstanding.

II.    During the continuance of any such Event of Default, Mortgagee personally, or by its agents or attorneys, may enter into and upon all or any part of the Premises, and each and every part thereof, and is hereby given a right and license and appointed Mortgagor's attorney-in-fact and exclusive agent to do so, and may exclude Mortgagor, its agents and servants wholly therefrom; and having and holding the same, may use, operate, manage and control the Premises and conduct the business thereof, either personally or by its superintendents, managers, agents, servants, attorneys or receivers; and upon every such entry, Mortgagee, at the expense of the Mortgaged Property, from time to time, either by purchase, repairs or construction, may maintain and restore the Mortgaged Property, whereof it shall become possessed as aforesaid, may complete

19

demolition of the existing improvements; and likewise, from time to time, at the expense of the Mortgaged Property, Mortgagee may make all necessary or proper repairs, renewals and replacements and such useful alterations, additions, betterments and improvements thereto and thereon as to it may deem advisable; and in every such case Mortgagee shall have the right to manage and operate the Mortgaged Property and to carry on the business thereof and exercise all rights and powers of Mortgagor with respect thereto either in the name of Mortgagor or otherwise as it shall deem best; and Mortgagee shall be entitled to collect and receive the Rents and every part thereof, all of which shall for all purposes constitute property of Mortgagor; and in furtherance of such right Mortgagee may collect the rents payable under all leases of the Premises directly from the lessees thereunder upon notice to each such lessee that an Event of Default exists hereunder accompanied by a demand on such lessee for the payment to Mortgagee of all rents due and to become due under its lease, and Mortgagor FOR THE BENEFIT OF MORTGAGEE AND EACH SUCH LESSEE hereby covenants and agrees that the lessee shall be under no duty to question the accuracy of Mortgagee's statement of default and shall unequivocally be authorized to pay said rents to Mortgagee without regard to the truth of Mortgagee's statement of default and notwithstanding notices from Mortgagor disputing the existence of an Event of Default such that the payment of rent by the lessee to Mortgagee pursuant to such a demand shall constitute performance in full of the lessee's obligation under the lease for the payment of rents by the lessee to Mortgagor; and after deducting the expenses of conducting the business thereof and of all maintenance, repairs, renewals, replacements, alterations, additions, betterments and improvements and amounts necessary to pay for taxes, assessments, insurance and prior or other proper charges upon the Mortgaged Property or any part thereof, as well as just and reasonable compensation for the services of Mortgagee and for all attorneys, counsel, agents, clerks, servants and other employees by it engaged and employed, Mortgagee shall apply the moneys arising as aforesaid, first, to the payment of the principal of the Note and the interest thereon, when and as the same shall become payable and in such order and proportions as Mortgagee shall elect and second, to the payment of any other sums required to be paid by Mortgagor hereunder or under the Loan Agreement.

III.    Mortgagee, with or without entry, personally or by its agents or attorneys, insofar as applicable, may:

(1)    sell the Mortgaged Property to the extent permitted and pursuant to the procedures provided by law (including, without limitation, if all or any part of the Premises is located in the State of New York, in accordance with Article 14 of the New York Real Property Actions and Proceedings Law), and all estate, right, title and interest, claim and demand therein, and right of redemption thereof, at one (1) or more sales as an entity or in parcels or parts, and at such time and place upon such terms and after such notice thereof as may be required or permitted by law; or

20

(2)    institute proceedings for the complete or partial foreclosure hereof; or

(3)    take such steps to protect and enforce its rights whether by action, suit or proceeding in equity or at law for the specific performance of any covenant, condition or agreement in the Note, the Loan Agreement or herein, or in aid of the execution of any power herein granted, or for any foreclosure hereunder, or for the enforcement of any other appropriate legal or equitable remedy or otherwise as Mortgagee shall elect.

Section 2.02.    Other Matters Concerning Sales.

(a)    Mortgagee may adjourn from time to time any sale by it to be made hereunder or by virtue hereof by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable provision of law, Mortgagee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(b)    Upon the completion of any sale or sales made by Mortgagee under or by virtue of this Article II, Mortgagee, or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument or instruments conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold. Mortgagee is hereby appointed the true and lawful irrevocable attorney of Mortgagor, in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold under or by virtue of this Article and for that purpose Mortgagee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, Mortgagor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Nevertheless, Mortgagor, if requested by Mortgagee, shall ratify and confirm any such sale or sales by executing and delivering to Mortgagee or to such purchaser or purchasers all such instruments as may be advisable, in the reasonable judgment of Mortgagee, for the purpose, and as may be designated in such request. Any such sale or sales made under or by virtue of this Article II, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Mortgagor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Mortgagor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under Mortgagor.

(c)    In the event of any sale or sales made under or by virtue of this Article II (whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale), the entire principal of, and interest and other sums on, the Note, if not previously due and payable, and all other sums required to be paid by Mortgagor pursuant hereto or to the Loan Agreement,

NY 50315980v3

IN WITNESS WHEREOF, this Mortgage has been duly executed and delivered by Mortgagor.

OLIVER, LLC, a New York limited liability company

By _____
   Izak Senbahar
   Co-Manager

951 LLC, a New York limited liability company

By:   Oliver, LLC, a New York limited liability company, sole member

By _____
   Izak Senbahar
   Co-Manager

STATE OF NEW YORK          )
                           :  ss.:
COUNTY OF NEW YORK         )


     On the __28__ day of April in the year 2008, before me, the undersigned, a notary public in and for said state, personally appeared Izak Senbahar, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


                                       *Liya W. Beaujean*
                                       Notary Public

**My Commission Expires:**
      LIYA W. BEAUJEAN
   Notary Public, State of New York
      No. 01BE5078278
   Qualified in Westchester County
Commission Expires May 19, 2011

# EXHIBIT U

## TO DECLARATION OF IZAK SENBAHAR

DEVELOPMENT RIGHTS ACQUISITION LOAN AGREEMENT

Dated as of October 12, 2007

among

OLIVER, LLC and 951 LLC,
as Borrower

and

BANK OF AMERICA, N.A.,
as Lender and Administrative Agent,

LOCATION OF PREMISES:

Block 1345, Lots 25, 26, 27, 28 and 29
951, 953, 957, 959 and 961 First Avenue
New York, New York

NY 50210103v5

DEVELOPMENT RIGHTS ACQUISITION LOAN AGREEMENT (this "Agreement"), dated as of October 12, 2007, among OLIVER, LLC, a New York limited liability company ("Oliver"), and 951 LLC, a New York limited liability company ("951"; Oliver and 951, jointly and severally, individually and collectively, "Borrower"), BANK OF AMERICA, N.A. (in its individual capacity and not as Administrative Agent, "BofA"; BofA and such other lenders as may become Lenders pursuant to Section 3.05, 7.16, 7.20 or 8.13 of the Fee Acquisition Loan Agreement (as defined below), as incorporated herein pursuant to paragraph 4 below, individually, a "Lender" and collectively, "Lenders"), and BANK OF AMERICA, N.A., as administrative agent for Lenders (together with its successors in such capacity, "Administrative Agent").

Borrower desires that Lenders extend credit as provided herein, and Lenders are prepared to extend such credit on the terms and conditions hereinafter set forth. Accordingly, Borrower, Administrative Agent and Lenders agree as follows:

1.  <u>Loan</u>.

(a)     On the basis of the representations, warranties and covenants made by Borrower herein and in the Fee Acquisition Loan Agreement, and subject to Borrower's satisfaction of the conditions herein set forth, each Lender agrees to advance its Pro Rata Share (as defined below) of, and Borrower agrees to accept, a loan (the "Loan") in the amount of up to $11,480,000 (the "Loan Amount"), which shall be advanced from time to time after the date hereof as contemplated in paragraphs 2 and 3 below. The Loan shall be evidenced by the Note (as herein defined) and shall be secured by the Mortgage (as herein defined) of Borrower's interest in respect of the real property described in Schedule A of the Mortgage (the "Premises"). Performance of certain of Borrower's obligations hereunder and under the Note and the Mortgage shall be guaranteed by an instrument(s) (the "Guaranty") executed by the persons or entities identified as "Guarantor" in the fee acquisition loan agreement (the "Fee Acquisition Loan Agreement") of even date herewith among Borrower, Lenders and Administrative Agent. This Agreement, the Note, the Mortgage, Uniform Commercial Code financing statements in respect of the "Mortgaged Property" (as such quoted term is defined in the Mortgage) and any other collateral given as security for the Loan, and any other documents which evidence or secure the Loan are hereinafter referred to collectively as the "Loan Documents", provided, however, that, until such time as the note(s), the mortgage and the other documents referred to in Section 3 are executed and delivered by Borrower with respect to each Subloan (as herein defined), references herein to the "Loan Documents" shall not include any such documents.

The Loan Amount shall be advanced from time to time as provided herein in order to provide a portion of the amounts necessary for Borrower to acquire the Additional Property (as herein defined) in question and/or in connection with amounts incurred by Borrower to terminate any existing tenancies with respect to the Mortgaged Property. Lenders shall fund each advance of the Loan ratably in accordance with the respective undisbursed amounts of their Individual Loan Commitments. For purposes of this Agreement, "Individual Loan Commitment" means, with respect to each Lender, the amount set forth in the table below opposite the name of such Lender (subject to

IN WITNESS WHEREOF, Borrower, Lenders and Administrative Agent have caused this Agreement to be executed the day and year first above written.

OLIVER, LLC, a New York limited liability company

By _____
Izak Senbahar
Manager

951 LLC, a New York limited liability company

By _____
Izak Senbahar
Manager

Address for notices:

150 East 58th Street
New York, New York 10155
Attention:      Mr. Izak Senbahar

BANK OF AMERICA, N.A. (as Lender and Administrative Agent)

By _____
Dale S. Blumenthal
Vice President

Address for notices:

Bank of America, N.A.
1185 Avenue of the Americas, 16th Floor
New York, New York 10036
Attention:      Mr. Stephen M. Soled
Telephone:      212/819-6128
Telecopy:      212/819-6111

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NESIM BAHAR, SIMON ELIAS, JACQUELINE M. C. ELIAS, IZAK SENBAHAR and SARAH SENBAHAR, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | 08 Civ. 4738 (WHP) |
| | ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |

### <u>DECLARATION OF NESIM BAHAR</u>

I, Nesim Bahar, hereby affirm and attest that the following statements are true to the best of my knowledge and belief:

1.      I have not received notices of deficiency from the Internal Revenue Service for any of the tax years 2002 through 2005.

2.      I have been advised that none of the other plaintiffs in this case have received notices of deficiency from the Internal Revenue Service for any of the tax years 2002 through 2005.

3.      The loans listed in Paragraph 4 of the Declaration of Izak Senbahar, which is attached hereto as Exhibit A, represent a portion of the outstanding financing that has been incurred with respect to the real estate business that I operate with Plaintiffs Izak Senbahar and Simon Elias.

4.      I believe that if the Internal Service were to levy on or publish federal tax liens on the assets of Plaintiffs Senbahar and Elias, the levies and/or liens would result in some or all of the above referenced loans being accelerated or would result in no further advances under the

loans. The continued vitality of these loans is critical to our development business and in particular to a number of projects which are currently under construction.

5.    If the above referenced loans are impeded as a result of levies and/or liens by the Internal Revenue Service, the effect would be a substantial, material, deleterious harm to our development business, and that this harm would be permanent and irreparable.

I declare, under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 26, 2008, in New York, New York.

NESIM BAHAR

# EXHIBIT A

## TO DECLARATION OF NESIM BAHAR

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NESIM BAHAR, SIMON ELIAS,<br>JACQUELINE M. C. ELIAS, IZAK<br>SENBAHAR and SARAH SENBAHAR,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) 08 Civ. 4738 (WHP)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF IZAK SENBAHAR

I, Izak Senbahar, hereby affirm and attest that the following statements are true to the best of my knowledge and belief:

1.    I have not received notices of deficiency from the Internal Revenue Service for any of the tax years 2002 through 2005.

2.    I have been advised that none of the other plaintiffs in this case have received notices of deficiency from the Internal Revenue Service for any of the tax years 2002 through 2005.

3.    I am the tax matters partner for Kislev Partners, L.P. I have not received a notice of final partnership administrative adjustment for the tax years 2003 through 2005.

4.    Attached to this Declaration are true and correct copies of the following documents, which were prepared, kept and maintained in the ordinary course of my real estate business:

**Exhibit A.**    Default and remedy provisions of an Amended and Restated Term Loan Agreement dated as of September 22, 2005.

**Exhibit B.**  Covenant provisions of an Amended and Restated Guaranty dated September 22, 2005.

**Exhibit C.**  Conditions to funding provision of a Building Loan Agreement dated as of December 20, 2007.

**Exhibit D.**  Default and remedy provisions of a Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated December 20, 2007.

**Exhibit E.**  Covenant provisions of a Limited Guaranty of Payment dated December 20, 2007.

**Exhibit F.**  Covenant provisions of a Completion Costs Guaranty dated December 20, 2007.

**Exhibit G.**  Default and remedy provisions of a Leasehold Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated December 20, 2007.

**Exhibit H.**  Conditions to funding provision of a Building Loan Agreement dated as of December 20, 2007.

**Exhibit I.**  Covenant provisions of an Amended and Restated Guaranty of Payment dated December 20, 2007.

**Exhibit J.**  Covenant provisions of a Completion Costs Guaranty dated December 20, 2007

**Exhibit K.**  Default and remedy provisions of an Amended and Restated Mezzanine Loan Agreement dated December 2007.

**Exhibit L.**  Covenant provisions of an Amended and Restated Guaranty of Payment dated as of December 20, 2007.

**Exhibit M.**  Covenant provisions of a Completion Costs Guaranty dated December 20, 2007.

**Exhibit N.**  Default and remedy provisions of a Building Loan Agreement dated July 3, 2007.

**Exhibit O.**  Incorporation provision of a Project Loan Agreement dated July 3, 2007.

**Exhibit P.**  Default and remedy provisions of a Mezzanine Loan Agreement dated July 3, 2007.

**Exhibit Q.**  Incorporation provision of a Mortgage Assumption, Consolidation, Modification and Spreader Agreement dated October 12, 2007.

**Exhibit R.**    Default and remedy provisions of a Gap Mortgage, Assignment of Leases and Rents and Security Agreement dated October 12, 2007.

**Exhibit S.**    Definition provision of a Fee Acquisition Loan Agreement dated October 12, 2007.

**Exhibit T.**    Default and remedy provisions of a Mortgage, Assignment of Leases and Rents and Security Agreement dated April 29, 2008.

**Exhibit U.**    Definition provision of a Development Rights Acquisition Loan Agreement dated October 12, 2007.

5.    The loans listed above represent a portion of the outstanding financing that has been incurred with respect to the real estate business that I operate with Plaintiffs Simon Elias and Nesim Bahar.

6.    Plaintiff Simon Elias and I have provided personal guaranties with respect to the majority of the financing incurred in our real estate business, including the financing listed above. These guaranties included specific financial covenants.

7.    If the Internal Revenue Service were to levy on or publish a federal tax lien on my assets and Plaintiff Elias's assets, our combined unencumbered, unrestricted liquid assets would be less than $5 million. In fact, we would have no unencumbered, unrestricted liquid assets.

8.    I believe that such levies and/or liens would result in some or all of the above listed loans being accelerated or would result in no further advances under the loans. The continued vitality of these loans is critical to our development business and in particular to a number of projects which are currently under construction.

9.    If the above listed loans are impeded as a result of levies and/or liens by the Internal Revenue Service, the effect would be a substantial, material, deleterious harm to our development business, and that this harm would be permanent and irreparable.

10.    While some of our loan agreements permit us to avoid triggering events of default by putting up bonds within 30 days of an attachment or judgment being levied on our assets, it

3

would be impossible to obtain such a bond in this case as this would require us to put up a minimum of $46 million in unencumbered liquid assets. The bonding process, remote and tenuous at best, would be tantamount to a levy.

I declare, under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 26, 2008, in New York, New York.

IZAK SENBAHAR

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NESIM BAHAR, SIMON ELIAS, JACQUELINE M. C. ELIAS, IZAK SENBAHAR and SARAH SENBAHAR, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) 08 Civ. 4738 (WHP) ) |
| UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) ) |

## DECLARATION OF SIMON ELIAS

I, Simon Elias, hereby affirm and attest that the following statements are true to the best of my knowledge and belief:

1.    I have not received notices of deficiency from the Internal Revenue Service for any of the tax years 2002 through 2005.

2.    I have been advised that none of the other plaintiffs have received notices of deficiency from the Internal Revenue Service for any of the tax years 2002 through 2005.

3.    The loans listed in Paragraph 4 of the Declaration of Izak Senbahar, which is attached hereto as Exhibit A, represent a portion of the outstanding financing that has been incurred with respect to the real estate business that I operate with Plaintiffs Izak Senbahar and Nesim Bahar.

4.    Plaintiff Izak Senbahar and I have provided personal guaranties for the majority of the loans incurred in our real estate business, including the loans specifically listed in Paragraph 4 of the Declaration of Izak Senbahar.  These guarantees included specific financial covenants.

5.      If the Internal Revenue Service were to levy on or publish a federal tax lien on my assets and Plaintiff Senbahar's assets, our combined unencumbered, unrestricted liquid assets would be less than $5 million.  In fact, we would have no unencumbered, unrestricted liquid assets.

6.      I believe that such levies and/or liens would result in some or all of the above referenced loans being accelerated or would result in no further advances under the loans.  The continued vitality of these loans is critical to our development business and in particular to a number of projects which are currently under construction.

7.      If the above referenced loans are impeded as a result of levies and/or liens by the Internal Revenue Service, the effect would be a substantial, material, deleterious harm to our development business, and that this harm would be permanent and irreparable.

8.      While some of our loan agreements permit us to avoid triggering events of default by putting up bonds within 30 days of an attachment or judgment being levied on our assets, it would be impossible to obtain such a bond in this case as this would require us to put up a minimum of $46 million in unencumbered liquid assets.  The bonding process, remote and tenuous at best, would be tantamount to a levy.

I declare, under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 26, 2008, in New York, New York.

_____
SIMON ELIAS

2

# EXHIBIT A

## TO DECLARATION OF SIMON ELIAS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NESIM BAHAR, SIMON ELIAS, JACQUELINE M. C. ELIAS, IZAK SENBAHAR and SARAH SENBAHAR, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 08 Civ. 4738 (WHP) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF IZAK SENBAHAR

I, Izak Senbahar, hereby affirm and attest that the following statements are true to the best of my knowledge and belief:

1. I have not received notices of deficiency from the Internal Revenue Service for any of the tax years 2002 through 2005.

2. I have been advised that none of the other plaintiffs in this case have received notices of deficiency from the Internal Revenue Service for any of the tax years 2002 through 2005.

3. I am the tax matters partner for Kislev Partners, L.P. I have not received a notice of final partnership administrative adjustment for the tax years 2003 through 2005.

4. Attached to this Declaration are true and correct copies of the following documents, which were prepared, kept and maintained in the ordinary course of my real estate business:

**Exhibit A.**    Default and remedy provisions of an Amended and Restated Term Loan Agreement dated as of September 22, 2005.

**Exhibit B.**    Covenant provisions of an Amended and Restated Guaranty dated September 22, 2005.

**Exhibit C.**    Conditions to funding provision of a Building Loan Agreement dated as of December 20, 2007.

**Exhibit D.**    Default and remedy provisions of a Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated December 20, 2007.

**Exhibit E.**    Covenant provisions of a Limited Guaranty of Payment dated December 20, 2007.

**Exhibit F.**    Covenant provisions of a Completion Costs Guaranty dated December 20, 2007.

**Exhibit G.**    Default and remedy provisions of a Leasehold Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated December 20, 2007.

**Exhibit H.**    Conditions to funding provision of a Building Loan Agreement dated as of December 20, 2007.

**Exhibit I.**    Covenant provisions of an Amended and Restated Guaranty of Payment dated December 20, 2007.

**Exhibit J.**    Covenant provisions of a Completion Costs Guaranty dated December 20, 2007

**Exhibit K.**    Default and remedy provisions of an Amended and Restated Mezzanine Loan Agreement dated December 2007.

**Exhibit L.**    Covenant provisions of an Amended and Restated Guaranty of Payment dated as of December 20, 2007.

**Exhibit M.**    Covenant provisions of a Completion Costs Guaranty dated December 20, 2007.

**Exhibit N.**    Default and remedy provisions of a Building Loan Agreement dated July 3, 2007.

**Exhibit O.**    Incorporation provision of a Project Loan Agreement dated July 3, 2007.

**Exhibit P.**    Default and remedy provisions of a Mezzanine Loan Agreement dated July 3, 2007.

**Exhibit Q.**    Incorporation provision of a Mortgage Assumption, Consolidation, Modification and Spreader Agreement dated October 12, 2007.

**Exhibit R.**    Default and remedy provisions of a Gap Mortgage, Assignment of Leases and Rents and Security Agreement dated October 12, 2007.

**Exhibit S.**    Definition provision of a Fee Acquisition Loan Agreement dated October 12, 2007.

**Exhibit T.**    Default and remedy provisions of a Mortgage, Assignment of Leases and Rents and Security Agreement dated April 29, 2008.

**Exhibit U.**    Definition provision of a Development Rights Acquisition Loan Agreement dated October 12, 2007.

5.    The loans listed above represent a portion of the outstanding financing that has been incurred with respect to the real estate business that I operate with Plaintiffs Simon Elias and Nesim Bahar.

6.    Plaintiff Simon Elias and I have provided personal guaranties with respect to the majority of the financing incurred in our real estate business, including the financing listed above. These guaranties included specific financial covenants.

7.    If the Internal Revenue Service were to levy on or publish a federal tax lien on my assets and Plaintiff Elias's assets, our combined unencumbered, unrestricted liquid assets would be less than $5 million. In fact, we would have no unencumbered, unrestricted liquid assets.

8.    I believe that such levies and/or liens would result in some or all of the above listed loans being accelerated or would result in no further advances under the loans. The continued vitality of these loans is critical to our development business and in particular to a number of projects which are currently under construction.

9.    If the above listed loans are impeded as a result of levies and/or liens by the Internal Revenue Service, the effect would be a substantial, material, deleterious harm to our development business, and that this harm would be permanent and irreparable.

10.    While some of our loan agreements permit us to avoid triggering events of default by putting up bonds within 30 days of an attachment or judgment being levied on our assets, it

3

would be impossible to obtain such a bond in this case as this would require us to put up a minimum of $46 million in unencumbered liquid assets. The bonding process, remote and tenuous at best, would be tantamount to a levy.

I declare, under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 26, 2008, in New York, New York.

IZAK SENBAHAR

4